UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ADRIAN BENJAMIN,

Plaintiff,

v. 3:26-CV-1703 (ECC/ML)

INVESTIGATOR WALTER, Badge No. 1233, Individual and Official Capacity; and COUNTY OF TOMPKINS,

Defendants.

---

APPEARANCES: OF COUNSEL:

ADRIAN BENJAMIN
Plaintiff, *Pro Se*
99 Turkey Hill Road
Berkshire, New York 13736-1502

MIROSLAV LOVRIC, United States Magistrate Judge

**ORDER and REPORT-RECOMMENDATION**

Plaintiff Adrian Benjamin ("Plaintiff") commenced this *pro se* action against Defendants Investigator Walter and County of Tompkins (collectively "Defendants") alleging violations of his civil rights. (Dkt. No. 1.) Plaintiff did not pay the filing fee and seeks leave to proceed *in forma pauperis* ("IFP"). (Dkt. No. 2.) For the reasons set forth below, I (1) grant Plaintiff's IFP application, and (2) recommend that the Complaint be accepted in part for filing and dismissed in part.

## I. BACKGROUND

Construed as liberally[1] as possible, the Complaint alleges violations of Plaintiff's civil rights by Defendants. (*See generally* Dkt. No. 1.)

More specifically, Plaintiff alleges that on January 13, 2025, he was operating a motor vehicle in the Village of Dryden, in Tompkins County, New York, when Defendant Walter conducted a traffic stop of his vehicle. (Dkt. No. 1 at ¶¶ 11-12.) Plaintiff alleges that he provided Defendant Walter with his driver's license and "satisf[ied] the lawful mission of the traffic stop." (*Id*. at ¶¶ 13-14.) The Complaint alleges that Defendant Walter prolonged Plaintiff's detention to demand that Plaintiff disclose his social security number and threatened to arrest and incarcerate Plaintiff if he did not immediately provide his social security number. (*Id*. at ¶¶ 15-18.) Plaintiff alleges that under fear and duress, he disclosed his social security number. (*Id*. at ¶ 19.)

Based on these factual allegations, the Complaint asserts the following three causes of action: (1) a claim of unlawful seizure pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim that Defendant violated Section 7 of the Privacy Act of 1974; and (3) a claim of coercion/intimidation under duress pursuant to New York tort law. (Dkt. No. 1 at ¶¶ 21-26.) As relief, Plaintiff seeks compensatory damages in the amount of $10,000,000.00 and punitive damages in an amount to be determined. (Dkt. No. 1 at 3.)

Plaintiff seeks leave to proceed IFP. (Dkt. No. 2.)

---

[1] The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1).[2] After reviewing Plaintiff's IFP application (Dkt. No. 2), the Court finds that Plaintiff meets this standard.[3] Therefore, Plaintiff's application to proceed IFP is granted.[4]

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief

---

[2] The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[3] Plaintiff is reminded that proceeding IFP is always a privilege, not an unqualified right. Misuse of the IFP process by a litigant, such as repetitive filing of frivolous lawsuits, may result in the denial of a request to proceed IFP.

[4] Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

### A. Claim Pursuant to 42 U.S.C. § 1983

#### 1. Against Defendant County of Tompkins

"[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Adams v. City of Syracuse*, 21-CV-0650, 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (Nardacci, J.) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)). A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted).

The Complaint here essentially complains of one discrete incident on January 13, 2025, during which Plaintiff was allegedly treated improperly by an employee of Defendant County of Tompkins. (*See generally* Dkt. No. 1.) Plaintiff fails to assert facts plausibly suggesting a policy or custom, which would support municipal liability based on these facts. *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a Monell claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.);

*Wright v. City of Syracuse*, 10-CV-0661, 2014 WL 1293527, at *15 (N.D.N.Y. Mar. 31, 2014) (Suddaby, J.) ("Isolated acts of municipal employees are typically not sufficient to establish municipal liability."). In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Defendant County of Tompkins.

As a result, I recommend that any claims against Defendant County of Tompkins be dismissed for failure to state a claim upon which relief may be granted.

In addition, to the extent that the Complaint asserts claims against Defendant Walter in his official capacity, I recommend that those claims be dismissed for failure to state a claim upon which relief may be granted. *See Malay v. City of Syracuse*, 638 F. Supp. 2d 303, 311 (N.D.N.Y. 2009) (McCurn, J.) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)) (holding that "claims against a government employee in his official capacity are treated as a claim against the municipality.").

**2. Against Defendant Walter in His Individual Capacity**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on state and municipal officers such as Defendant Walter. *See Tsinberg v. City of New York*, 20-CV-0749, 2021 WL 1146942, at *10 (S.D.N.Y. Mar. 25, 2021) (citing *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010)).

"Police stops such as the traffic stop at the center of this case fall into two categories: arrests and so-called *Terry* stops." *Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 295 (S.D.N.Y. 2020) (citing *Grice v. McVeigh*, 873 F.3d 162, 166-67 (2d Cir. 2017)). Importantly, "[a]rrests require probable cause, while a police officer may make a *Terry* stop 'as long as the officer has reasonable suspicion that the person to be detained is committing or has

committed a criminal offense.'" *Grice*, 873 F.3d at 167 (quoting *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016)). "The standard for reasonable suspicion is 'not high,' and is less than what probable cause requires." *Id.* (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (internal citation omitted)). Courts tasked with determining the existence of reasonable suspicion must weigh the totality of the circumstances as they would appear through the eyes of a reasonable and cautious police officer, guided by his experience and training. *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015).

The test for determining whether a *Terry* stop is taking place "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). A *Terry* stop requiring reasonable suspicion may ripen into a *de facto* arrest requiring probable cause "if the means of detention are 'more intrusive than necessary.'" *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (quoting *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993)).

A *Terry* stop initially justified by reasonable suspicion may still violate the Fourth Amendment if it is extended unreasonably." *United States v. Compton*, 830 F.3d 55, 64 (2d Cir. 2016). This is because "[i]f an investigative stop based on reasonable suspicion continues too long . . . , it will ripen into a *de facto* arrest that must be based on probable cause." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992). While there is "no rigid time limitation on Terry stops," *United States v. Sharpe*, 470 U.S. 675, 685 (1985), "the detention can continue only for the period of time necessary to either verify or dispel the suspicion," *United States v. Watson*, 787 F.3d 101, 105 (2d Cir. 2015) (internal quotation marks and alteration omitted).

Similarly, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop"

and to "attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)) (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation"). "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop[,]" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. Unrelated inquiries, while permissible, violate the Fourth Amendment where they prolong or add time to a traffic stop absent reasonable suspicion of a separate crime. *Id.* at 354-55; *see United States v. Gomez*, 877 F.3d 76, 90 (2d Cir. 2017); *see also United States v. Drayton*, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means.").

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment unlawful seizure claim against Defendant Walter in his individual capacity for the extension of the traffic stop.

**B. Claim Pursuant to the Privacy Act of 1974**

The Complaint asserts claims pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a, which provides for certain privacy protections for the records of individuals maintained by federal agencies. "The privacy act is inapplicable to state or local agencies." *Pritzker v. City of Hudson*, 26 F. Supp. 2d 433, 441 (N.D.N.Y. 1998) (McAvoy, C.J.) (citing *St. Michael's Convalescent Hosp. v. State of California*, 643 F.2d 1369, 1373 (9th Cir. 1981)); *see Stoianoff v. Comm'r of Motor Vehicles*, 107 F. Supp. 2d 439, 444-45 (S.D.N.Y. 2000), *aff'd*, 12 F. App'x 33 (2d Cir. May 25, 2001). Moreover, the Privacy Act does not permit claims against individuals. *Smith v. Johnson*, 24-CV-0368, 2024 WL 3010886, at *4 (N.D.N.Y. June 14, 2024) (Lovric, M.J.) (citing *Mamarella v. Cnty. of Westchester*, 898 F. Supp. 236, 238 (S.D.N.Y. 1995) (noting that "the plain language of [the Privacy Act] provides that only 'agencies' are subject to the [statute]," not individuals)), *report and recommendation adopted by*, 2024 WL 3371023 (N.D.N.Y. July 11, 2024) (D'Agostino, J.).

Hence, the Privacy Act does not permit a claim against Defendant County of Tompkins because it is a local municipality and it does not permit a claim against Defendant Walter because he is an individual. As a result, I recommend that Plaintiff's claims pursuant to the Privacy Act be dismissed for failure to state a claim upon which relief may be granted.

**C. State Law Claim**

Plaintiff appears to assert a claim of "coercion/intimidation under duress" pursuant to New York tort law. (Dkt. No. 1 at 2-3.) The undersigned is unaware of a standalone common law or statutory private cause of action for "intimidation" or "coercion" under New York or

federal law.[5] *See Bey ex rel. Tashano Jenkins Estate Trust v. In-Progress Housing*, 25-CV-1544, 2026 WL 1802361, at *4 (N.D.N.Y. June 23, 2026) (Evangelista, M.J.) (finding that a claim for "psychological coercion" is not grounded in any identifiable federal or state law); *Smith v. Ebanks*, 22-CV-6193, 2024 WL 1242082, at *4 (E.D.N.Y. Mar. 22, 2024) ("the court is unaware of a standalone common law or statutory action for 'intimidation' . . . under New York or federal law.").

Further, although New York state law and federal common law recognize duress claims, such a claim exists in the context of an agreement or contract where one party asserts that he or she "received a wrongful or improper threat." *Francis v. Home Box Office, Inc.*, 04-CV-7430, 2005 WL 1020863, at *3 (S.D.N.Y. Apr. 28, 2005); *see John Hancock Life Insurance Company (U.S.A.) v. Anisa*, 22-CV-1001, 2024 WL 4297662, at *4 (E.D.N.Y. Sept. 26, 2024) (quoting *805 Third Avenue Co. v. M.W. Realty Assoc.*, 58 N.Y.2d 447, 451 (N.Y. 1983)) ("Under New York state law, a party alleging duress may 'void a contract . . . when it establishes that it was compelled to agree to the contract terms because of a wrongful threat by the other party which precluded the exercise of its free will.'"). The Complaint fails to allege facts plausibly suggesting an agreement or contract related to the alleged events that occurred on January 13, 2025. (*See generally* Dkt. No. 1.)

---

[5] New York Penal Law § 136.60 sets forth the criminal misdemeanor of coercion in the third degree. To the extent that the Complaint is construed as asserting a claim pursuant to N.Y. Penal Law § 136.60, I recommend that it be dismissed because a "plaintiff cannot seek the initiation of a criminal prosecution, an arrest, or enforcement of any state penal law." *Dan v. New York*, 24-CV-1233, 2025 WL 1448314, at *13 (N.D.N.Y. May 20, 2025) (Evangelista, M.J.) (citing *Leeke v. Timmerman*, 454 U.S. 83, 86-87 (1981) (holding that there can be no private initiation of a criminal prosecution or arrest); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (affirming that there is no private right of action to enforce state or federal criminal statutes)).

As a result, I recommend that Plaintiff's state law claim be dismissed for failure to state a claim upon which relief may be granted.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[6]

Although this Court has serious doubts about whether Plaintiff can amend the Complaint to assert actionable claims against Defendant County of Tompkins, given Plaintiff's *pro se* status and that this is Plaintiff's first pleading, out of an abundance of caution, I recommend that

---

6 *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Plaintiff be granted leave to amend his pleading against Defendant County of Tompkins and Defendant Walter in his official capacity.

Notwithstanding, I recommend that Plaintiff's claims pursuant to the Privacy Act and New York State claim of coercion/intimidation under duress be dismissed without leave to amend because a better pleading cannot cure the deficiencies identified herein.

If Plaintiff chooses to file an amended complaint, he should note that in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

PLAINTIFF IS ADVISED THAT HE SHOULD NOT SEEK TO FILE A MOTION TO AMEND HIS COMPLAINT UNTIL UNITED STATES DISTRICT JUDGE COOMBE RULES ON THIS COURT'S RECOMMENDATIONS WITH RESPECT TO PLAINTIFF'S COMPLAINT. ANY AMENDED COMPLAINT OR MOTION TO AMEND BEFORE JUDGE COOMBE'S DECISION WITH RESPECT TO THIS COURT'S RECOMMENDATIONS WILL BE STRICKEN AS PREMATURE AND WILL NOT BE CONSIDERED BY THE

COURT. As noted below, however, Plaintiff may file objections to this Court's recommendations.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2), is **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be (1) **ACCEPTED FOR FILING** to the extent that it asserts a claim of unlawful seizure pursuant to the Fourth Amendment and 42 U.S.C. § 1983 against Defendant Walter in his individual capacity; and (2) **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** to the extent that it asserts claims against Defendant County of Tompkins and Defendant Walter in his official capacity; and (3) **DISMISSED WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND** with respect to (a) claims pursuant to the Privacy Act, and (b) a "State Law Tort – Coercion / Intimidation Under Duress" claim; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order and report-recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[7]

---

[7] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: September 23, 2026
Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

8 If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2024 WL 4297662
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.), Plaintiff,
v.
Ann ANISA Ali, Hallima Ali, Robert Ramcharitar, and Stephen Ali, Defendants.

22-CV-1001 (SIL)
|
Signed September 26, 2024

**Attorneys and Law Firms**

Owen Andrew Kloter, Sichenzia Ross Ference Carmel LLP, New York, NY, for Plaintiff.

Robert Ramcharitar, Wellington, FL, Pro Se.

Stephen Ali, Port Saint Lucie, FL, Pro Se.

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

STEVEN I. LOCKE, United States Magistrate Judge:

***1** The following constitutes the Court's Fed. R. Civ. P. 52 findings of fact and conclusions of law in this life insurance proceeds-interpleader action, following a bench trial held on January 30, 2024. *See* DE [53] (citations to the trial transcript are to "Tr."). At its core, this case is about two brothers' competing claims to the proceeds of their deceased mother's life insurance policies.

Decedent Zaimoon Ali ("Zaimoon") held two life insurance policies with Plaintiff John Hancock Life Insurance Company (U.S.A.) ("John Hancock"), the proceeds of which total $89,052.07. *See* Complaint ("Compl."), DE [1]; Amended Receipt, DE [31]. On February 24, 2022, John Hancock commenced this interpleader action requesting that the Court resolve the conflicting claims of the defendants: (i) Stephen Ali ("Stephen"), Zaimoon's son; (ii) Robert Ramcharitar ("Ramcharitar"), also Zaimoon's son; (iii) Ann Anisa Ali ("Anisa"), Zaimoon's niece; and (iv) Hallima Ali ("Hallima"), Stephen's ex-wife and Zaimoon's former daughter-in-law. *See* Compl., DE [1]. Only Ramcharitar and Stephen answered the Complaint, *see* DEs [12], [40], and the Clerk of Court issued certificates of default against Anisa and Hallima. *See* DE [16]. On March 28, 2023, the parties stipulated to John Hancock depositing $93,459.90 plus interest, minus $5,000 in attorneys' fees and costs, with the registry of the Court. *See* Minute Order, DE [30]. On April 3, 2023, John Hancock deposited $89,052.07 with the Court, representing the proceeds of the relevant policies, plus interest, less attorneys' fees and costs. *See* Amended Receipt, DE [31]; Declaration of Owen Andrew Kloter, DE [33]; Minute Order dated May 2, 2023, DE [35]. John Hancock was dismissed from the case on August 30, 2023. *See* Elec. Order dated Aug. 30, 2023.

## I. FINDINGS OF FACT [1]

On October 7, 1991, while living in New York and holding a New York bank account, Zaimoon applied to John Hancock Mutual Life Insurance Company [2] for a life insurance policy, which bore the number XXXXXX230 ("Policy 230"). Exhibit ("Ex.") 20; Tr. 82:10-15, 113:19-20, 136:13-14, 159:20-161:3. Zaimoon held a second life insurance policy with John Hancock bearing the number XXXXXX688 ("Policy 688"), although the application for Policy 688 is not in the trial record. In her application for Policy 230, she elected as beneficiaries her "husband if living, otherwise, Stephen S. Ali, son[;] Teddy I. Ali, son[; and] Robert R. Ramcharitar" in "equal shares or [to] the survivor[.]" Ex. 20 at 3. Zaimoon's husband predeceased her. Tr. 10:9-18.

On May 9, 2000, Zaimoon executed a change of beneficiary form with respect to Policy 230, naming as beneficiaries her sons Stephen, Teddy I. Ali ("Teddy"), and Ramcharitar, equally or to the survivor, if any. Ex. 1 at 2. Then, seventeen years later, on December 5, 2017, Zaimoon executed another change of beneficiary form applicable to both Policy 230 and Policy 688 (collectively, "the Policies"), identifying Stephen, Teddy, and Ramcharitar as primary beneficiaries, each entitled to "33 1/3 %" of the proceeds of those policies (the "December 5, 2017 Change of Beneficiary Form"). *See* Exs. 2, 21. At some time prior to December 13, 2017, Zaimoon moved from New York to live with Teddy in Port St. Lucie, Florida. Tr. 136:5-14; *see* Ex. 2. In 2020, Teddy passed away. Tr. 109:24-110. On May 8, 2020, Zaimoon changed the beneficiary distribution of the Policies, so that Stephen and Ramcharitar would each receive approximately one-third of the proceeds, and Anisa would receive a portion of the remaining balance. Tr. 11:4-13, 110:9-14, 136:22-137:3.

***2** On September 13, 2021, Zaimoon executed a notarized quitclaim deed (the "Deed") granting Stephen title to a house at 1038 SW Whittier Terrace, Port St. Lucie, Florida, 34953. Ex. 4; Tr. 6:18-20, 184-24, 136:5-11. Around the same time, she was diagnosed with breast cancer and admitted into a hospital, identified in the record only as "Tradition." Tr. 19:25-20:14, 23:8-18, 140:15-23. On or around October 9, 2021, she was admitted to a hospice called Trustbridge in Palm Beach County, Florida. Tr. 25:14-26:11; Ex. 10 at 1. Ramcharitar offered testimony that Zaimoon was not administered morphine at Trustbridge. *See* Tr. 29:3-7, 30:7-12, 67:3-7. The Court nevertheless rejects this testimony in light of medical records to the contrary demonstrating that Zaimoon received subcutaneous morphine intermittently at Trustbridge, including on October 9, 2021. Ex. 10 at 1, 2, 4. Nevertheless, Zaimoon was described as "alert" and "oriented" by Trustbridge medical personnel on October 9, 10 and 20, 2021. Ex. 10 at 2, 3, 7. Further, Zaimoon was visited by hospital volunteers on October 14, October 15, October 18, and October 21, 2021. Ex. 9. These volunteers described her as "alert and responsive" on October 14 and October 21, 2021; and "awake and alert" on October 18, 2021. *Id.* at 1, 3-4. The volunteer who visited her on October 15, 2021, Joseph Zarcone, stated that "Zaimoon and [he] spoke, and she offered [him] her life advice," as well as her "experiences of living in New York City." *Id.* at 2. Moreover, Sheryl Ali ("Sheryl"), Zaimoon's niece, testified that she spoke to Zaimoon on the phone "every day" between September and November 2021, with their final communication occurring two days before Zaimoon's death. Tr. 123:8-17. During these conversations, Sheryl testified, Zaimoon was "mentally ... competent" and "talk[ed] ... normal[ly]." Tr. 123:25-124:8. Sheryl further emphasized that there was "no" difference in her cognitive ability, and that Zaimoon's illness was not apparent during their communications. Tr. 124:3-12. Anisa and Zaimoon also spoke on the phone and via Facetime frequently, often multiple times a day. Tr. 97:25-98:2, 101:6-20. During these calls, Zaimoon communicated clearly and did not "appear confused at any time." Tr. 98:3-10.

Shortly before October 15, 2021, Ramcharitar and Zaimoon called John Hancock and requested to change the beneficiaries on the Policies. Ex. 6, Recording of Undated Phone Call; Tr. 36:22-37:3.[3] During that phone call, Zaimoon stated that Ramcharitar was authorized to speak on her behalf and explained that he was helping her because she was in a hospital bed, but that she wanted to complete the policy changes herself. Ex. 6. She also carefully spelled her name at the operator's request, articulated her date of birth, and stated the last four digits of her Social Security Number. *Id.* Ramcharitar explained to the operator that he needed to hold the phone for Zaimoon. *Id.*

The operator informed Zaimoon and Ramcharitar that beneficiary designation changes could not be completed over the phone, and Ramcharitar and the operator discussed the form required to change a beneficiary designation. *Id.* On October 15, 2021, while Zaimoon was in hospice, Ramcharitar filled out and Zaimoon signed a change of beneficiary form on Policy 688 and Policy 230 ("October 15, 2021 Change of Beneficiary Form"), so that Ramcharitar would receive 90% of the proceeds, and Anisa and Hallima Ali ("Hallima"), Stephen's ex-wife, would receive five percent each, but Stephen would receive no proceeds. Ex. 3 at 5-6; Ex. 11; Tr. 27:17-20, 39:22-40:4. Zaimoon's signature was witnessed by an unidentified individual. *See* Ex. 3 at 8; Tr. 40:5-9. The next day, on October 16, 2021, Zaimoon executed a power of attorney (the "Power of Attorney") in favor of Ramcharitar. Ex. 5, Tr. 26:23-27:20. On October 20, 2021, John Hancock mailed Zaimoon a letter confirming that the changes requested in the October 15, 2021 Change of Beneficiary Form were in effect. Ex. 11.

In late October 2021, Zaimoon left a series of voicemails on Stephen's telephone. *See* Exs. 15-19. Initially, on October 22, 2021, Zaimoon left a largely inaudible voicemail in which she sounds distressed, asking Stephen to come see her at Trustbridge. Ex. 19. In a voicemail dated October 24, 2021, Zaimoon asked Stephen to return her call and stating "something going on there. I need you to know what is going on," but not explaining what was "going on." Ex. 15. On October 25, 2021, Zaimoon left a voicemail to Stephen asking him to explain what a power of attorney is, stating that she "[did not] know what [Ramcharitar] want[ed] to do with" the Power of Attorney, and asking if a power of attorney is "a good paper." Ex. 16. On October 28, 2021, Zaimoon left another voicemail, which is difficult to understand, during which she became increasingly upset. Ex. 17. In this voicemail, Zaimoon stated that she had "no more money to give to Robert" and explained that Ramcharitar frequently asked for her "ATM card" to withdraw money from an ATM machine. *Id.* Further, Zaimoon stated that "everything [was] money, money, money" with respect to Ramcharitar, and that he had offered to order her checks, which she declined. *Id.* Zaimoon explained that she had "no wallet" with her and repeatedly asked Stephen to come visit her. Finally, Zaimoon stated that "Robert ... [took] advantage of [her]." *Id.* On October 29, 2021, Zaimoon left Stephen the

final voicemail in evidence, which is largely inaudible, asking him to "bring some stuff to wash [her] hair" because her "head [was] stinking." Ex. 18.

***3** Approximately two weeks after Zaimoon executed the Power of Attorney, on or around November 1, 2021, she was moved to a second hospice facility (the "Second Hospice Facility"), the name of which is not in the trial record. Tr. 68:6-17. Ramcharitar did not alert Stephen to Zaimoon's relocation. Tr. 63:17-64:7. She was administered morphine at the Second Hospice Facility. Tr. 67:8-18, 68:11-12. In an undated video taken there, Zaimoon spoke to Ramcharitar and identified him, by name, as her "last son." Ex. 13. In that video, Zaimoon confirmed that she "g[a]ve that power [of attorney] to ... Robert," and that she gave Ramcharitar her debit card to purchase and bring her supplies. *Id.* She was being treated with morphine at the time of that video. Tr. 67:8-17. Sheryl and Anisa, Zaimoon's nieces, testified that Ramcharitar used Zaimoon's debit card to purchase items that Zaimoon needed. Tr. 102:11-16, 127:10-17. On November 6, 2021, Zaimoon executed a Designation of Health Care Surrogate, authorizing Ramcharitar to "make health care decisions and to provide, withhold, or withdraw consent on [her] behalf," among other powers, and designating Anisa as her alternate surrogate. Ex. 12 at 1; Tr. 48:11-16. Anisa visited Zaimoon in person in mid- to late November 2021, for approximately four days, during which time Zaimoon was "very" lucid. Tr. 96:18-22. Zaimoon passed away on December 2, 2021. Tr. 82:15.

At present, Stephen and Ramcharitar live in Florida, while Anisa and Hallima live in New York. *See* Tr. 1, Appearances, 100:8-9; Ex. 3 at 5.

## II. CONCLUSIONS OF LAW

Having found the facts above based on the credible evidence, the Court now evaluates Defendants Ramcharitar's, Stephen's, Anisa's and Hallima's entitlement to the proceeds of the Policies. "[I]nterpleader is designed to protect stakeholders from undue harassment in the face of multiple claims against the same fund, and to relieve the stakeholder from assessing which claim among many has merit." *JP Morgan Chase Bank, NA v. Meged Funding Grp. Corp.*, No. 23-CV-2605, 2024 WL 3995052, at *3 (E.D.N.Y. Aug. 29, 2024) (citation omitted). An interpleader complaint "generally involves a two-stage inquiry": at the first stage, the stakeholder must "demonstrate that the requirements for interpleader have been met and that it is entitled to a discharge." *Id.* (citation omitted). Next, the Court "determines the adverse claims between the claimants." *Id.* Because John Hancock has already been discharged from the case, *see* Elec. Order dated Aug. 30, 2023, the Court turns to each relevant individual's entitlement to the proceeds of the Policies.

Ramcharitar claims entitlement to 90% of the life insurance proceeds, with the remaining ten percent divided evenly between Anisa and Hallima, based on the October 15, 2021 Change of Beneficiary Form. *See* Tr. 164:6-13; Ex. 3 at 5. Stephen, on the other hand, asserts a number of affirmative defenses, seeking to invalidate the October 15, 2021 Change of Beneficiary Form, and asks the Court to distribute the proceeds of the Policies according to the December 5, 2017 Change of Beneficiary Form instead. *See* Answer of Stephen Ali, DE [40], at 2.

### A. Anisa's and Hallima's Default

Initially, Hallima and Anisa failed to answer the Complaint or otherwise defend the action, and so on April 22, 2022, the Clerk of Court issued certificates of default against them. *See* DE [16]. In an interpleader action, a defaulting claimant is not entitled to proceeds. *See Great Am. Ins. Co. v. Gold Coast Exp. Inc.*, No. 12-CV-4847, 2015 WL 1039770, at *3 (E.D.N.Y. Mar. 10, 2015) (" 'The failure of a named interpleader defendant to answer the interpleader complaint and assert a claim to the res can be viewed as forfeiting any claim of entitlement that might have been asserted.' ") (citing *Metro. Life Ins. Co. v. Little*, No. 13-CV-1059, 2013 WL 4495684, at *2 (E.D.N.Y. Aug. 17, 2013)); *JP Morgan Chase Bank, NA v. Meged Funding Grp. Corp.*, No. 23-CV-2605, 2024 WL 3995052, at *3 (E.D.N.Y. Aug. 29, 2024); *Chicago Title Ins. Co. v. Lumbermens Mut. Cas. Co.*, No. 22-CV-00768, 2022 WL 19520885, at *3 (E.D.N.Y. Dec. 23, 2022); *Wells Fargo Bank, N.A. v. Krenzen Auto Inc.*, No. 19-CV-5329, 2021 WL 695122, at *3 (E.D.N.Y. Feb. 23, 2021). Accordingly, neither Anisa nor Hallima are entitled to any portion of the proceeds of the Policies, and the Court must determine the proper beneficiary between Stephen and Ramcharitar.

### B. Stephen's Affirmative Defenses

***4** Turning to Stephen's affirmative defenses, because he proceeds *pro se*, the Court liberally construes these affirmative defenses and interprets them to raise the strongest arguments they suggest. *See Courchevel 1850 LLC v.*

*Rodriguez*, No. 17-CV-6311, 2019 WL 2233828, at *5 (E.D.N.Y. May 22, 2019).

New York law applies here. A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012). Accordingly, the Court applies New York choice-of-law rules here. "New York looks to the 'center of gravity' of a contract," including an insurance policy, to determine choice of law. *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018) (citation omitted). "The two most important factors under New York law are the place of contracting," that is, "the state in which the policy was negotiated, contracted, and signed," and "the place of performance," that is, "the location where the premiums are billed and a claim on the policy is made." *Id.* (citations omitted). Under New York law, "where the insured risk is scattered throughout multiple states, New York courts deem the risk to be located principally in one state, namely, in the state of the insured's domicile at the time the policy was issued." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 642 (2d Cir. 2016) (citation omitted).

Here, Zaimoon lived in New York when she applied for Policy 230. Ex. 20. As explained above, the application for Policy 688 is not in the record. Prior to her move from New York to Florida on a date uncertain, Zaimoon held a New York bank account, from which she presumably paid premiums. Tr. 113:19-20, 136:13-14. Two possible beneficiaries to the Policies, Stephen and Ramcharitar, live in Florida, while the other two, Anisa and Hallima, live in New York. *See* Tr. 1, Appearances, 100:8-9; Ex. 3 at 5. While Florida and New York both have an interest in the litigation, the Court applies New York law in analyzing Stephen's affirmative defenses of duress, undue influence, lack of capacity, and fraud in the inducement, principally because Zaimoon was domiciled in New York when she applied for Policy 230. *See Fireman's Fund Ins. Co.*, 822 F.3d at 642 (2d Cir. 2016).

### *1. Duress and Undue Influence*

Initially, Stephen asserts duress and undue influence as separate affirmative defenses, and seeks to invalidate the October 15, 2021 Change of Beneficiary Form under these theories. *See* Answer, DE [40], at 2. For the reasons set forth below, Stephen has failed to meet his burden.

Under New York state law, a party alleging duress may "void a contract ... when it establishes that it was compelled to agree to the contract terms because of a wrongful threat by the other party which precluded the exercise of its free will." *805 Third Avenue Co. v. M.W. Realty Assoc.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 780 (1983) (internal citations omitted). New York courts recognize duress by "physical compulsion, by threat, or by the exercise of undue influence." *Silver v. Starrett*, 176 Misc. 2d 511, 516, 674 N.Y.S.2d 915, 919 (Sup. Ct. N.Y. Cty. 1998) (citing *Evans v. Waldorf-Astoria Corp.*, 827 F. Supp. 911, 913 (E.D.N.Y. 1993), *aff'd*, 33 F.3d 49 (2d Cir. 1994)). Because Stephen offers no testimony or evidence that Ramcharitar physically compelled or threatened Zaimoon, the Court construes Stephen's duress defense as an affirmative defense based on duress *via* undue influence and considers the two theories together.

***5** A party contesting a change of beneficiary designation in an insurance policy on grounds of undue influence must show "(1) the existence and exertion of an influence; (2) the effective operation of such influence as to subvert the mind at the time the transaction occurred; and (3) the execution of the transaction that, but for undue influence, would not have happened." *New York Life Ins. Co. v. Brown*, 19-CV-09437, 2021 WL 325857, at *6 (S.D.N.Y. Feb. 1, 2021) (citation omitted). To prove that a policyholder was unduly influenced, the party asserting the theory must show that another party "restrained [the policyholder's] independent action and destroyed free agency." *In re Zirinsky*, 43 A.D.3d 946, 947-48, 841 N.Y.S.2d 637, 639 (2d Dep't 2007) (citing *In re Walther's Will*, 6 N.Y.2d 49, 53, 188 N.Y.S.2d 168, 172 (1959)). Further, the party challenging the change of beneficiary designation must show more than opportunity and motive to exercise undue influence: he must prove "that such influence was actually utilized." *Brown*, 2021 WL 325857, at *6. "While undue influence may be proved by circumstantial evidence, the circumstances must lead to it not only by fair inference but as a necessary conclusion." *Id.* (citation omitted).

Stephen has not met his burden to prove that Ramcharitar "restrained" Zaimoon's "independent action" or "destroyed [her] free agency" with respect to the relevant beneficiary change. *See In re Zirinsky*, 43 A.D.3d at 947-48, 841 N.Y.S.2d at 639. Zaimoon called John Hancock, requesting to change the beneficiaries of the Policies, and authorized Ramcharitar to speak on her behalf. Ex. 6. The is no evidence in the trial record that Ramcharitar even asked Zaimoon to make that phone call, let alone influenced her to do so. Moreover,

while Ramcharitar filled out the October 15, 2021 Change of Beneficiary Form, *see* Tr. 39:22-40:4, Zaimoon signed it, which signature was witnessed by an unidentified individual. Ex. 3 at 8.

In his attempt to prove that Ramcharitar unduly influenced their mother, Stephen points to the voicemails she left Stephen in late October 2021. *See* Stephen Ali Closing Statement, DE [56]. While Zaimoon did leave Stephen a voicemail on October 28, 2021 complaining that Ramcharitar was focused on "money, money, money" and asked for her debit card, *see* Ex. 17, this topic of this voicemail was Ramcharitar's purchases with that card and his offer to order her more checks, not on the October 15, 2021 Change of Beneficiary Form. Moreover, both Sheryl and Anisa testified that Ramcharitar purchased necessities for his mother, Tr. 102:11-16, 127:10-17, and Zaimoon explained in a video recording that she gave him her card to buy her items she requested. *See* Ex. 13. Accordingly, the October 28, 2021 voicemail, Ex. 17, does not establish undue influence.

The other three voicemails, Exs. 15, 16, and 18, are even less probative. In a voicemail dated October 24, 2021, Zaimoon asked Stephen to return her call and stating "something going on there. I need you to know what is going on," without any context. Ex. 15. Her October 25, 2021 voicemail explicitly concerned the Power of Attorney and did not reference the Policies. Ex. 16. Finally, on October 29, 2021, Zaimoon asked Stephen "bring some stuff to wash [her] hair" because her "head [was] stinking." Ex. 18. The rest of that voicemail is inaudible. None of the voicemails, either separately or together, establish undue influence as an affirmative defense invalidating the October 15, 2021 Change of Beneficiary Form, or that Zaimoon was influenced in any way on the date she executed that form.

### *2. Lack of Capacity*

Next, Stephen asserts lack of capacity as an affirmative defense. *See* Answer, DE [40], at 2. For the reasons set forth below, the Court finds that Stephen has not carried his burden here either.

"In evaluating mental capacity, New York courts apply two different standards: one for contracts and one for testamentary instruments." *Brown*, 2021 WL 325857, at *6 (citation omitted). "The law is unclear with respect to which standard applies to beneficiary changes under a life insurance policy." *Id.*; *see Metro. Life Ins. Co. v. Giscombe*, No. 19CV4463, 2022 WL 2467066, at *10 (E.D.N.Y. Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 2704572 (E.D.N.Y. July 12, 2022). Because "[t]he contract standard is more exacting than the testamentary standard," a policyholder who is capable of making beneficiary changes to her life insurance policy under the contract standard is capable under both. *Brown*, 2021 WL 325857, at *6; *see Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 326 (S.D.N.Y. 2014) ("The capacity standard for making a will is less rigorous than the competence standard for making a contract, as a will is sometimes made by a person who is ill and facing death.") (citation omitted); *Sun Life Assur. Co. of Canada (U.S.) v. Gruber*, No. 05-CV-10194, 2007 WL 4457771, at *14 (S.D.N.Y. Dec. 14, 2007), *aff'd sub nom. Sun Life Assur. Co. of Canada v. Gruber*, 334 F. App'x 355 (2d Cir. 2009) ("In this case, we consider only the contractual standard, since if [the policyholder] would be deemed capable of designating a beneficiary under the contractual standard, he would necessarily meet the less demanding testamentary standard.").

***6** "In contract disputes, the test for a person's mental capacity is whether the person's mind was 'so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction.' " *Quinio v. Aala*, 344 F. Supp. 3d 464, 478-79 (E.D.N.Y. 2018) (citing *Rudolf Nureyev Dance Foundation v. Noureeva-Francois*, 7 F.Supp.2d 402, 416 (S.D.N.Y. 1998)). " 'People who observe the [person] daily—family members, teachers, employers—are often most familiar with his or her capacity to cope with challenge and can illuminate for the jury' that person's ability (or inability) to enter into a contract." *Id.* (citing *People v. Cratsley*, 86 N.Y.2d 81, 87-88, 629 N.Y.S.2d 992, 996 (1995)). "Under the contract standard[,] a person is presumed competent at the time of the performance of the challenged action and the burden of proving incompetence rests with the party asserting incapacity." *Brown*, 2021 WL 325857, at *7. Incapacity must be demonstrated at the time of the challenged transaction. *Feiden v. Feiden*, 151 A.D.2d 889, 890, 542 N.Y.S.2d 860, 862 (3rd Dep't 1989).

Here, the overwhelming weight of evidence points to Zaimoon's capacity to enter into a contract on October 15, 2021. Initially, Zaimoon is presumed to have had the mental capacity to make the relevant beneficiary changes. *Brown*, 2021 WL 325857, at *7. Trustbridge medical personnel described her as "alert" and "oriented" on October 9, 10 and 20, 2021. Ex. 10 at 2, 3, 7. Notably, Dr. Antonio Mendez

described her as "alert" and "oriented" on October 9, the same day that she was administered morphine, and so the record does not reflect that her capacity was impacted at that time. *See id.* at 1-2. Further, Zaimoon was visited by volunteers on October 14, 15, 18, and 21, 2021, who described her as "alert and responsive" on October 14 and 21, 2021; and "awake and alert" on October 18, 2021. Ex. 9 at 1, 3-4. The volunteer who visited her on October 15, the day she executed the relevant change of beneficiary designation, stated that "Zaimoon and [he] spoke, and she offered [him] her life advice," as well as her "experiences of living in New York City." *Id.* at 2.

Moreover, both Sheryl and Anisa, who spoke with Zaimoon daily, insisted that she was lucid during the relevant period. *See* Tr. 106:3-4, 123:12-14. Sheryl testified that Zaimoon was "mentally ... competent" and "talk[ed] ... normal[ly]." Tr. 123:25-124:8. Sheryl further emphasized that there was "no" difference in her cognitive ability, and that Zaimoon's illness was not apparent during their communications. Tr. 124:3-12. As for Anisa, she testified that Zaimoon communicated clearly with her and did not "appear confused at any time." Tr. 98:3-10. Further, on the phone call that Ramcharitar and Zaimoon placed to John Hancock requesting to change her beneficiary designations, Zaimoon articulated her date of birth, spelled her full name and stated the last four digits of her Social Security Number without confusion or hesitation. Ex. 6. This clarity of speech leads the Court to conclude that Zaimoon had mental capacity to change the beneficiary designations of the Policies on October 15, 2021.

While Zaimoon did sound distressed and confused on later voicemails she left Stephen, *see* Exs. 15-19, these voicemails were left one to two weeks after October 15, 2021, and are therefore insufficient to establish lack of capacity. *See Feiden*, 151 A.D.2d at 890, 542 N.Y.S.2d at 862 (under New York law, incapacity must be demonstrated at the time the challenged contract was formed). Moreover, these voicemails, as explained above, do not address the changes to the Policies' beneficiary designations at all. Therefore, they do not demonstrate her inability to "understand the nature of the transaction" at issue. *Quinio v. Aala*, 344 F. Supp. 3d 464, 478-79 (E.D.N.Y. 2018). Accordingly, the Court concludes that Stephen has failed to meet his burden as to this affirmative defense.

### *3. Fraud in the Inducement*

***7** Finally, Stephen asserts an affirmative defense of fraud in the inducement for the first time in his closing statement. *See* Stephen Ali Closing Statement, DE [56]. Generally, courts do not consider new theories of liability or recovery raised for the first time at trial. *See Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 285 (E.D.N.Y. 2012), *aff'd*, 519 F. App'x 724 (2d Cir. 2013); *Andrus v. Juniper Grp., Inc.*, No. 08-CV-1900, 2011 WL 4532694, at *4 (E.D.N.Y. Sept. 26, 2011). Courts considering whether to amend pleadings post-trial to include a new cause of action primarily consider whether the opposing party would be prejudiced by such an amendment. *See Monz*, 853 F. Supp. 2d at 285 ("[T]o allow Plaintiff to raise and argue a new theory of recovery at trial would seriously prejudice Defendants who had no opportunity to conduct discovery with respect to this issue or develop a defensive strategy."); *Andrus*, 2011 WL 4532694, at *4 (concluding that Defendant would be prejudiced by Plaintiff's introduction of alter-ego liability on the morning of trial); *Alberts v. City of New York*, 549 F. Supp. 227, 229 (S.D.N.Y. 1982).

"To maintain a cause of action for fraudulent inducement of contract, a plaintiff must show a material representation, known to be false, made with the intention of inducing reliance, upon which it actually relied, consequentially sustaining a detriment." *Frank Crystal & Co. v. Dillmann*, 84 A.D.3d 704, 704, 925 N.Y.S.2d 430, 431 (1st Dep't 2011). The essence of Stephen's fraudulent inducement defense is that Ramcharitar filled out the October 15, 2021 Change of Beneficiary Form without following Zaimoon's wishes, "ma[d]e the beneficiary changes without [his] mother's knowledge," "gave himself ... 90%" of the proceeds of the Policies, and then deceived Zaimoon into signing it. *See* Stephen Ali Closing Statement, DE [56], at 2-3. Stephen's answer contains no indication that he intended to raise this defense. *See* Answer, DE [40]. Moreover, at trial, Stephen only briefly reached the issue of why Ramcharitar, and not Zaimoon, filled out the October 15, 2021 Change of Beneficiary Form. *See* Tr. 72:14-73:20. This short line of cross-examination did not put Ramcharitar on notice that Stephen intended to prove that Ramcharitar had made a "material representation, known to be false" to Zaimoon about what the form she was signing actually said. *See Frank Crystal & Co.*, 84 A.D.3d at 704, 925 N.Y.S.2d at 431. Accordingly, the Court concludes that Ramcharitar would be prejudiced if Stephen were permitted to raise this affirmative defense post-trial, and declines to consider it. Moreover, even if the affirmative defense was properly pled, there was no evidence of a material misrepresentation or reliance at trial, and so the claim fails on the merits in any event.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that Robert Ramcharitar is entitled to the proceeds of the Policies, totaling $89,052.07. Further, the Court rejects Stephen Ali's affirmative defenses in their entirety for failure to carry their burden of proof, and, in the case of the defense of fraudulent inducement, for failure to introduce that defense prior to trial.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4297662

## Footnotes

1 In order to save costs, this trial was conducted entirely by video conference, with the consent of the parties.

2 John Hancock later did business as, *inter alia*, John Hancock Life Insurance Company (U.S.A.). *See* Ex. 2.

3 Both Ramcharitar and Stephen offer recordings of Zaimoon prior to her death as evidence. *See* Exs. 6, 13, 15-19. Although these recordings implicate hearsay rules, neither party objected to their admission, and so any such objection is waived. *See* *Atl. Specialty Ins. Co. v. Coastal Env't Grp.*, 368 F. Supp. 3d 429, 452 (E.D.N.Y. 2018), *aff'd*, 945 F.3d 53 (2d Cir. 2019).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,
v.
Jose D. ORTIZ, Executive Officer Chase JP Morgan Chase & Co., and James Simon, Manager Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase & Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co., New York, NY.

## MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTING, District Judge.

## I. INTRODUCTION

***1** Plaintiff *pro se* Alexander McFadden ("McFadden"), an inmate at the Southport Correctional Facility ("SCF"), filed this action pursuant to 42 U.S.C. § 1983. In his complaint, Plaintiff appears to allege that Defendants, two executives of Chase JP Morgan Chase & Co. ("Chase"), violated his constitutional rights through conduct that, in some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter issued an Order and ReportRecommendation, recommending that the Court dismiss Plaintiff's complaint in its entirety with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5. Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's August 7, 2012 Order and ReportRecommendation.

## II. BACKGROUND

In his Order and Report–Recommendation dated August 7, 2012, Magistrate Judge Baxter recommended that Plaintiff's motion to proceed *in forma pauperis* ("IFP") should be denied by the Court and, upon review of the complaint, that this action be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9. Further, Magistrate Judge Baxter recommended that if the Court approves his report, the Court should certify that any appeal from this matter will not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's Order and ReportRecommendation recommends that because there is no indication that either Defendant acted under "color of state law," and because there are no allegations that either or both Defendants "conspired" with any state actors to bring this action under section 1983, Plaintiff's complaint should be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New York Penal Law by offering false documents for filing, tampering with public records, and falsifying business records, Magistrate Judge Baxter recommended that because there is no private right of action to enforce either state or federal criminal statutes, Plaintiff is barred from bringing a claim to enforce these provisions of the New York State Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this Court hold that, due to Plaintiff's failure to state a claim under 42 U.S.C. § 1983 upon which relief can be granted, combined with the courts inability to determine what venue might be appropriate, Plaintiff's motion for IFP should be denied, and Plaintiff's complaint should be dismissed in its entirety with prejudice pursuant 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and Report–Recommendation, Plaintiff simply provides the Court with language from various cases discussing various types of objections and the Court's authority to review unpreserved errors. *See* Dkt. Nos. 14, 15.

## III. DISCUSSION

**A. Review of a magistrate judge's decision**

***2** If a party files specific objections to a magistrate judge's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. *In Forma Pauperis* application**

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information. However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

**C. Sufficiency of the complaint**

***1. Legal Standard***

***3** In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

***2. Application***

***a. Color of state law***

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v.* County of Westchester, 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals,* Inc., No. 08–CV–0430, 2009 WL 3068217, *1 (2d Cir. Sept. 28, 2009); *see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish

their personal involvement in any alleged constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

***b. Criminal statutes***

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See Abrahams v. Incorporated Village of Hempstead,* No. 08–CV–2584, 2009 WL 1560164, *8 (E.D.N.Y. June 2, 2009) (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo,* that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

***4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

***c. Venue***

Venue in federal-question cases is generally determined by 28 U.S .C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

***d. Leave to amend***

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

***5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

## IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1789593

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1242082
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Ahtwana Marie SMITH, Plaintiff,
v.
Lakuan EBANKS, Kareem Ebanks, Natasha Blanford, Michelle Smalls, Mendeecee Harris, Damon Dash, Robert Williams, Onika Maraj, Sean Combs, Roc Nation LLC, and Reform Alliance, Defendants.

22-cv-6193(EK)(LB)
|
Signed March 22, 2024

**Attorneys and Law Firms**

Ahtwana Smith, Flushing, NY, Pro Se.

Andrew S. Black, Gelb and Black, Brooklyn, NY, for Defendants Lakuan Ebanks, Natasha Blanford.

John Patrick Kennedy, Reed Smith LLP, New York, NY, for Defendant Reform Alliance.

Richard Granofsky, John Sandercock, Lester, Schwab, Katz & Dwyer LLP, New York, NY, for Defendant Roc Nation.

**MEMORANDUM & ORDER**

ERIC KOMITEE, United States District Judge:

***1** Ahtwana Smith filed this suit against eleven individuals and two private entities, Roc Nation LLC and Reform Alliance. She has since amended her form complaint three times. Proceeding *pro se*, she asserts claims under 42 U.S.C. § 1983 for violations of her First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights, allegedly stemming from cyberstalking and harassment. She also asserts a claim for human trafficking and state law tort claims including defamation, slander, intentional infliction of emotional distress, and negligence.

The two entity defendants have moved to dismiss her claims against them for lack of jurisdiction and failure to state a claim. For the reasons that follow, the motions to dismiss for failure to state a claim are granted. In addition, Smith's remaining claims are dismissed *sua sponte.*

## I. Background

### A. Factual Allegations

Despite having been amended several times, the complaint remains largely devoid of specifics concerning who — that is, which defendant — did what, let alone when or how. The complaint is similarly opaque as to which claims are being asserted against which defendants.

Smith does allege that "Damon Dash and Michelle Smalls have been stalking me for almost a decade." Third Amended Complaint ("TAC"), ECF No. 70, at 8. [1] She writes that a non-party, Carlton Roper, enlisted the "help of Robert Williams and his music and social media" to make "cyberthreats." *Id.* "Roper came up with the idea to compare me to 2pac [Shakur, presumably]" and two other individuals, as well as "anyone else he can come up with while cyberstalking me and everyone else on my social media friends' post." *Id.*

Smith asserts that defendant Williams — known professionally as Meek Mill — "sexual abuse [sic] me through his lyrics" "on his 2018 Championships album," *id.* at 12, though no specific lyrics are recited in the complaint. Lakuan Ebanks stalked her family "due to a termination of pregnancy I received upsetting him." *Id.* at 11. Kareem Ebanks is alleged to be "a sex predator and human trafficker" who "threatened ... that he would post pictures of me that he obtained without my consent"; he also "conspired with" defendant Harris and others "to kill me" at the behest of "Roper and Damon Dash." *Id.* Smith alleges that she has been subject to "constant assassination attempts." *Id.* at 10. The complaint also alleges that Smith's nephew, Tamel Dixon, was "lured to California in February of 2019" by Williams, Dash, and others, resulting (in ways left unexplained) in Dixon's death in October 2019. *Id.* at 12.

The complaint refers to the entity defendants only sparingly. "Meek Mill [is] a Roc Nation artist" and also the "chairman of Reform Alliance." *Id.* Apart from that, the TAC does not explicitly attribute any specific conduct to Roc Nation, Reform Alliance, or their agents.

Smith checked a box on the form complaint indicating that she is "bringing suit against" certain "state or local officials," *id.* at 7, but she does not say who they are. The entity defendants are said to be "corporation[s] act[ing] under color of state law by contracting to perform a government function." *Id.*

But the TAC makes no allegation about what that government function is.

***2** Smith alleges that as a result of the defendants' actions, she has suffered from "severe mental anguish, severe emotional distress," and "constant breakouts" on her skin. *Id.* at 10. She refers to the "labor trafficking of my son" and the "numerous attempts to take the life of family members." She requests $350 million in damages. *Id.*

**B. Selected Procedural History**

Although this case has been pending since October 2022, Smith has not filed proof that she served process on four of the individual defendants: Michelle Smalls, ECF No. 50 (summons returned unexecuted), Mendeecee Harris, ECF No. 54 (incomplete proof of service), Onika Maraj, ECF No. 49 (summons returned unexecuted), and Sean Combs. ECF No. 52 (incomplete proof of service).

The court has permitted Smith to amend her complaint three times, most recently to add factual content supporting her claims following a pre-motion conference on the defendants' motions to dismiss. ECF Nos. 12, 20, 70. Read liberally, the operative complaint alleges claims under Section 1983; federal human trafficking claims pursuant to 18 U.S.C. § 1595; and various state-law tort claims against all defendants.

## II. Legal Standard

On a motion to dismiss, "the court's task is to assess the legal feasibility of the complaint." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). In so doing, the court "must take the facts alleged in the complaint as true, drawing all reasonable inferences in [the plaintiff's] favor." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007). *Pro se* complaints are "held to less stringent standards" than pleadings drafted by attorneys, and the court will read a *pro se* complaint liberally and interpret it as raising the strongest arguments it suggests. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Still, a *pro se* plaintiff is not exempt from "compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). Thus, to survive a motion to dismiss, the complaint must plead sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Furthermore, "district courts may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee." *Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000). A complaint "is frivolous where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

## III. Discussion

None of Smith's Section 1983 claims are viable. Among other shortcomings, she does not allege that any defendant is a state actor. Her remaining federal and state claims lack an arguable basis in law or fact, either because they are not legally cognizable claims or because she fails to plead adequate facts in support.

**A. Section 1983 Claims**

***3** The complaint appears to assert claims under Section 1983 against all defendants. TAC at 7, 12.[2] But it fails to state a Section 1983 claim upon which relief may be granted. Smith makes no non-frivolous, non-conclusory allegations that any defendant is a state actor. Private individuals and entities are not generally amenable to suit under Section 1983, which provides a remedy for violations of constitutional rights by state actors. *See, e.g.*, *Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (noting the Court's "repeated insistence" in Section 1983 cases that "the party charged with the deprivation must be a person who may fairly be said to be a state actor").[3]

In relatively rare circumstances, actions by private individuals or entities may give rise to liability under Section 1983. "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with governmental character that it can be regarded as

governmental action." *Rendell-Baker v. Kohn*, 457 U.S. 830, 847 (1982). Here, however, the complaint includes only the bare recitation that "when a corporation acts under color of state law by contracting to perform a government function they are treated as a government entity." TAC at 12. Smith has therefore failed to adequately allege any claims under Section 1983.

**B. Human and Labor Trafficking Claims**

Smith also alleges a claim for "human trafficking labor trafficking." TAC at 12. I construe this (generously in light of the plaintiff's *pro se* status) as brought pursuant to 18 U.S.C. § 1595. That statute sets out the civil liability provision of the Trafficking Victims Protection Reauthorization Act of 2008. *See Walia v. Veritas Healthcare Solutions, L.L.C.*, No. 13-CV-6935, 2015 WL 4743542, at *3 (S.D.N.Y. Aug. 11, 2015) (construing *pro se* claims for human trafficking as claims under the TVPRA).[4] Such claims must allege that the defendant "knowingly benefit, financially or by receiving anything of value," from participating in a trafficking venture. 18 U.S.C. § 1595(a); *S.J. V. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 152-53 (E.D.N.Y. 2020).

Here, the complaint does not adequately allege the existence of a trafficking venture, nor any facts suggesting the defendants benefited from one. Smith alleges that her nephew was "lured to California in February of 2019" but fails to explain how or for what trafficking-related purpose. TAC at 12.

**C. State Law Claims**

***4** Smith's complaint alleges the following claims under state law: "vicarious liability," "recklessness," "intentional infliction of emotional distress," "intimidation," "cyber stalking," "defamation of character," and "slander." TAC at 12.

Several of these claims are not legally cognizable causes of action. Vicarious liability "is not a separate cause of action." *Zalt v. Wells Fargo Home Mortg.*, No. 8-CV-11225, 2010 WL 3026536, at *2 n.7 (S.D.N.Y. Aug. 2, 2010) (citing *Brothers v. New York State Elec. & Gas Corp.*, 11 N.Y.3d 251, 257-58 (2008)). Neither federal nor New York law recognizes a private cause of action for stalking. *Cain v. Christine Valmy Int'l Sch. Of Esthetics, Skin Care, & Makeup*, 216 F. Supp. 3d 328, (S.D.N.Y. 2016); *Di Pompo v. Ruggiero*, No. 17-CV-8077, 2018 WL 5045339, at *4 (S.D.N.Y. Oct. 17, 2018). And the court is unaware of a standalone common law or statutory cause of action for "intimidation" or "recklessness" under New York or federal law.

Smith's three remaining claims are for defamation, slander, and intentional infliction of emotional distress. Under New York law, the elements of oral defamation (i.e. slander) are: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 528 (2d Cir. 2018). Written defamation (i.e. libel) requires the same elements, but as to a "written defamatory statement of fact." *Celle v. Filipino Report Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). "A defamation claim is only sufficient if it adequately identifies the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated." *Thai v. Cayre Group, Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010).

Smith's complaint does not adequately identify a defamatory statement. She alleges that "Michelle Smalls thought it [would] be a good look for her to take chapters out of my life to use for her book," but does not explain what Smalls wrote, why it was false, or how it harmed her. TAC at 8. She alleges that "Carlton Roper came up with the idea to compare me to 2PAC, Reika Carter, Kevin Chiles," and others, but Roper is not a defendant to this action. *Id.* And she alleges that Natasha Blanford and Kareem Ebanks "sent me a lot of Instagram comments" and "defamed my name to my church." *Id.* at 13. But again, the complaint fails to recite an actual statement made on Instagram or to her church, or to explain how Smith was harmed as a result of it. Accordingly, Smith has failed to state a claim for defamation, slander, or libel.

Smith has also failed to state a claim for intentional infliction of emotional distress. To state such a claim in New York, a plaintiff must allege "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chanko v. Am. Broad. Companies Inc.*, 27 N.Y.3d 46, 56 (2016) (holding that filming and broadcasting the last moments of the plaintiffs'

family member's life did not "rise to the level necessary to satisfy the outrageousness element"). Here, Smith has not adequately alleged non-frivolous and non-conclusory facts suggesting extreme and outrageous conduct.

**D. Leave to amend**

***5** Generally, a district court should allow a *pro se* plaintiff an opportunity to amend a complaint to cure its deficiencies. *Jaser v. New York Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987). Leave to amend may be denied where, as is the case here, the plaintiff has already been given the opportunity (or multiple opportunities) to amend, but has failed to cure the complaint's deficiencies. *See* *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Leave to amend is therefore denied. [5]

**Conclusion**

Roc Nation and Reform Alliance's motions to dismiss are granted, and all remaining claims are dismissed *sua sponte.* All such dismissals are with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1242082

## Footnotes

1 Citations to the complaint refer to ECF pagination rather than the complaint's native page numbers.

2 Defendants Reform Alliance and Roc Nation LLC have moved to dismiss the claims against them for lack of subject matter jurisdiction. But the court has federal question jurisdiction over Smith's claims pursuant to Section 1983, regardless of whether they adequately allege state action and other required elements. TAC at 7; 28 U.S.C. § 1331; *see* *Chan Ah Wah v. HSBS Bank PLC*, No. 13-CV-4789 (JPO), 2014 WL 2453304, at *2 (S.D.N.Y. June 2, 2014) ("Federal courts retain jurisdiction to dismiss cases even when the federal claims in those cases are not plausibly pleaded.").

3 Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

4 Civil liability under this statute was created by the TVPRA. *See* *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012). Although Smith "did not raise claims under the TVPRA in [her] amended complaint, the failure in a complaint to cite a statute, or cite the correct one, in no way affects the merits of a claim, because factual allegations alone are what matters." *Id.*

5 Furthermore, this plaintiff has a history of filing frivolous suits against celebrities and public figures. Judge Engelmayer of the Southern District of New York dismissed her substantially similar complaint in *Smith v. Harris, et al.*, for lack of subject matter jurisdiction, finding that the complaint failed to plead the parties' domiciles or a federal question. No. 21-CV-571, ECF No. 8 (Oct. 6, 2021).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3010886
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bishme SMITH, Plaintiff,
v.
Teresa JOHNSON; Michelle Folino; Renee Hall; Stephanie Albert; Holley Davis; and Julie Richardson, Defendants.

5:24-CV-0368 (MAD/ML)
|
Signed June 14, 2024

**Attorneys and Law Firms**

BISHME SMITH, Plaintiff, Pro Se, 10 Centennial Drive, Apt. B3, Syracuse, New York 13207.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

***1** The Clerk has sent a *pro se* complaint together with an application to proceed *in forma pauperis* ("IFP") in the above captioned action filed by Bishme Smith ("Plaintiff") to the Court for review. (Dkt. Nos. 1, 2.) For the reasons discussed below, I (1) grant Plaintiff's IFP application (Dkt. No. 2), and (2) recommend that Plaintiff's Complaint (Dkt. No. 1) be dismissed with leave to replead.

## I. BACKGROUND

Plaintiff commenced this action on March 17, 2024, by the filing of a verified Complaint against defendants Teresa Johnson, Michelle Folino, Renee Hall, Stephanie Albert, Holley Davis, and Julie Richardson (collectively "Defendants"). (Dkt. No. 1.) The allegations set forth in the Complaint are substantially similar to allegations set forth by Plaintiff in another action pending in this district, *Smith v. Davis*, 5:22-CV-1202 (MAD/ML) ("*Smith I*"). (Compare Dkt. No. 1, *with Smith I*, Dkt. Nos. 1, 42.)

In sum, the Complaint alleges that Plaintiff and his family began renting an apartment in Black River Apartments housing complex in November 2021. (Dkt. No. 1 at ¶ 11.) The Complaint alleges that Defendant Johnson was the manager of the property and beginning on December 1, 2021, Plaintiff experienced issues with the property "rang[ing] from not having the correct mailbox key ... to rent calculations being incorrect and ... heat not working for a few days at a time." (Dkt. No. 1 at ¶ 12.) The Complaint alleges that Plaintiff attempted to rectify the issues by contacting Defendants, but the issues were either not resolved or not resolved in a timely fashion. (Dkt. No. 1 at ¶¶ 19-20; *see generally* Dkt. No. 1.)

The Complaint alleges that a new tenant moved into the apartment above Plaintiff's at the end of February/beginning of March 2022, and conflicts between Plaintiff and the new tenant began. (*Id.* at ¶ 13.) The Complaint alleges that Plaintiff attempted to contact Defendants regarding the conflicts with the new tenant but did not receive a response. (*Id.* at ¶ 14.)

The Complaint alleges that on May 30, 2022, an incident occurred at Plaintiff's apartment between Plaintiff and the new tenant that resulted in Plaintiff calling the police and Plaintiff being charged with the criminal violation of harassment. (*Id.* at ¶ 15.)

The Complaint alleges that Plaintiff requested to move to another unit because the close geographic proximity to the new tenant was causing a decline in his mental health but that Defendants did not provide that accommodation. (Dkt. No. 1 at ¶¶ 17-18.)

The Complaint alleges that on July 27 (of an unspecified year), Plaintiff filed a formal complaint for discrimination with FHEO, HUD on the basis of race and disability. (Dkt. No. 1 at ¶ 21.)

The Complaint alleges that on August 22, 2022, the criminal violation of harassment was dismissed against Plaintiff. (Dkt. No. 1 at ¶ 23.) Plaintiff alleges that he shared news of the dismissal and documents reflecting the same with Defendants. (*Id.*)

The Complaint alleges that on September 10, 2022, Plaintiff received a letter from FHEO HUD confirming receipt of his complaint and confirming that the complaint had been forwarded to Defendants. (Dkt. No. 1 at ¶ 24.) The Complaint alleges that on September 14, 2022, Plaintiff received a "Notice to Vacate" stating that Plaintiff and his family must vacate their apartment by November 30, 2022. (*Id.* at ¶ 25.)

***2** The Complaint alleges that Plaintiff and Defendants exchanged a series of correspondence regarding the basis

for the eviction and that Plaintiff provided documents rebutting Defendants' proffered reason. (Dkt. No. 1 at ¶ 26.) Plaintiff alleges that his family was ultimately evicted and homeless for six months because Defendants provided false information to assistive agencies and organizations that Plaintiff was attempting to work with. (*Id.* at ¶¶ 27-35.)

Based on these factual allegations, the Complaint appears to allege the following five claims: (1) a claim pursuant to 42 U.S.C. § 1983 against Defendants; (2) a claim that Defendants improperly disseminated information protected by the Privacy Act; (3) a claim of defamation *per se* against Defendants; (4) a claim of defamation against Defendants; and (5) a claim of intentional infliction of emotional distress. (Dkt. No. 1 at 11-20.) As relief, Plaintiff seeks compensatory damages in the amount of $2,000,000, punitive damages, reasonable attorney fees, and other relief deemed just and equitable by the Court. (Dkt. No. 1 at 20-21.)

Plaintiff also seeks leave to proceed IFP.

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [1] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted. [2]

## III. LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

"In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

***3** Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

### A. Claims Pursuant to 42 U.S.C. § 1983

To the extent that Plaintiff attempts to assert any constitutional claims, the Court construes those claims as made pursuant to 42 U.S.C. § 1983. "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (internal quotation marks omitted). "A plaintiff pressing a claim of [a] violation of his constitutional rights under § 1983 is thus required to show state action." *Fabrikant*, 691 F.3d at 206 (internal quotation marks omitted). "State action requires *both* ... the exercise of some right or privilege created by the State ... *and*" the involvement of "a person who may fairly be said to be a state actor." *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks and brackets omitted).

There is no single test that is determinative of whether a private person or entity may be a state actor, but rather a host of factors. *Baum. N. Dutchess Hosp.*, 764 F. Supp. 2d 410, 428 (N.D.N.Y. 2011) (Treece, M.J.). A state actor may be found when: (1) "[the challenged activity] results from the State's exercise of coercive powers"; (2) "the State provides

significant encouragement, either overt or covert ... or when a private actor operates as a willful participant in joint activity with the State or its agents"; (3) "it is controlled by an agency of the State;" (4) "it has been delegated a public function by the State [known as the public function test]"; or (5) "it is entwined with governmental policies or when government is entwined in its management or control[.]" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 296 (2001) (citations, quotation marks, and alterations omitted). [3]

***4** Here, Defendants ostensibly are private actors. However, in the interest of reading Plaintiff's Complaint "liberally and interpreted to raise the strongest arguments that [it can] suggest," *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013), the Court considers whether Defendants' alleged activities establish "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be treated as that of the State itself.' " *Tancredi v. Metropolitan Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

The only nexus between Defendants and the government is the allegation in the Complaint that

> Defendants collectively and separately are employees of a Federally funded housing management company and in their official capacities due to receiving government funds by HUD, Defendants have the independent authority, and in executing that authority given to them by HUD, it appears that the government authorized it, although defendants collectively abused that authority and were acting under the color of law.

(Dkt. No. 1 at ¶ 37.) Courts in this Circuit have held that receipt of federal funds and being subject to HUD regulations are insufficient to "even approach the close nexus test." *Hylton v. RY Mgmt.*, 05-CV-6710, 2006 WL 2088196, at *4 (S.D.N.Y. July 25, 2006); *see Miller v. Hartwood Apartments, Ltd.*, 689 F.2d 1239, 1243 (5th Cir. 1982) ("[L]essors in Section 8 new construction housing programs act as private parties."); *Bowman v. Mitchell*, 10-CV-0005, 2010 WL 1529473, at *2 (W.D. Ky. Apr. 14, 2010) ("The fact that Defendants work for and live in a property that is regulated by HUD is not enough to transform them into state actors.").

As a result, I recommend that Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendants be dismissed because they are not state actors.

### B. Claims Pursuant to the Privacy Act

The Complaint asserts claims pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a, which allows individuals to request access to federal agency records about themselves. *Devine v. United States*, 202 F.3d 547, 550 (2d Cir. 2000). The Privacy Act also allows an individual to bring a civil suit against a federal agency that "fails to comply" with the statute such that the individual suffers an adverse effect. *Devine*, 202 F.3d at 550-51 (quoting 5 U.S.C. § 552a(g)(1)(D)). The statute does not permit such claims against a private entity, *Pennyfeather v. Tessler*, 431 F.3d 54, 56 (2d Cir. 2005) (citation omitted), or against individual federal employees, *Mamarella v. Cnty. of Westchester*, 898 F. Supp. 236, 238 (S.D.N.Y. 1995) (noting that "the plain language of [the Privacy Act] provides that only 'agencies' are subject to the [statute]," not individuals).

Therefore, I recommend that Plaintiff's claims under 5 U.S.C. § 552a be dismissed against Defendants—who are private individuals—for failure to state a claim upon which relief may be granted. *See Razzoli v. Richmand Univ. Med. Ctr.*, 23-CV-6697, 2023 WL 7017105, at *4 (E.D.N.Y. Oct. 25, 2023) (dismissing the plaintiff's Privacy Act claims where there was not an agency named as a defendant).

### C. State Law Claims

Having found that all of Plaintiff's federal claims are subject to dismissal, the undersigned recommends that the Court decline to exercise jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if ... the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (holding that "federal

courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment") (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)).

***5** Accordingly, I recommend that Plaintiff's state law claims against Defendants be dismissed.

**V. OPPORTUNITY TO REPLEAD**

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to replead at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to replead is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also* *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[4]

Out of deference to Plaintiff's *pro se* status, I recommend that he be permitted to amend his Complaint.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

***6 ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1), because it fails to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[5]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3010886

## Footnotes

1 The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

2 Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

3 On occasion, these criteria have been stated differently but the impact remains the same:

> The conduct of private actors can be attributed to the State for [§ 1983] purposes if (1) the State compelled the conduct, (2) there is a sufficiently close nexus between the State and the private conduct, or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State.

*Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)).

4 *See also* *Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

5 The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

6 If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3371023
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bishme SMITH, Plaintiff,
v.
Teresa JOHNSON, et al., Defendants.

5:24-CV-368 (MAD/ML)
|
Signed July 11, 2024

**Attorneys and Law Firms**

BISHME SMITH, 10 Centennial Drive, Apt B3, Syracuse, New York 13207, Plaintiff, pro se.

**ORDER**

Mae A. D'Agostino, United States District Judge:

***1** On March 17, 2024, Plaintiff Bishme Smith commenced this action, *pro se*, against Defendants Stephanie Albert, Holley Davis, Michelle Folino, Renee Hall, Teresa Johnson, and Julie Richardson. *See id.* Plaintiff alleges Defendants violated his constitutional rights pursuant to 42 U.S.C. § 1983 as well as the Privacy Act of 1974 and New York State laws. *See id.* Plaintiff also submitted an application to proceed *in forma pauperis* ("IFP"). *See* Dkt. No. 2.

On June 14, 2024, Magistrate Judge Miroslav Lovric issued an Order and Report-Recommendation granting Plaintiff's IFP application and recommending that his complaint be dismissed with leave to amend. *See* Dkt. No. 6.

Plaintiff did not file any objections to the Order and Report-Recommendation. When a party declines to file objections, the district court reviews a report-recommendation for clear error. *See Hamilton v. Colvin*, 8 F. Supp. 3d 232, 236 (N.D.N.Y. 2013). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Having reviewed Magistrate Judge Lovric's Order and Report-Recommendation, Plaintiff's complaint, and the applicable law, the Court does not discern any clear error in the recommendation. First, Magistrate Judge Lovric correctly recommended dismissal of Plaintiff's § 1983 claims because Plaintiff has not alleged state action. *See* Dkt. No. 6 at 5-7; *see also Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) ("In order to satisfy the state action requirement where the defendant is a private entity, the allegedly unconstitutional conduct must be 'fairly attributable' to the state") (quotation omitted). In Plaintiff's complaint, he names Defendants who work for Black River Apartments, Cold Black River L.P., and/or Preservation Management, Inc. *See* Dkt. No. 1 at ¶¶ 4-9. As Magistrate Judge Lovric explained, Plaintiff alleges that these entities are federally funded by the Department of Housing and Urban Development ("HUD"). *See* Dkt. No. 6 at 7 (quoting Dkt. No. 1 at ¶ 37).

However, as Magistrate Judge Lovric correctly opined, numerous courts have concluded that funding from HUD does not render private conduct to be state action. *See id.* (citing, *inter alia, Hylton v. RY Mgmt.*, No. 05-CV-6710, 2006 WL 2088196, *4 (S.D.N.Y. July 25, 2006)); *see also DeSouza v. Park W. Apartments, Inc.*, No. 3:15-CV-01668, 2018 WL 2990099, *16 (D. Conn. June 14, 2018) (collecting cases). Plaintiff has not alleged any conduct which would establish that the named Defendants were state actors or took state action. *See* Dkt. No. 1. Therefore, the Court finds no clear error in this aspect of Magistrate Judge Lovric's Order and Report-Recommendation.

Second, as to Plaintiff's claims concerning the Privacy Act of 1974, 5 U.S.C. § 552a, the Court likewise finds no clear error in the Order and Report-Recommendation. Magistrate Judge Lovric correctly determined that Plaintiff cannot bring claims against the individual Defendants under the Privacy Act. *See* Dkt. No. 6 at 7-8; *see also Young v. Tryon*, No. 12-CV-6251, 2013 WL 2471543, *5 (W.D.N.Y. June 7, 2013) (collecting cases to support the contention that "the Privacy Act does not provide for a cause of action against individuals").

***2** Third, as recommended by Magistrate Judge Lovric, because Plaintiff's federal claims must be dismissed, the Court will also dismiss his state law claims. *See Torres v. City of New York through New York City Dep't*, 590 F. Supp. 3d 610, 629 (S.D.N.Y. 2022) (" 'A district court usually should decline the exercise of supplemental jurisdiction when all federal claims have been dismissed at the pleading stage' ") (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006)). The Court therefore finds no clear error in this aspect of the Order and Report-Recommendation. *See* Dkt. No. 6 at 8-9.

Fourth, as recommended by Magistrate Judge Lovric, and in light of Plaintiff's *pro se* status, the Court will afford Plaintiff an opportunity to amend his complaint. *See* Dkt. No. 6 at 9-10. If Plaintiff decides to amend his complaint, he must clearly set forth the facts that give rise to the claim, including, when possible, the dates, times, and places of the alleged underlying acts, as well as each individual who committed each alleged wrongful act. The revised pleading should allege facts demonstrating the personal involvement of any named Defendant. *See* *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Finally, Plaintiff is informed that any amended complaint will replace the existing complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See* *Jeanty v. Sciortino*, No. 6:22-CV-319, 2023 WL 2931863, *14 (N.D.N.Y. Apr. 13, 2023). [1]

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Lovric's Order and Report-Recommendation (Dkt. No. 6) is **ADOPTED** in its entirety for the reasons set forth herein; and the Court further

**ORDERS** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED without prejudice,** with leave to file an amended complaint within **thirty (30) days** of the date of this Order; and the Court further

**ORDERS** that, if Plaintiff fails to file an amended complaint within **thirty (30) days** of this Order, the Clerk of the Court shall enter judgment in Defendants' favor and close this case, without further order of this Court; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Order upon Plaintiff in accordance with Local Rules. [2]

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3371023

## Footnotes

1 The Court directs Plaintiff to the instructions outlined in Magistrate Judge Lovric's Order and Report-Recommendation. *See* Dkt. No. 6 at 10.

2 The Court notes that this case has been deemed related to *Smith, et al. v. Davis, et al.*, No. 5:22-CV-1210 (N.D.N.Y). *See* Dkt. No. 7. Four of the six named Defendants in this action are also named defendants in the 2022 action. Plaintiff is notified that pursuant to Federal Rule of Civil Procedure 42(a), the Court has discretion to consolidate actions if the "actions before the court involve a common question of law or fact." FED. R. CIV. P. 42(a)(2).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1146942
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Leon G. TSINBERG, Plaintiff,
v.
CITY OF NEW YORK, Defendant.

20 Civ. 749 (PAE)
|
Signed 03/25/2021

**Attorneys and Law Firms**

Leon G. Tsinberg, Bronx, NY, Pro Se.

Pamela Ann Koplik, Mark W. Muschenheim, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendant.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

***1** Plaintiff Leon G. Tsinberg, a "non-admitted attorney" proceeding *pro se*, sues the City of New York (the "City") under 42 U.S.C. § 1983, alleging constitutional violations arising from the ticketing and towing of his 2009 Nissan Altima (the "Vehicle").

In 2018, while Tsinberg was temporarily living out of state, the Vehicle accumulated several parking tickets, mostly for displaying an expired registration. After Tsinberg failed to respond to those tickets, the City entered default judgments on them. Tsinberg later moved to reopen those judgments, but did not succeed. Then, in January 2019, the City immobilized and towed the Vehicle, which remains in storage accruing storage fees. Tsinberg alleges that these events violated, *inter alia*, his due process rights under the Fourteenth Amendment, his right to be free from excessive fines under the Eighth Amendment, his right to be free from unreasonable seizures under the Fourth Amendment, and his right against double jeopardy under the Fifth Amendment. The City has moved to dismiss all Tsinberg's claims.

Before the Court is the report and recommendation of the Honorable Sarah L. Cave, United States Magistrate Judge, recommending that the City's motion to dismiss be granted. *See* Dkt. 46 ("Report"). For the following reasons, the Court adopts that recommendation in full.

## I. Background

### A. Factual Background [1]

The Court adopts the Report's comprehensive account of the facts and procedural history, to which no party objects. The following summary captures the limited facts necessary for an assessment of the issues presented.

In New York City, the Parking Violations Bureau ("PVB") [2] issues and adjudicates summonses for violations of parking and traffic laws. *See* N.Y. Veh. & Traf. Law ("VTL") § 237(1)–(2), (9); N.Y.C. Admin. Code § 19-201 *et seq.* A person accused of a parking violation is first given a summons, *i.e.*, a parking ticket, containing information about the charged offense and how to contest or pay it. *See* VTL § 238(1); N.Y.C. Admin. Code § 19-204(a). State and City law require that, if the operator of the vehicle is not present at the time of service, notice of the violation must be affixed to the vehicle "in a conspicuous place." VTL § 238(2); N.Y.C. Admin. Code § 19-204(b). In that case, such notice "shall have the same force and effect and shall be subject to the same penalties for disregard thereof as" personal service on the violator. VTL § 238(2); N.Y.C. Admin. Code § 19-204(b).

***2** Once a parking summons issues, the recipient may plead guilty and pay the fine, or plead not guilty and receive a hearing date before an administrative law judge ("ALJ"). N.Y.C. Admin. Code §§ 19-202, 19-204, 19-206. A person may so plead by mail, by phone, in person at one of the Department of Finance's "Business Centers," or online, either through the City's website or a "Pay or Dispute" application. *See Schaer v. City of New York*, No. 09 Civ. 7441 (CM), 2011 WL 1239836, at *7 (S.D.N.Y. Mar. 25, 2011); Report at 3–4. If a party fails to plead or appear, the City may obtain a default judgment sustaining the charge in the summons, fixing the fine, and assessing fees and penalties. *See* N.Y.C. Rules & Regs. tit. 19 §§ 39-05, 39-07, 39-10(d). Once a default judgment is entered, a party may reopen it "only upon written application showing excusable neglect and a substantial defense to the charge." *Id.* § 39-10(i). After a party is found guilty of a parking violation, she may appeal to the PVB Appeals Board. *See* VTL § 242; N.Y.C. Rules & Regs. tit. 19 § 39-12(a), (b)(2). Finally, a party may challenge an adverse decision by the Appeals Board in New York State Supreme Court, by petitioning under Article 78 of the N.Y.

C.P.L.R. ("CPLR"). *See* VTL § 243; N.Y.C. Admin. Code § 19-209.

If the owner of a vehicle owes more than $350 in judgments, the City may tow and impound her vehicle to satisfy those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212; N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9). In that case, the owner may be held liable for towing and storage fees associated with the impoundment. *See* CPLR § 8013(c);[3] N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(iii)–(vii) (authorizing, among other things, $185 removal fee and $20-per-day storage fee).

Tsinberg spent most of 2018 temporarily living and working in Pennsylvania, where he ran a business out of the Philadelphia International Airport. FAC ¶ 1. During that time, he left the Vehicle parked in the Riverdale neighborhood of the Bronx, where it amassed 11 tickets, five of which are relevant here. *Id.* ¶¶ 1–2; Dkt. 22-3; Dkt. 26 ("Koplik Decl."), Ex. A.[4] The first of those five tickets was for displaying an expired inspection sticker; the other four were for displaying an expired registration sticker. *See* Dkt. 22-3; Koplik Decl., Exs. D–H. Each was issued on a different day between April and October 2018. After Tsinberg failed to respond to them, the City entered a default judgment on each about three months after issuance. *See* Koplik Decl., Exs. D–H; Report at 6–7. Each ticket was originally $65, or $325 total, but, after penalties associated with Tsinberg's failure to plead to or contest the tickets accrued, the total amount owed on the five tickets rose to over $600. FAC ¶ 34; Report at 6–7.

In January 2019, Tsinberg discovered the tickets and the default judgments against him. FAC ¶ 3. He then sought to vacate three of the default judgments by filing disputes through the City's "Pay or Dispute" application and submitting an image of his current, unexpired registration. *See* FAC ¶ 11; Koplik Decl., Exs. D–F. Each application was denied by an ALJ because his application did not show a legally sufficient reason for his failure to respond to the summons, and his proof of current registration did not refute that his car had displayed an expired registration when each summons was issued. *See* Koplik Decl., Exs. D–F.

On January 29, 2019, the City placed an immobilizing "boot" on the Vehicle. FAC ¶ 14. The City affixed a notice to the Vehicle, which provided a telephone number and five physical addresses at which Tsinberg could pay the outstanding judgments. Dkt. 22-4 ("Booting Notice"). The City also affixed an execution to the Vehicle, which stated that the state of New York, or one of its subdivisions, was the judgment creditor, "and/or the debt enforced is for child support, spousal support, maintenance or alimony." FAC ¶ 7; Dkt. 22-2 ("Execution"). The same day, Tsinberg filed an order to show cause ("OTSC") in New York State Supreme Court, seeking to commence an Article 78 proceeding and to obtain a temporary restraining order ("TRO") to prevent the towing of his Vehicle. FAC ¶¶ 5, 8; Dkt. 22-9. He tried to serve the City with the OTSC at two the addresses provided on the Booting Notice, but neither office would accept service. FAC ¶ 10.

***3** On January 30, 2019, the City towed the Vehicle. *Id.* ¶ 12. On February 15, 2019, the City placed an "indefinite sales hold" on the Vehicle—meaning that the Vehicle would not be auctioned to satisfy Tsinberg's unpaid judgments—given the pending Article 78 petition. *See id.* ¶¶ 22, 36; Koplik Decl., Ex. R. The Vehicle remains in City storage and has accrued thousands of dollars in storage fees. Reply at 7 n.5 (as of July 28, 2020, total outstanding judgments were $10,397.72). On June 25, 2019, the New York State Supreme Court dismissed Tsinberg's Article 78 petition because he had failed to serve or file any complaint or petition in the matter and to exhaust administrative appeals. Koplik Decl., Ex. Q.

**B. Procedural History**

On January 28, 2020, Tsinberg filed a Complaint. Dkt. 2. On May 7, 2020, the City moved to dismiss. Dkts. 15–17. On June 18, 2020, Tsinberg filed the FAC. On August 3, 2020, the City moved to dismiss the FAC, Dkt. 25, and filed a memorandum of law in support, City Mem., and the declaration of Pamela A. Koplik, Esq., *see* Koplik Decl. On August 4, 2020, the Court referred that motion to Judge Cave for a report and recommendation. Dkt. 29. On August 18, 2020, Tsinberg opposed the City's motion. Dkt. 31 ("Pl. Opp'n"). On September 8, 2020, the City replied. *See* Reply.

While the motion to dismiss was pending, Tsinberg sought "preliminary discovery" from the City; the City moved to stay discovery pending a ruling on its motion to dismiss. *See* Dkt. 43 at 1. On November 19, 2020, Judge Cave granted the City's motion to stay, with an exception for the exchange of five narrow categories of information, largely relating to the circumstances surrounding the seizure and storage of the Vehicle. *Id.* at 2–3.

On January 22, 2021, Judge Cave issued the Report, which recommends the dismissal of the FAC with prejudice and without leave to amend. *See* Report at 1, 35. On February

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

15, 2021, Tsinberg filed objections to the Report. Dkt. 51 ("Objections"). On March 15, 2021, the City responded. Dkt. 54 ("Response").

## II. Legal Standard

### A. Report and Recommendation

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections are made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citing *Wilds v UPS*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)); *see also Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006).

To the extent that the objecting party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report and recommendation strictly for clear error. *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012).

### B. Motion to Dismiss Pursuant to Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

***4** Where, as here, the plaintiff is *pro se*, his complaint must be construed "liberally, reading it with special solicitude and interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). This mandate "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 348 (S.D.N.Y. 2009). Consistent with that approach, factual allegations made in a *pro se* plaintiff's opposition papers, or the attachments thereto, may be considered "as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint." *George*, 2012 WL 2512964, at *6 n.7.

However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (citation omitted). Thus, even a *pro se* plaintiff "must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). The Court need not accept allegations that are "contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005).

## III. Discussion

The Report recommends dismissal of Tsinberg's entire case for failure to state a claim. In many respects, Tsinberg's objections do not engage with any specific aspects of the thoughtful and well-reasoned Report, but reprise, through 35 "claims" spanning nearly 50 pages, general assertions about the sufficiency of the FAC's allegations and principles of constitutional law. Thus, as to much of the Report, review for clear error would be appropriate. *See Dickerson*, 2013 WL 3199094, at *1. Nevertheless, for the avoidance of doubt, in the interest of thoroughness, and given Tsinberg's *pro se* status, the Court will review the entire Report *de novo.*

The Court addresses Tsinberg's claims in the following order: (1) Fourteenth Amendment Due Process Clause claims; (2) Fifth Amendment Double Jeopardy Clause claim; (3) Eighth Amendment Excessive Fines Clause claim; (4) Fourth Amendment claim; (5) municipal liability claim; (6) Fair Debt Collection Practices Act claim; and (6) state-law claims. Finally, the Court addresses Tsinberg's request for leave to amend the FAC.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**A. Due Process Clause**

**1. Procedural Due Process**

Tsinberg claims that the City's ticketing and towing of his car violated his rights to procedural due process because he received insufficient notice of the tickets, because the dispute mechanism provided by the "Pay or Dispute" application was inadequate, and because his Article 78 proceeding failed to provide adequate post-deprivation remedies. *See* FAC ¶¶ 48–61; Pl. Opp'n ¶¶ 1–11, 18–20.

The Court agrees with the Report that Tsinberg has failed to allege a violation of his rights to procedural due process. Before depriving a person of a liberty or property interest, the state, consistent with due process of law, must use procedures that balance the interests involved in the deprivation. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). The interests to be balanced are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

***5** "Courts in this Circuit have found that, as a general matter, the PVB/Article 78 review process for challenging parking summonses meets the requirements of procedural due process." *Nestle Waters N. Am., Inc. v. City of New York*, No. 15 Civ. 5189 (ALC), 2016 WL 3080722, at *8 (S.D.N.Y. May 25, 2016) (collecting cases), *aff'd*, 689 F. App'x 87 (2d Cir. 2017) (summary order); *see Schaer*, 2011 WL 1239836, at *9 ("The City's administrative parking violations system has been held to be constitutional.") (collecting cases); *Rackley v. City of New York*, 186 F. Supp. 2d 466, 480 (S.D.N.Y. 2002) (The City "provide[s] parking violators ... with more than sufficient process to satisfy the Constitution."). To plausibly allege a procedural due process violation, therefore, Tsinberg must allege some departure from that constitutionally "more than sufficient" process.

Tsinberg has failed to do so. First, he alleges that the City's service of parking summonses by affixing them to his car and mailing them to him was insufficient. That is because he alleges that he failed to receive *actual* notice of the tickets and, because he lived in Philadelphia at the time, the City should have either called or emailed him to give him such notice before the judgments against him were entered. *See* FAC ¶¶ 48–49; Objections at 17, 20–21. But the method of service the City employed here is prescribed by the statutes above, and courts have repeatedly held it to be constitutional. *See* VTL § 238(2); *e.g.*, *Nestle Waters*, 2016 WL 3080722, at *8. Nor was the City obliged to anticipate that Tsinberg might have been out of state for several months, and to depart from its statutorily prescribed method of service to accommodate that absence. Further, as the Report notes, Tsinberg did receive actual notice of the default judgments against him, as evidenced by his challenges thereto, and had both the chance to contest them before the City towed and impounded his Vehicle several weeks later, and to pay them while his Vehicle continued to accumulate storage costs. *See* Report at 19.

Second, Tsinberg alleges that the procedures through which he tried to vacate the default judgments against him were deficient because the "Pay or Dispute" application is flawed in unspecified ways. *See* FAC ¶¶ 48–51; Pl. Opp'n ¶ 10. To the extent that Tsinberg alleges that the City obtained judgments against him through "adjudication via app," that is wrong. As the Report notes, the default judgments were entered in the usual course, and Tsinberg merely tried to vacate them through the "Pay or Dispute" application. *See* Report at 18–19. As to the latter process, Tsinberg was never required to use that method of contesting the judgments—he remained free at all times to file his disputes by mail or in person. *See* City Reply at 3 n.1. His decision to do so, absent any allegation that other such options were unavailable, cannot support a plausible claim for any deprivation of procedural due process.

Third, Tsinberg alleges that, while Article 78 proceedings may, in some cases, provide adequate post-deprivation protections against arbitrary government action, here that was not so because the New York Supreme Court's dismissal of his Article 78 proceeding for failure to serve, failure to file a petition, and failure to exhaust administrative remedies was "merely on a Temporary Restraining Order," and not a "valid, final judgment on the merits." FAC ¶ 55. He also argues that, because the Booting Notice did not provide him with the proper address for service of an Article 78 petition on the City, he was denied procedural due process.

Pl. Opp'n ¶¶ 7–9; Objections at 6–7, 9–11, 15–17. As to the first point, Tsinberg's decision to seek a TRO rather than commence an Article 78 proceeding, as well as his failure to serve or file any attending petition or exhaust administrative remedies, resulted from his own decisions, not any procedural impediments erected by the City. *See* Koplik Decl., Ex. Q. Those decisions do not affect the availability of Article 78 proceedings as a sound, post-deprivation guard against erroneous deprivations. "The fact that [a plaintiff] failed properly to pursue the state court action, and that it is now too late to do so, does not affect [the] due process analysis. Where a state law remedy gives a party a meaningful opportunity to challenge the state's action, he is not deprived of due process simply because he failed to avail himself of the opportunity." *Nestle Waters*, 2016 WL 3080722, at *10 (quoting *Rivera-Powell v. N.Y.C. Bd. of Elections*, 740 F.3d 458, 467 n.9 (2d Cir. 2006)); *see Schaer*, 2011 WL 1239836, at *9 ("[T]he Second Circuit has 'held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy[.]' " (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 985 F.2d 90, 93 (2d Cir. 1996))).[5] As to the second, Tsinberg does not provide any authority for the notion that the City deprived him of due process by failing to provide, on the Booting Notice, the proper address for service of a TRO, rather than the proper address at which to pay his tickets.

***6** The Court thus agrees with the Report that the FAC fails to plausibly allege any procedural due process violation.[6]

### 2. Substantive Due Process

Although the FAC did not do so expressly, the Report also construed it to assert a substantive due process claim, but found such claim to be deficient. The Court agrees with that assessment. To violate Tsinberg's substantive due process rights, the City's actions "must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.' " *Schaer*, 2011 WL 1239836, at *6 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)). "Only conduct that 'shocks the conscience' qualif[ies] as even potentially violative of plaintiffs' substantive due process rights." *Id.* (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)). Upon *de novo* review, the Court agrees with, and adopts in full, the Report's conclusion that the City's ticketing and towing of Tsinberg's car—all under established and oft-approved state and local law—does not approach this threshold. *See* Report at 23–24.[7] Tsinberg's claim for violation of his substantive due process rights is also dismissed.

### B. Double Jeopardy

Tsinberg next claims that the issuance of several tickets for the same alleged failure to display an unexpired registration sticker subjected him to double jeopardy, in violation of the Fifth Amendment. *See* FAC ¶ 45. The Report recommends dismissing this claim because the Double Jeopardy Clause applies only to criminal proceedings, and Tsinberg has failed to adequately allege that the parking sanctions imposed on him were "so punitive in form and effect as to render them criminal despite [the legislature's] intent to the contrary." Report at 25–26 (quoting *Doe v. Pataki*, 120 F.3d 1263, 1274 (2d Cir. 1997)).

***7** Again, the Court agrees with that assessment. The Double Jeopardy Clause protects an individual's right not to be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. The Supreme Court has held that the "Clause protects only against the imposition of multiple *criminal* punishments for the same offense," and does not apply to civil penalties. *Hudson v. United States*, 522 U.S. 93, 99 (1997). To decide whether a sanction is criminal or criminal, courts apply a two-part test. First, courts consider whether the legislative intent behind the law was punitive: If the intent was " 'not to punish, but to accomplish some other legitimate governmental purpose,' then it has been considered 'nonpenal.' " *Doe*, 120 F.3d at 1273. Second, even where a law was not *designed* to be punitive, courts then must determine whether it is "so punitive either in purpose or effect" that the sanction at issue is "transform[ed] into a criminal penalty." *United States v. Ward*, 448 U.S. 242, 248–49 (1980). The Supreme Court "has not spelled out the precise nature of the second-stage inquiry," *Doe*, 120 F.3d at 1275, but has identified several non-exclusive and non-dispositive factors that may guide it, *see Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963) (identifying, *inter alia*, whether the sanction imposes an affirmative disability or restraint, has historically been considered punishment, and depends on a finding of scienter). At this second stage of the inquiry, the burden is on the party challenging a law to "show by 'the clearest proof' that the sanctions imposed 'are *so punitive in form and effect* as to render them criminal despite [the legislature's] intent to the contrary.' " *Doe*, 120 F.3d at 1274 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Here, Tsinberg addresses only the second inquiry, arguing that the collective amount of fines and fees, including storage fees, imposed on him provide "the clearest proof" that the parking sanctions at issue are in fact criminal. *See* Objections at 32–35. The Court disagrees. As the Report cogently explains, the City's parking procedures, including seeking recoupment of storage costs occasioned by the impoundment of delinquent vehicles, serve legitimate, important non-punitive interests. *See* Report at 24, 26 (collecting cases). And Tsinberg does not explain how the accumulation of fines and storage costs, resulting from his own failure to pay the original penalties, can convert otherwise civil sanctions into criminal ones. Indeed, as the Report notes, such a result would be surprising given the substantial New York state authority holding that parking and traffic sanctions are civil, not criminal. *See Dubin v. County of Nassau*, 277 F. Supp. 3d 366, 400 (E.D.N.Y. 2017) (noting that "such a claim would not be plausible given the weight of New York legal authority holding that penalties for traffic infractions are civil and not criminal" and collecting cases). The imposition of parking tickets, and resulting penalties for non-payment, thus is not a criminal punishment to which the Double Jeopardy Clause applies. The Court adopts the Report's recommendation and dismisses Tsinberg's double jeopardy claim.

**C. Excessive Fines**

Next, Tsinberg alleges that the magnitude of the civil penalties that have accrued on the parking tickets at issue are impermissible under the Eighth Amendment's prohibition on excessive fines. In support, he argues that, while the $65 fines originally imposed may not be excessive, the accumulation of "fines on fines," including tow, boot, and storage fees, is unconstitutional, and tantamount to "criminal usury." *See* FAC ¶¶ 32–44, 69; Pl. Opp'n ¶¶ 21–27; Objections at 36–40. The Report recommends dismissal of this claim because, even if the Excessive Fines Clause applies here, the fines are not disproportionately excessive. *See* Report at 26–30. The Court agrees with the Report's assessment.

The Second Circuit has established a "two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment." *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016). First, a court must "determine whether the Excessive Fines Clause applies at all," *i.e.*, whether the forfeiture at issue "may be characterized, at least in part, as 'punitive.' " *Id.* at 109. Second, a court must "determine whether the challenged forfeiture is unconstitutionally excessive." *Id.* A fine is constitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

***8** Here, the parties and the Report focus only on the second question, assuming that the Excessive Fines Clause applies in the first instance. The Court therefore assumes without deciding that the Clause applies to the routine application of the City's parking and traffic laws in cases like Tsinberg's.[8] As to the second factor, the Second Circuit has set forth a four-factor test governing the inquiry:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Viloski*, 814 F.3d at 109 (quoting *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015)). Courts may also consider, along with those four factors, "whether the forfeiture would deprive the defendant of his livelihood." *Id.* at 111. In undertaking this analysis, the Supreme Court has admonished that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336; *see id.* (courts "should grant substantial deference" to the legislature (citation omitted)).

The Court agrees that Tsinberg has failed to plausibly allege that the fines at issue are "grossly disproportional" to Tsinberg's offenses. Tsinberg does not argue that the $65 parking fines were excessive. *See, e.g.*, FAC ¶ 36; Pl. Opp'n ¶ 11.[9] Instead, he contends that the fines he accrued for failing to address the five $65 tickets, and the resulting fees associated with booting, towing, and storing his Vehicle collectively became disproportionate. *See, e.g.*, Objections at 38–40. Whereas Tsinberg was ticketed $65 per original ticket, or $325 total, those penalties increased to about $640, or another $63 per ticket, after he failed to respond to or pay those tickets. *See* FAC ¶ 34; Koplik Decl., Exs. D–H; Dkt. 22-3. As to the first factor, Tsinberg's offense is the accumulation and failure to resolve several duly issued parking tickets, for which, as several ALJs held, he did not

provide any legitimate excuse. *See* Koplik Decl., Exs. D–F. Beyond the five tickets directly at issue here—which Tsinberg still has not paid—he also accrued at least six others in a similar period, for a variety of offenses. *See* Dkt. 22-3. Thus, while negligent or reckless parking violations themselves may not entail a great degree of moral culpability, *see George*, 779 F.3d at 123, Tsinberg's sustained refusal to lawfully address them, well after he undisputedly received notice of them, weighs in the City's favor. As a result, Tsinberg is squarely a member of the "class of persons for whom" such enhanced penalties were principally designed. *Viloski*, 814 F.3d at 109. Without the prospect of escalating fines, violators like Tsinberg would have little reason ever to pay their tickets to the City. The third factor, as to whether the maximum fine was imposed, does not fit well into the parking-ticket context, where there appears to be little discretion over the degree of any given penalty. *Cf. Viloski*, 814 F.3d at 109 (discussing imposition of sentence and fine within the context of the criminal Sentencing Guidelines and statutory maximum penalties). Thus, the Court gives it little weight in the analysis. Last, although when Tsinberg's experience is viewed in isolation, his non-payment of five $65 tickets may not have meaningfully harmed the City of New York, the City must process an "overwhelming volume of alleged parking violations." *C.A.U.T.I.O.N., Ltd. v. City of New York*, 898 F. Supp. 1065, 1067 (S.D.N.Y. 1995). Without the ability to enforce timely compliance by scofflaws who might otherwise be disinclined to pay up, it would likely suffer substantial financial harms. The City also has a separate, if less tangible, interest in promoting compliance with its laws, which is undermined even by small-scale disregard like that here.

***9** Considering the above factors, Tsinberg has not plausibly alleged anything close to a gross disproportion between his offense and the penalties, totaling $315, for his failure to address his many parking tickets. That conclusion accords with the assessment of various other courts to have considered the issue. *See, e.g.*, *Shibeshi v. City of New York*, No. 11 Civ. 4449 (LAP), 2011 WL 13176091, at *2 (S.D.N.Y. Sept. 21, 2011) ("[Plaintiff's] fines totaling $515.16 for four tickets, plus additional fees, are not disproportional."), *aff'd*, 475 F. App'x 807 (2d Cir. 2012) (summary order); *Wemhoff v. City of Baltimore*, 591 F. Supp. 2d 804, 808–09 (D. Md. 2008); *Popescu v. City of San Diego*, No. 06 Civ. 1577 (LAB), 2008 WL 220281, at *4 (S.D. Cal. Jan. 25, 2008) (penalty's increase from $47 to $104 upon nonpayment not excessive). [10]

The same is true of Tsinberg's claim that the City's booting, towing, and impounding of his car, and that the resulting accrual of fees, were excessive. Courts have approved the towing and auctioning of vehicles to satisfy municipal judgments, as state law specifically authorizes. *See, e.g.*, *Berger v. Phila. Parking Auth.*, 413 F. Supp. 3d 412, 420 (E.D. Pa. 2019) (denying Eighth Amendment Excessive Fines claim under *Timbs* for towing and impoundment of vehicle for failure to pay parking tickets); *see also Rackley*, 186 F. Supp. 2d at 469–85 (same under Fourth Amendment and Due Process Clause). Although the value of the car was, at the time of its towing, substantially greater than the amount Tsinberg owed, he remained free at all times to recover the Vehicle by paying the City what he owes it. And even if the City auctions his car to satisfy the judgments at issue, Tsinberg would then have a right to receive any sale proceeds above the outstanding judgments and fees at the time of sale. *See* CPLR § 5234(a). Finally, as to the booting, towing, and storage fees associated with the Vehicle—including the mandatory $20 daily storage fee that has been amassing since January 2019 as a result of Tsinberg's refusal to pay his debts to the City, *see* N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(vii)—Tsinberg fails to explain, except in conclusory terms, why those essentially compensatory fees are unconstitutional. *See, e.g.*, *Potter v. City of Lacey*, No. 20 Civ. 05925 (RJB), 2021 WL 915138, at *1 (W.D. Wash. Mar. 10, 2021) (impoundment fees not excessive because "they can reflect the costs associated with towing and storage"); *see* Objections at 38–40. Accordingly, the Court adopts in full the Report's recommendation that Tsinberg's Eighth Amendment claim, too, be dismissed for failure to state a claim.

### D. Fourth Amendment

Tsinberg also asserts a Fourth Amendment claim related to the towing of the Vehicle, arguing that such towing constituted an unreasonable seizure. *See* FAC ¶¶ 62–67. Specifically, he claims that the City booted and towed his Vehicle "through an automated system ... without an independent review of the underlying facts and circumstances ... by a judge." *Id.* ¶ 65. He also asserts that the inclusion of language regarding child support, spousal support, or alimony on the Execution makes the seizure even more unreasonable. *See id.*; Execution. The Report recommends dismissal of this claim, which the Court adopts.

***10** The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on states

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and, relevant here, municipalities such as New York City. *See City of Ontario v. Quon*, 560 U.S. 746, 750 (2010). It "applies in the civil context as well" as the criminal. *See, e.g.*, *Soldal v. Cook County*, 506 U.S. 56, 57 (1992) (collecting cases).

A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting *United States v. Jacobson*, 466 U.S. 109, 113 (1984)). The reasonableness of a seizure is the "ultimate standard under the Fourth Amendment." *Soldal*, 506 U.S. at 61 (citation omitted). The permissibility of any governmental seizure is thus "judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979).

Tsinberg has failed to plausibly allege that any seizure of his Vehicle was unreasonable. It is undisputed that the City seized Tsinberg's Vehicle based on valid judgments entered against him pursuant to state and local law, and that the seizure was authorized by statute given those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212 (allowing towing of vehicle for which outstanding judgments exceed $350); *see also* VTL § 237(5) (empowering PVB to "enter judgments and enforce them, without court proceedings, in the same manner as the enforcement of money judgments in civil actions in any court of competent jurisdiction or any other place provided for the entry of civil judgment within the state of New York"); FAC ¶ 34 (alleging that $640.59 in fines "caused NYC Admin. Code § 19-212 to trigger this seizure of the property"). Courts have held that the towing and impoundment of vehicles in similar circumstances is reasonable under the Fourth Amendment. *See, e.g.*, *Shibeshi*, 2011 WL 13176091, at *2 ("The City's warrantless seizure of a person's vehicle from a public street due to that person's failure to pay parking ticket fines has been held not to violate the Fourth Amendment in that it is a reasonable seizure, does not implicate core privacy concerns requiring a warrant and, of itself, demonstrates probable cause."); *Yu Juan Sheng v. City of New York*, No. 05 Civ. 1118 (RRM) (VVP), 2009 WL 6871132, at *8 (E.D.N.Y. June 26, 2009) (approving towing and impoundment resulting from default judgments on parking tickets), *report and recommendation adopted*, 2010 WL 3744428 (E.D.N.Y. Sept. 20, 2010); *Rackley*, 186 F. Supp. 2d at 478–79 (same even where City officials erroneously calculated amounts owed to City on multiple dates). Tsinberg does not offer any countervailing authority, or explain why the underlying tickets arising from the same expired registration makes the ultimate seizure, which undisputedly complied with N.Y.C. Admin. Code § 19-212, unreasonable. *See* FAC ¶ 65. [11] The Court therefore also adopts the Report's recommendation on this point and dismisses Tsinberg's Fourth Amendment claim.

**E. *Monell* Liability**

***11** Having dismissed each of Tsinberg's § 1983 claims, the Court holds, with the Report, that dismissal of Tsinberg's claim for municipal liability against the City is required as well. A plaintiff cannot establish municipal liability under § 1983 based on a theory of *respondeat superior.* Instead, to hold a municipality liable for its employees' unconstitutional actions, a plaintiff must establish a municipal policy or custom that directly caused the plaintiff to be subjected to a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Because *Monell* liability merely extends liability for an underlying constitutional violation to a municipality, without a predicate violation, the Court need not address whether the municipality itself can be liable for such violation. *See, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *see also Salem v. City of New York*, 811 F. App'x 678, 683 (2d Cir. 2020) (summary order) (dismissal of *Monell* claim appropriate where plaintiff had "not plausibly pled any underlying constitutional violation that survives a motion to dismiss"). Here, with the Court's having held that Tsinberg failed to state a claim for any underlying constitutional violation under § 1983, there is no basis to extend any such liability to the City based on an alleged custom, policy, or widespread usage of the City. Tsinberg's *Monell* claim is therefore dismissed.

**F. Fair Debt Collection Practices Act**

Tsinberg next asserts that the City's actions violated the Fair Debt Collection Practice Act ("FDCPA"), 15 U.S.C. § 1962 *et seq.* He alleges that the Execution's reference to child support or alimony, as a potential ground for seizure of the Vehicle, was false and harassing under that statute. *See* FAC ¶¶ 62–63; Pl. Opp'n ¶¶ 28–29; Objections at 40. As the Report

correctly concluded, that claim fails for at least two reasons. First, the FDCPA does not apply to actions taken by municipal employees, and Tsinberg alleges only that the City of New York, through its employees, affixed the Execution notice to his Vehicle. *See* 15 U.S.C. § 1962a(6)(C) (excluding from definition of "debt collector" any "officer or employee of ... any state"), (8) (defining "state" to include "any political subdivision" thereof). Second, the FDCPA "does not extend to creditors seeking to collect on debts owed to themselves." *Muniz v. Bank of Am., N.A.*, No. 11 Civ. 8296 (PAE), 2012 WL 2878120, at *3 (S.D.N.Y. July 13, 2012) (collecting cases). Here, the City's Execution was issued and posted in connection with its attempts to collect debts Tsinberg owed to the City, not to any other person. The Court thus adopts the Report in full in dismissing Tsinberg's claim for a violation of the FDCPA.

**G. State-Law Claims**

Finally, Tsinberg brings claims under state law for conversion, trespass to chattels, and defamation. FAC ¶¶ 68–71. The Report recommends that the Court decline to exercise supplemental jurisdiction over these claims given the Court's dismissal of Tsinberg's federal causes of action. The Court agrees. "District courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Having dismissed all federal claims over which the Court had original jurisdiction before meaningful discovery has taken place, and far before trial, the Court dismisses Tsinberg's state-law claims, too, without prejudice to his pursuit of those claims in state court.

**H. Leave to Replead**

***12** Last, the Report recommends that Tsinberg not be granted leave to file another amended complaint, and that his claims instead be dismissed with prejudice given the substantive deficiencies in his allegations and his earlier opportunity to amend his complaint after the City moved to dismiss it. Report at 34–35. Tsinberg, in his Objections (but not in his opposition), sought leave to file another amended complaint, after further discovery, to remedy any deficiencies in the FAC. *See* Objections at 48. He does not, however, identify any specific facts that, if pled, could salvage any of his claims. *See id.*

*Pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (citation omitted); *see Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013). But a district court has discretion to deny leave if a revised claim still "could not withstand a motion to dismiss." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). If the problems with a *pro se* plaintiff's claim are "substantive," rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be "futile" and "should be denied." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Thus, "[i]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g.*, *Cuoco*, 222 F.3d at 112 (courts should generally grant a *pro se* plaintiff "leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated"); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

The Court agrees with the recommendation in the Report and will dismiss Tsinberg's claims without leave to amend, and with prejudice. Tsinberg already had one opportunity to amend his complaint, and did so after reviewing the City's arguments, in its first motion to dismiss, explaining why his pleading failed to state a claim. *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had already amended its

complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint"); *Green v. Niles*, No. 11 Civ. 1349 (PAE), 2012 WL 987473, at *7 (S.D.N.Y. Mar. 23, 2012). Further, the Court agrees with the Report's assessment that the FAC's substantive deficiencies are such that a third attempt to state a viable claim would be futile. *See, e.g.*, *Binn v. Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N. Y July 13, 2020) (collecting cases denying plaintiffs a "third bite at the apple"), *aff'd*, 2020 WL 4547167 (2d Cir. Aug. 6, 2020).

## CONCLUSION

For the foregoing reasons, the Court adopts the Report in full, grants the City's motion to dismiss, and dismisses Tsinberg's claims without leave to amend. Tsinberg's federal claims are dismissed with prejudice, but his state-law claims are dismissed without prejudice to his ability to pursue them in state court.

***13** The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1146942

## Footnotes

1 The Court mainly draws its account of the facts from the Amended Complaint and the documents attached to and discussed in it. Dkt. 22 ("FAC"); *see* *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). Given Tsinberg's *pro se* status, the Court also considers the allegations raised in Tsinberg's opposition to the motion to dismiss to the extent consistent with those in the FAC. *See, e.g.*, *George v. Pathways to Hous., Inc.*, No. 10 Civ. 9505 (ER), 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012). To resolve the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See* *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2 What was once called the PVB is now called the "Adjudications Division." *See* Dkt. 27 ("City Mem.") at 2. The Court, however, follows the parties and the Report in generally referring to the agency using its old name, the PVB.

3 In its opening brief, the City misidentified the statute authorizing the imposition of towing and storage fees as VTL § 1224. *See* Dkt. 33 ("Reply") at 7 n.5. It clarified in its reply brief that VTL § 1224 only applies to abandoned vehicles, and that CPLR § 8013(c) is the authorizing statute for the imposition of removal and storage fees in this case. *Id.*

4 Only the first five were subject to final judgments in January 2019, when Tsinberg's car was towed, although several would later become so, leading to $750 more in outstanding judgments. *See* Dkt. 22-3; Report at 7–8.

5 The Report construed Tsinberg's allegations about the adequacy of the Article 78 proceedings as a challenge to the result of that action, and so assessed this issue under the *Rooker-Feldman* doctrine. *See* Report at 19–20. But in the Court's view, Tsinberg's challenge to the procedural adequacy of the Article 78 proceeding, liberally construed, does not necessarily require review of the merits of that action. *See* *Hoblock v. Albany Cnty. Bd. Of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (*Rooker-Feldman* bars federal court review of merits of state-court judgments). Thus, while the Court agrees with the Report's ultimate conclusion, it departs from the

Report insofar as it based its recommendation on the application of *Rooker-Feldman.* To the extent Tsinberg does seek review of the merits of the state-court decision at issue, the Court fully agrees with the thoughtful assessment of this issue in the Report.

6 In his Objections, Tsinberg argues, for the first time, that *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) requires a different result. But parties may not raise new legal arguments for the first time in their objections to a report and recommendation. *See, e.g.*, *Gonzalez v. Garvin*, No. 99 Civ. 11062 (SAS), 2002 WL 655164, at *2 (S.D.N.Y. Apr. 22, 2002) (dismissing objection "because it offers a new legal argument that was not presented in his original petition, nor in the accompanying Memorandum of Law"); *see also* *Abu-Nassar v. Elders Futures, Inc.*, No. 88 Civ. 7906 (PKL), 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994) (rejecting arguments advanced for first time in objections to report because permitting such claims would "undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments"). The Court thus rejects this objection. In any event, as the City notes, *Krimstock* appears inapposite. *See* Response at 3 & n.1.

7 In his Objections, Tsinberg expands on his claim of a substantive due process violation, suggesting that the state has no legitimate interest in enforcing registration requirements and that he was singled out for disfavored treatment when the City placed his car on an "indefinite sales hold" as a result of his Article 78 petition, leading to significant storage fees. Objections at 17–19, 25–32. Again, these new theories are not cognizable in the Court's review of a report and recommendation. *See, e.g.*, *Gonzalez*, 2002 WL 655164, at *2. Even if they were, they do not come close to showing a substantive due process violation. In fact, it appears that it was Tsinberg, not the City, who requested that the Vehicle be placed on a sales hold, which request led to the accumulating storage fees. FAC ¶ 54; *see also* Koplik Decl., Ex. R (sales hold listing "requester" as "Leon G. Tsinberg").

8 *See* *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 198–99 (S.D.N.Y. 2019) ("fees and penalties" that "are multiples" of an unpaid tolls were plausibly alleged to be partially punitive); *Dubin*, 277 F. Supp. 3d at 400–02 (Excessive Fines Clause applied to "Drivers' Responsibility Fee" that imposed a mandatory $45 payment on ticketed motorists who received a final disposition other than "not guilty," and recognizing that "administrative and other civil penalties satisfy the [first factor], even if they bear no direct relationship to a criminal prosecution"); *see also* *Pimental v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020) (Excessive Fines Clause applies to "municipal fines," and specifically parking tickets and late penalties, under *Timbs v. Indiana*, 139 S. Ct. 682 (2019), which held that the Clause applies to the states). *But see* *id.* at 925–29 (Bennett, J., concurring) (disagreeing that Eighth Amendment Excessive Fines Clause "should routinely apply to parking meter violations," noting that the "potential for federal court litigation is endless" and risks "trivializ[ing] the Eighth Amendment, the Fourteenth Amendment, and the Civil Rights Acts"). Given the Supreme Court's recent holding that the Fourteenth Amendment incorporates the Excessive Fines Clause against state and municipal governments, *see* *Timbs*, 139 S. Ct. 682, courts in the coming years may be called on more often to assess its applicability to cases like this one, and the extent to which these protections police the bounds of municipal fines, fees, and other penalties. Without fuller presentation by the parties, the Court here has no occasion to opine on this threshold question.

9 Tsinberg, for the first time in his Objections, argues that the $65 exceeds a statutory cap of $50 for parking violations set by N.Y. Admin. Code § 19-203(b). *See* Objections at 37. As the City notes, the $65 amount results from a mandatory state surcharge required by VTL § 1809-a, which provides that "[t]he provisions of any other general or special law notwithstanding," any city with more than 100,000 persons, must levy "a mandatory surcharge in addition to any other sentence, fine or penalty otherwise permitted or required, in the amount of fifteen dollars." Response at 7. That provision states that such $15 surcharge "shall not be deemed a monetary penalty for the purposes of ... section 19-203 of the administrative code of the city of New York"—the provision that Tsinberg relies on for this point.

10 Although Tsinberg relies heavily on the Supreme Court's holding in *Timbs* in arguing to the contrary, that case merely held that the Excessive Fines Clause applies to the states. *See* 139 S. Ct. at 691 ("[R]egardless of whether application of the Excessive Fines Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged"). It did not purport to alter the above analysis.

11 Tsinberg is also vague as to how the reference to child support or alimony on the Execution plays into the Fourth Amendment analysis. To the extent he argues that the language on the Execution falsely accuses him of owing child support or alimony, that characterization is wrong. A photograph of the Execution is attached to the FAC. It identifies outstanding child support or alimony as *among* the authorized bases for such an execution, but it does not state that each was the bases for executing on Tsinberg's car. It states: "The judgment creditor is the state of New York, or any of its agencies or municipal corporations *and/or* the debt enforced is for child support, spousal support, maintenance or alimony." Execution (emphasis added). The execution's recitation thus is consistent with the FAC's allegation that Tsinberg does not owe child support, alimony, or spousal support. FAC ¶ 7; *see* Report at 29 (noting that Execution merely recites legally available bases). Even construing the FAC liberally, it is not plausibly alleged that Tsinberg's vehicle was towed based on a misperception that he owed child support, spousal support, or alimony, as opposed to the substantial debts that Tsinberg admits he actually owed to the City for parking infractions.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Declined to Extend by Jordan v. County of Chemung, W.D.N.Y., September 5, 2017

2014 WL 1293527
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Guynell WRIGHT, Plaintiff,
v.
CITY OF SYRACUSE; Jeffrey T. Wright; Andrew Nolan; Donald Thompson; Robert Calkin; John Doe(s); Jane Doe(s); John M. O'Connor, III; and Thomas Simone, Defendants.

No. 5:10–CV–0661 (GTS/TWD).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Bosman Law Firm, L.L.C., A.J. Bosman, Esq., Daniel W. Flynn, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Robert P. Stamey, James P. McGinty, Esq., Aimee M. Paquette, Esq., of Counsel, Syracuse, NY, for City of Syracuse Counsel for Defendants.

Hancock Estabrook LLP, John G. Powers, Esq., of Counsel, Syracuse, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

***1** Currently before the Court, in this employment discrimination action filed by Guynell Wright ("Plaintiff") against the City of Syracuse, six of its employees and an unstated number of John and Jane Does ("Defendants") is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 95.) For the reasons set forth below, the motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, in his Third Amended Complaint, Plaintiff, an African–American man who was formerly employed by the City of Syracuse ("the City") as a laborer for the Department of Public Works ("the Department"), alleges that, throughout his employment with the City, he was treated differently than similarly situated white employees in the form of promotions, work assignments and discipline; he was retaliated against for his complaints of racial discrimination; and he was subject to continuous hostile work environment conditions. (Dkt. No. 45.)

Based on the factual allegations of Plaintiff's Third Amended Complaint, he asserts the following twenty-one claims: (1) a claim against all Defendants alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); (2) a claim against all Defendants alleging race discrimination in violation of the New York Human Rights Law, N.Y. Exec. Law § 296 ("NYHRL"); (3) a claim against all Defendants alleging hostile work environment in violation of Title VII; (4) a claim against all Defendants alleging hostile work environment in violation of NYHRL; (5) a claim against all Defendants alleging retaliation in violation of Title VII; (6) a claim against ll Defendants alleging retaliation in violation of NYHRL; (7) a claim against all Defendants alleging race discrimination in violation of Plaintiff's right to equal protection under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 ("Section 1983"); (8) a claim against all Defendants alleging hostile work environment in violation of Plaintiff's right to equal protection under the Fourteenth Amendment pursuant to Section 1983; (9) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983; (10) a claim against the City alleging municipal liability on Plaintiff's Section 1983 claims against the individually named Defendants; (11) a claim alleging breach of contract against all Defendants; (12) a claim against all Defendants alleging race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"); (13) a claim against all Defendants alleging hostile work environment in violation of Section 1981; (14) a claim against all Defendants alleging retaliation in violation of Section 1981; (15) a claim against all Defendants alleging the deprivation of Plaintiff's property interest in his continued employment in violation of his right to due process under the Fourteenth Amendment pursuant to Section 1983; (16) a claim against all Defendants alleging the deprivation of Plaintiff's property and liberty interest in his good name and reputation in violation of his right to due process under the Fourteenth Amendment

pursuant to Section 1983; (17) a claim against all Defendants alleging the deprivations of Plaintiff's rights under Article I of the New York State Constitution; (18) a claim against all Defendants alleging retaliation in violation of Title VII based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (19) a claim against all Defendants alleging retaliation in violation of Section 296 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (20) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; and (21) a claim against all Defendants alleging retaliation in violation of Section 1981 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits. (*Id.*)

**B. Undisputed Material Facts**

***2** The following material facts [1] are gleaned from Defendants' Local Rule 7.1 Statement of Undisputed Material Facts, and Plaintiff's response thereto. (*See* Dkt. No. 100–7 [Defs.' Rule 7.1 Statement]; Dkt. No. 105 [Pl.'s Rule 7.1 Response Statement].) Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3). It further provides that, to the extent that the nonmoving party fails to do so, the facts asserted in the movant's Statement of Material Facts will be deemed admitted, as long as they are supported by the record. *Id.*

Plaintiff was employed as a "Laborer I" in the Department's Street Cleaning Bureau from at least June of 2006 until his termination in February of 2010. [2] Laborer I is a civil service classified job title that includes a written job description and written qualifications. The Laborer I position is covered within the American Federation of State, County and Municipal Employees ("AFSCME") Local 400 ("Local 400") bargaining unit, of which Plaintiff was a member.

The collective bargaining agreement ("CBA") for the relevant period between the City and Local 400 provides that the City shall furnish each employee member of Local 400 with a copy of the existing Work Rules and that any amendments or additions to the Work Rules shall be discussed with Local 400 and published to its members prior to becoming effective and that thereafter, any complaint shall be resolved through the grievance procedure. (*See* Dkt. No. 96–2, at 64 [Ex. B to Decl. of Donald Thompson, June 13, 2013].) Section 8.1.4 of the CBA also provides that, "[i]n the event that an employee receives a written reprimand and one (1) year elapses without any other disciplinary action being imposed on the employee, such reprimand shall be removed from the employee's personal file.

The Work Rules provide, in relevant part, at follows:

> VII. Employee Discipline
>
> The City shall not exercise its right to discharge or otherwise discipline an employee without just cause. Whenever reasonable, the City shall subscribe to the principles of progressive discipline. Set forth below are the guidelines used by the City in enforcing progressive discipline and determining the appropriate disciplinary penalty in any particular circumstance. These guidelines may be deviated from when, in the City's opinion, circumstances warrant.

| MINOR OFFENSES | | |
|---|---|---|
| FIRST, SECOND, THIRD | - | Write up |
| FORTH | - | Write up and one day suspension |
| FIFTH | - | Write up and three day suspension |
| SIXTH | - | Write up and five day suspension |
| SEVENTH | - | Write up and ten day suspension |
| EIGHTH | - | Write up and termination |

| | | |
|---|---|---|
| MAJOR OFFENSES | | |
| FIRST | - | Write up and suspension or termination |
| SECOND | - | Write up and suspension or termination |
| THIRD | - | Write up and termination |

***3** Notwithstanding the provisions of Article 8.1.4 of the parties ['] collective bargaining agreement, the discipline imposed for those violations considered to be 'minor' shall be determined by reviewing the number of such violations for which an employee has been disciplined in the twelve (12) months preceding the current violation;

> However, upon committing a fourth (4th) 'minor' violation within the above stated twelve (12) month[ ] period, then that minor violation and each succeeding 'minor' violation shall be based on discipline[ ] received within the preceding eighteen (18) month period. The discipline imposed for each succeeding violation shall be in accordance with progressive discipline as outlined in the above guidelines;

> In all cases of 'major' violations which are subject to suspension and/or termination, the preceding eighteen (18) months disciplinary record (including 'minor' violations) shall be considered in determining the discipline to be imposed in accordance with those outlined in the above guidelines.

(Dkt. No. 107–1, at 9–10 [Ex. 1 to Flynn Aff. ].) The Work Rules expressly provide that "[i]nsubordination is a major ... violation." (*Id.,* at 7.) To be sure, the Work Rules provide that "[t]heft of any City property or services is prohibited[,]" the level of violation attached to such conduct is not specified. (*Id.*) However, Section 9.2.1 of the CBA refers to fighting, theft, substance abuse and insubordination as "serious violations." (*See* Dkt. No. 96–2, at 53.)

From July 2006 until he was terminated, Plaintiff was subject to a series of disciplinary actions by the City. First, in July 2006, Plaintiff was given a one-day suspension for insubordination. In February 2007, Plaintiff was given a 20–day suspension for fighting with another employee. [3] In July 2007, Plaintiff was given a 20–day suspension for theft of City property. In January 2009, Plaintiff was terminated for insubordination, but then was brought back to work through a "last chance" agreement between the City and Local 400. [4] Finally, on February 24, 2010, Plaintiff was terminated for theft of City Property. Plaintiff does not dispute the fact of these disciplinary actions, but disputes the bases for the actions and/or argues that the City applies their policies inconsistently, discretionarily and disparately.

Defendant, John M. O'Connor, III ("O'Connor") made the decision to terminate Plaintiff. O'Connor was appointed Commissioner of the Department in January 2010 and had no involvement in Plaintiff's discipline or any employment actions regarding Plaintiff prior to his termination in February 2010. Defendant, Jeffrey Wright ("Wright") was the Commissioner of the Department through December 2009 and had no involvement in the decision to terminate Plaintiff in February 2010. Defendant, Thomas Simone, III ("Simone") has been the First Deputy Commissioner of the Department since January 2010. He was not a decision maker regarding the determination to terminate Plaintiff in February 2010.

***4** Defendant, Donald Thompson ("Thompson") was the Director of Personnel during the relevant period. Thompson asserts by Declaration that he agreed that it was appropriate to terminate Plaintiff under the circumstances and concurred with O'Connor's decision in that regard. (*See* Dkt. No. 96 at ¶¶ 34–35 [Decl. of Donald Thompson, June 13, 2013].) At his deposition, O'Connor testified regarding his communication with Thompson prior to terminating Plaintiff, as follows: "I had [a] conversation with Don Thompson, who told me the level of progression [Plaintiff] was at and [sic] was instructed and encouraged that I should investigate, and most likely there would be termination here." (Dkt. No. 112, at 56 [Dep. of John M. O'Connor, III, at 152: 4–8, Jan. 4, 2013].) According to Plaintiff, O'Connor told him that Don (meaning Thompson) "said to fire you." (Dkt. No. 106 at 7–8 [Aff. of Guynell Wright at ¶ 41].)

During the relevant time period, Defendant, Robert Culkin ("Culkin") was the Acting Assistant Superintendent of the Department's Street Cleaning Bureau and Defendant, Andrew Nolan ("Nolan") was Acting Superintendent. Both Culkin and Nolan assert that they did not initiate the discipline leading up to Plaintiff's termination, did not participate in the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

pretermination hearing and played no role in the decision to terminate Plaintiff, nor were they consulted by O'Connor for their input regarding Plaintiff's discipline. (*See* Dkt. No. 98 at 8 [Decl. of Andrew Nolan at ¶ 49, June 13, 2013]; Dkt. No. 100 at 5 [Decl. of Robert Culkin at ¶ 32, June 13, 2013].) Plaintiff counters that he "personally observed [ ] O'Conn[o]r go to [ ] Nolan and [ ] C[u]lkin for advice on how to perform his duties as Commissioner." (Dkt. No. 106 at 8 [Wright Aff. ¶ 42].)

Prior to his termination in February 2010, Plaintiff was provided a copy of the notice of the disciplinary charges against him as well as the possibility that termination would be considered as a result. Plaintiff was afforded a disciplinary hearing at which he was given the chance to respond to the disciplinary charges against him and was permitted to have union representation present to advocate on his behalf. Simone was present at Plaintiff's disciplinary hearing. Although Simone has the authority to advise regarding discipline, his role at Plaintiff's hearing was as an observer and gatherer of information.

Also, Plaintiff exercised his procedural right to grieve his termination. That procedure ran its course according to the grievance procedure set forth in the CBA and terminated prior to the final step, when Local 400 voted not to take the grievance to arbitration.

Plaintiff ultimately filed complaints with the New York State Division of Human Rights ("DHR") on March 26, 2010 and April 28, 2010 challenging his February 2010 termination.[5] (*See* Dkt. No. 96–33 [Ex. GG to Thompson Decl.].) In those complaints, Plaintiff alleges that he was suspended and terminated based on his race and that he was retaliated against for his prior DHR complaints. Plaintiff alleges that white employees are treated differently than black employees in terms of employee discipline. (*See id.*) On June 3, 2010 and June 10, 2010, respectively, the DHR dismissed those complaints for administrative convenience. (*See* Dkt. No. 9'–13 [Ex. L to Decl. of Aimee Paquette, June 14, 2013]; Dkt. No. 96–34 [Ex. HH to Thompson Decl.].)

***5** After Plaintiff was terminated, he filed a claim for unemployment benefits with the Department of Labor ("DOL"). When the DOL inquired about the circumstances of Plaintiff's termination, the City responded that he had been terminated for cause. Plaintiff availed himself of the administrative appeal process to challenge the DOL's determination, which was ultimately overturned. Plaintiff received full payment of back benefits owed.

### C. Parties' Briefing on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, the Defendants assert twelve arguments with regard to Plaintiff's claims against them. (Dkt. No. 100–8 [Defs.' Mem. of Law].)

First, argue the Defendants, Plaintiff's employment discrimination claims based on his termination may be dismissed for the following three reasons: (1) the discriminatory determination claim against Simone, Wright, Culkin, Thompson and Nolan should be dismissed because each was either not the decision maker or was not otherwise actionably involved in the decision to terminate Plaintiff; (2) the discriminatory determination claim against O'Connor and the City should be dismissed because (a) Plaintiff cannot make out a prima facie case that his termination was discriminatory, (b) Defendants have come forward with legitimate, nondiscriminatory reasons for Plaintiff's termination, and (c) Plaintiff has no evidence that Defendants' stated reasons for his termination are a pretext for discrimination; and (3) absent individual liability for discriminatory termination, no liability will lie against the City pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018 (1978). (*Id.* at 14–25.)

Second, argue the Defendants, Plaintiffs 18th, 19th, 20th and 21st causes of action alleging discrimination against the City for opposing his application for unemployment benefits may be dismissed for the following three reasons: (1) there is caselaw supporting the legal conclusion that an employer's opposition of a former employee's application for unemployment benefits is not adverse employment action; (2) where an employer opposes a former employee's unemployment application, but the employee is ultimately awarded those benefits, no adverse employment action occurs in any event; and (3) Plaintiff cannot prove discriminatory animus in the opposition of his unemployment application because he failed to seek any discovery or deposition from the City employee responsible for responding to DOL inquiries. (*Id.* at 26–27.)

Third, argue the Defendants, Plaintiff's hostile work environment claims may be dismissed as a matter of law for the following five reasons: (1) Plaintiff's Title VII and NYHRL claims of hostile work environment must be

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

dismissed for failure to exhaust his administrative remedies before the DHR; (2) Plaintiff's NYHRL claim must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) all of Plaintiff's hostile work environment claims must be dismissed because Plaintiff has failed to identify evidence that his workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of his employment; (4) Plaintiff's hostile work environment claims against Simone, O'Connor, Wright and Thompson must be dismissed because there is a lack of evidence of their personal involvement or discriminatory purpose; and (5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 27–36.)

***6** Fourth, argue the Defendants, there is no claim for discriminatory overtime in this action for the following six reasons: (1) the Third Amended Complaint does not include a claim for discriminatory overtime; (2) any claim for discriminatory overtime under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (3) any discriminatory overtime claim under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (4) Plaintiff cannot identify any evidence that he was denied overtime due to discrimination; (5) Plaintiff cannot identify any evidence that he was denied overtime because of his race or protected activity; and (6) any claim of discriminatory overtime against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory overtime assignments. (*Id.* at 36–43.)

Fifth, argue the Defendants, Plaintiff's discrimination and retaliation claims based on less desirable work assignments must be dismissed for the following five reasons: (1) Plaintiff's claimed discriminatory work assignments fail or do not constitute adverse employment action; (2) any claim of discriminatory work assignments against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory work assignments; (3) any claim for discriminatory work assignments under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (4) any discriminatory claim for discriminatory work assignments under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; and (5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 43–48.)

Sixth, argue the Defendants, Plaintiff's discriminatory and retaliatory discipline claims must be dismissed for the following six reasons: (1) Plaintiff's claim for discriminatory and retaliatory discipline under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory and retaliatory discipline under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) some or all of Plaintiff's claims for discriminatory and retaliatory discipline are barred by the relevant statute of limitations; (4) Plaintiff cannot established that the challenged disciplinary actions were premised on discriminatory or retaliatory animus; (5) discriminatory discipline claim against Simone, O'Connor, Nolan, Culkin and Thompson must be dismissed because none of them was a decision maker or involved in the discipline of Plaintiff; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 48–57.)

***7** Seventh, argue the Defendants, Plaintiff's claims of discriminatory and retaliatory denial of promotion may be dismissed for the following six reasons: (1) Plaintiff's claims for discriminatory denial of promotion under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory denial of promotion under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) Plaintiff's claims for discriminatory denial of promotion under Title VII, NYHRL and Section 1983 must be dismissed because they are timebarred; (4) Plaintiff cannot establish that the claimed promotions for which he was passed over were filled based on discriminatory or retaliatory intent; (5) Plaintiff's claims for discriminatory denial of promotion against Simone, Nolan, Culkin, Thompson and O'Connor should be dismissed because none of them was a decision maker or involved in the alleged failure to promote Plaintiff to crew leader; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 57–67.)

Eighth, argue the Defendants, Plaintiff's breach of contract claim must be dismissed because Plaintiff has failed to file a claim against Local 400, which is a prerequisite to a breach

of contract claim based on a union's breach of its duty of fair representation. (*Id.* at 67–68.)

Ninth, argue the Defendants, Plaintiff's 15th and 16th causes of action, brought under Section 1983 for violation of his Fourteenth Amendment right to Due Process may be dismissed because (1) municipal employees hold no due process rights to promotions, overtime, discipline or work assignments; and (2) a municipal employee's liberty interest in keeping his employment is adequately served where there is a process available to challenge the employer's deprivation, such as a grievance procedure. (*Id.* at 68–70.)

Tenth, argue the Defendants, Plaintiff's 17th cause of action for violations of the New York State Constitution must be dismissed because no private right of action exists under the New York State Constitution where a claim based on the same allegations is asserted under Section 1983. (*Id.* at 70–71.)

Eleventh, argue the Defendants, Plaintiff's claim for punitive damages must be dismissed because no such claim may be maintained against the City as a matter of law and because Plaintiff has failed to identify any evidence to establish that the individual Defendants acted with evil motive or intent. (*Id.* at 71.)

Twelfth, argue the Defendants, Plaintiff's claims against John and Jane Doe defendants must be dismissed because Plaintiff failed to identify them through amendment of his pleading prior to the close of discovery. (*Id.*)

**2. Plaintiff's Opposition Memorandum of Law**

Generally, in his opposition memorandum of law, Plaintiff asserts eleven arguments: (1) because Plaintiff asserts claims under the NYHZL and the New York State Constitution, this Court should apply New York procedural law when deciding the pending motion for summary judgment; (2) Defendants' motion should be denied because there are triable issues of fact to support Plaintiff's claims that he was unlawfully discriminated against; (3) Defendants' arguments of failure to exhaust should be rejected because they rely only on the formal charges to the DHR rather than Plaintiff's intake form and handwritten submissions; (4) Plaintiff's hostile work environment claims should not be dismissed because there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation, ridicule and insult that the terms and conditions of his employment were altered for the worse; (5) the City Charter's Notice of Claim provision does not apply to Plaintiff's NYHRL claims; (6) Plaintiff's claims relating to his unemployment benefits should not be dismissed because the City's opposition of Plaintiff's unemployment applications should be deemed adverse employment action under *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006); (7) Plaintiff has viable due process claims because the CBA here only allows Local 400 to seek a post-termination hearing through arbitration; (8) Plaintiff's breach of contract claim should not be dismissed because it is a matter of fact for the jury to decide whether Local 400 breached its duty of fair representation; (9) Plaintiff's claims under the New York State Constitution should not be dismissed because the availability of a federal constitutional or statutory claim does not render a claim under the New York State Constitution subordinate; (10) Plaintiff's entitlement to punitive damages is not suitable for resolution at the summary judgment stage; and (11) Defendants lack standing to seek dismissal of the John and Jane Doe defendants. (*See* Dkt. No. 104 [Pl.'s Opp'n Memo. of Law].)

**3. Defendants' Reply Memorandum of Law**

***8** Generally, in their reply memorandum of law, the Defendants assert eleven arguments: (1) Plaintiff mischaracterizes his summary judgment burden; (2) Plaintiff fails to meet his burden with respect to his wrongful termination claim; (3) Plaintiff fails to oppose, and therefore concedes, Defendants' argument that no claim exists based on discriminatory overtime; (4) Plaintiff fails to meet his burden on his discriminatory promotion claim; (5) Plaintiff fails to meet his burden on his excessive discipline claim; (6) Plaintiff fails to meet his burden on his hostile work environment claim; (7) Plaintiff effectively concedes he has no discriminatory assignments claim; (8) post-employment contestation of unemployment benefits is not actionable; (9) Plaintiff is barred from asserting a contract claim against the City; (10) Plaintiff does not have a viable due process claim; and (11) Plaintiff has failed to establish sufficient evidence to support a *Monell* claim against the City. (Dkt. No. 124 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Motion for Summary Judgment

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine

dispute as to a material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598 (1970)). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must identify evidence in the record that creates a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348 (1986)).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248 (citation omitted).

As for the genuineness requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Id.* As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted; emphasis added). [6] Similarly, inadmissible hearsay is insufficient to create a genuine issue of fact, "absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985) (citations omitted). [7]

**B. Legal Standard Governing Unopposed Motions**

***9** In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at * 1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y.Aug.7, 2009) (Suddaby, J.) (collecting cases).

**C. Plaintiff's Claims**

**1. Title VII**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's race, color, religion, sex, or national origin." 42 U .S.C. § 2000e–2(a)(1). Liability under Title VII is limited to employers, not individuals. *See Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012).

Filing a charge with the EEOC is a jurisdictional prerequisite to a private civil action under Title VII. *See Morgan v. NYS Attorney Gen.'s Office,* No. 11–CV–9389, 2013 WL 491525, at *6 (S.D.N.Y. Feb. 8, 2013) (citing *Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 135, 146 (2d Cir.2012) (citing 42 U.S.C. §§ 2000e–5(e) (1), (f)(1))). Claims not raised before the EEOC may still be brought in federal court as long as they are "reasonably related" to the claims that were filed with the agency. *See id.* (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993), superseded by statute on other grounds as recognized in *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684 (2d Cir.1998)). A claim is "reasonably related" where the conduct complained of "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402. When determining whether a claim is reasonably related to the claims filed with the EEOC, courts should focus "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and "whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Williams v. New York City Housing Auth.,* 458 F.3d 67, 70 (2d Cir.2006) (internal alteration and citation omitted). "[I]t is the substance of the charge and not its label that controls." *Mathirampuzha v. Potter,* 548 F.3d 70, 76–77 (2d Cir.2008) (quoting *Deravin v. Kerik,* 335 F.3d 195, 200–01 (2d Cir.2003)). "The central question is whether the complaint filed with the [EEO] gave th[e] agency adequate notice to investigate discrimination on both bases." *Mathirampuzha,* 548 F.3d at 76–77 (citing *Williams,* 458 F.3d at70).

**a. Hostile Work Environment**

***10** In enacting Title VII, Congress intended to protect against "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole,* 678 F.3d 166, 174–175 (2d Cir.2012) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367 (1993)).

In order to establish a claim for a hostile work environment under Title VII, the underlying harassment alleged "must be sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd,* 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U .S. 57, 67, 106 S.Ct. 2399 (1986); *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). Further, the plaintiff must establish that the hostile or abusive treatment was because of his membership in a class of persons protected by Title VII. *See Redd,* 678 F.3d at 175.

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd,* 678 F.3d at 175 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Whether an environment is subjectively hostile or abusive may be determined by the effect on the plaintiff's psychological well-being, although no single factor is required. *See id.*

In order to establish his claim for hostile work environment, a plaintiff need not show that his "working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Redd,* 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.,* 618 F.3d 112, 119 (2d Cir.2010)). Typically, isolated incidents will not suffice to establish a hostile work environment, "although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd,* 678 F.3d at 175–176 (citing, inter alia, *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004) ("[A] single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (internal quotation marks omitted)). "For racist comments, slurs, and jokes to constitute a hostile work environment, there [generally] must be more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quotation marks omitted).

It is important to keep in mind, however, that "while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd,* 678 F.3d at 176 (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251 (1976); *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405 (2006). Title VII is "meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency." *Taylor v. New York City Dept. of Educ .,* No. 11–CV–3582, 2012 WL 3150388, at *8 (E.D.N.Y. Aug. 2, 2012) (quoting *Curtis v. DiMaio,* 46 F.Supp.2d 206, 213–14 (E.D.N.Y.1999)). Thus, "the 'mere utterance of an epithet which engenders offensive feelings' is insufficient to sustain a hostile work environment claim." *Tolbert v. Smith,* 09–CV–6579, 2014 WL 906158, at *19 (W.D.N.Y. Mar. 7, 2014) (quoting *Hannon v. Wilson Greatbatch, Ltd.,* No. 00–CV–0203, 2002 WL 1012971, *7 (W.D.N.Y. Apr. 24, 2002). *See also Brown v. Coach Stores, Inc.,* 163 F.3d 706 (2d Cir.1998) (occasional offensive racial comments are not sufficiently severe or pervasive to establish a hostile work environment).

***11** In addition to showing that he was subjected to a hostile work environment, a plaintiff must also establish that the conduct which created the hostile environment may be imputed to his employer. *See Shiner v. State Univ. of New York,* No. 11–CV–1024, 2012 WL 5398658, at *4 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d. Cir.2001)).

The actions of a plaintiff's coworkers will be imputed to the employer if the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Wiercinski v. Mangia 57, Inc.,* No. 09–CV–4413, 2012 WL 2319142, at * 10 (E.D.N.Y. June 19, 2012) (quoting *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

However, the actions of a plaintiff's supervisor are "automatically imputed to the employer unless the employer is able to successfully raise an affirmative defense that examines the reasonableness of the conduct of both the employer and the employee." *Shiner,* 2012 WL 5398658, at *4. This defense requires the employer to show that it "exercised reasonable care to prevent and correct any

harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257 (1998).

Where an employer "maintains a policy against [ ] harassment and provides a process through which employees can complain about violations of that policy," it will have met the first prong of its affirmative defense. *Joyner v. City of New York,* No. 11–CV–4958, 2012 WL 4833368, at *3 (S.D.N.Y. Oct. 11, 2012). Further, where a plaintiff fails to take advantage of that system until more than a year after the alleged harassment began, and where the offensive conduct ceased once plaintiff reported it, an employer will establish the second prong of its defense. *See Joyner,* 2012 WL 4833368, at *3 (citing *Leopold,* 239 F.3d at 246).

**b. Race Discrimination and Disparate Treatment**

At the summary judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), and its progeny. *See Mathirampuzha,* 548 F.3d at 78 citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742 (1993); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089 (1981)). At the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden to show that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013) (quoting *Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012) (internal quotation marks and alteration omitted)). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003).

***12** In order to establish a prima facie case of discrimination based on failure to promote under Title VII, a plaintiff ordinarily must demonstrate that: "(1) [he] is a member of a protected class; (2)[he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Yu v. New York City Housing Development Corp.,* 494 F. App'x 122, 124–125 C.A.2 (2d Cir.2012) (quoting *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (quotation marks omitted).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate non-discriminatory reason for the employment action at issue. *See Bir,* 2013 WL 362973, at*1 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). If the employer makes this showing, the burden then shifts back to the plaintiff to show that the employer's proffered explanation is a pretext for discrimination. *Id.* (citing *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 492 (2d Cir.2010)).

" 'A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' A change that is 'materially adverse' could consist of, inter alia, 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " *Morgan,* 2013 WL 491525, at *5 (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)).

**c. Retaliation**

To make out a prima facie case of retaliation under Title VII, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two." *Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d

203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *id.* (quoting *Sumner,* 899 F.2d at 209). The reasonableness of a plaintiff's belief is to be assessed in light of the totality of the circumstances. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996).

***13** Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya,* 202 F.3d at 640; *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield,* 663 F.Supp.2d at 343 (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 (S.D.N.Y.2004)).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 (E.D.N.Y.2003)).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

Claims of retaliation under Title VII are governed by the burden-shifting analysis announced in *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. *See Guzman v. News Corp.,* No. 09–CV–9323, 2013 WL 5807058, at * 19 (S.D.N.Y. Oct. 28, 2013) (citing *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010); *Lennert–Gonzalez v. Delta Airlines, Inc.,* No. 11–CV–1459, 2013 WL 754710, at *9 (S.D.N.Y. Feb. 28, 2013)). *See also Puglisi v. Town of Hempstead,* 545 F. App'x 23, ––––, 2013 WL 5663223 (2d Cir. Oct. 18, 2013) (discussing Title VII retaliation claim in context of *McDonnell–Douglas* burden-shifting framework).

"Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343.

> ***14** If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (2013). The Supreme Court recently clarified that 'a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006).

*Guzman,* 2013 WL 5807058, at * 19. *See also Puglisi,* 2013 WL 5663223; *Leacock v. Nassau Health Care Corp.,* No. 08–CV–2401, 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013); *Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.,* ––– F.Supp.2d. ––––, ––––, 2013 WL 5338516, at *18 (S.D.N.Y.2013).

**2. NYHRL**

"Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII," those claims may be analyzed in tandem. *Leopold v. Baccarat, Inc.* 174 F.3d 261, 264, n. 1 (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304, n. 4 (2d Cir.1995), abrogated on other grounds by *Burlington Indus.,* 524 U.S. 742, 118 S.Ct. 2257). *See also Salmon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226, n. 2 (2d Cir.2008). Accordingly, a

court's ruling regarding a plaintiff's Title VII claims applies with equal force to those claims under the NYHRL. *See Leopold,* 174 F.3d at 264, n. 1.

Under the NYHRL, however, a plaintiff may allege claims against an individual defendant as an aider or abettor of NYHRL violations. In order for a plaintiff to recover against an aider or abettor of NYHRL violations, she must establish "(1) that [ ]he engaged in conduct protected by the NYHRL; (2) there is a causal connection between the protected conduct and the alleged [violations] of the NYHRL; and (3) that [the defendant] 'actually participated' in the discrimination." *Beattie v. Guilderland Cent. Sch. Dist.,* 124 F.Supp.2d 802, 805 (N.D.N.Y.2000) (citations omitted). *See also* N.Y. Exec. Law § 296.1(a) (McKinney 2012). Further, a plaintiff must show that the defendant "aided or abetted a primary violation of the NYHRL committed by another employee or the business itself." *Jordan v. Cayuga Cnty.,* No. 01–CV1037, 2004 WL 437459, at *4 (N.D.N.Y. Feb. 9, 2004) (quoting *Bennett v. Progressive Corp.,* 225 F.Supp.2d 190, 213 (N.D.N.Y.2002) (internal quotation and emphasis omitted)). *See DeJohn v. Wal–Mart Stores East, LP,* No. 09–CV–1315, 2012 WL 3679204, at * 16 (N.D.N.Y. Aug. 17, 2012). However, an individual cannot be held liable for aiding and abetting their own violations of the NYHRL. *See Reid v.. Ingerman Smith LLP,* 876 F.Supp.2d 176, 186 (E.D.N.Y.2012). Finally, an employee is not individually subject to suit as an aider or abettor under the NYHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Miotto v. Yonkers Public Schools,* 534 F.Supp.2d 422, 427 (S.D.N.Y.2008) (quoting *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984)). *See also Tomka,* 66 F.3d at 1317.

### 3. 42 U.S.C. § 1983

***15** In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689 (1979)).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York,* 821 F.Supp.2d 651, 655–656 (S.D.N.Y.2011) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted)). A plaintiff may allege the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant: "(1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act." *Kregler,* 821 F.Supp.2d at 655–56 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501).

A municipality may only be liable on a § 1983 claim "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018 (1978)). In the absence of such a custom or policy, a municipality may not be held liable on a § 1983 claim for the actions of its employees under a theory of vicarious liability. *See Jones,* 691 F.3d at 80 (citing *Monell,* 436 U.S. at 691, 98 S.Ct.2018). Thus, isolated acts of municipal employees are typically not sufficient to establish municipal liability. However, acts done "pursuant to municipal policy, or [that] were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware" would justify liability of the municipality. *Jones,* 691 F.3d at 81. Further, "a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Id.*

#### a. First Amendment Retaliation

***16** "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Dillon v. Suffolk Cnty. Dep't of Health Servs.,* 917 F.Supp.2d 196, 205 (E.D.N.Y.2013) (quoting *Garcetti v. Caballus,* 547 U.S. 410, 417, 126 S.Ct. 1951 (2006)). In order to establish a claim for First Amendment retaliation, a public employee must show that (1) he engaged in "constitutionally protected speech" because

he spoke as a citizen on a matter of public concern; (2) he suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. *Dillon,* 2013 WL 208950, at *6 (quoting *Johnson v.. Ganim,* 342 F.3d 105, 112 (2d Cir.2003)). The threshold inquiry is whether the employee spoke as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti,* 547 U.S. at 418. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.' " *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684 (1983)).

In the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006). Such actions can include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," or may include "lesser actions" such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik,* 464 F.3d at 226 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)).

**b. Equal Protection**

A plaintiff may establish a claim for the violation of her right to equal protection under the Fourteenth Amendment based on race discrimination, since the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006) (quoting *Feingold,* 366 F.3d at159 & n. 20). Thus, claims for hostile work environment and disparate treatment may be brought under § 1983 as equal protection claims. *See Demoret,* 451 F.3d at 149. However, a claim of retaliation for complaining of race discrimination is not properly brought under the Equal Protection Clause. *See Bernheim v. Litt,* 79 F.3d 318, 323 (2d Cir.1996).

**c. Due Process**

***17** The Due Process Clause of the Fourteenth Amendment essentially provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Thus, in order to prevail on a due process cause of action, a plaintiff must establish the deprivation of some tangible property or liberty interest. *See Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004) ("stigma plus" claim requires a showing of the loss of one's reputation coupled with a more tangible liberty or property interest); *DeMuria v. Hawkes,* 328 F.3d 704, 705 (2d Cir.2003) (substantive due process claim requires plaintiff to identify the deprivation of a protected liberty or property interest, in addition to the requisite consciousshocking behavior on the part of the government); *McMenemy v. City of Rochester,* 241 F.3d 279, 285–286 (2d Cir.2001) (to establish a procedural due process claim, plaintiff must show that he possessed a protected liberty or property interest, of which he was deprived without due process).

When an individual claims to have a property interest related to employment, courts may look to the relevant contract of employment-either explicit or implicit-or its functional equivalent to determine whether the individual has such a property interest. *See Board of Regents v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701 (1972); *Ciambriello v. County of Nassau,* 292 F.3d 307, 314 (2d Cir.2002).

Where a government employee has a constitutionally protected property interest in his employment, "some kind of hearing [is required] prior to [termination]." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487 (1985) (internal quotation marks and citation omitted).

> However, in general, something less than a full evidentiary hearing is sufficient prior to adverse action. Before being terminated, the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. As long as a full post-termination hearing

is provided for, the pre-termination hearing may be minimal.

*Arteta v. Cnty. of Orange,* 141 F. App'x. 3, 7 (2d Cir.2005) (citing *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487; *Locurto v. Safir,* 264 F.3d 154, 173–74 (2d Cir.2001)) (quotations omitted).

It is a well-established legal principle in the Second Circuit "that there is no [procedural] due process violation where ... pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams v. Suozzi,* 517 F.3d 124, 128 (2d Cir.2008) (citing cases). *See also Coollick v. Hughes,* 699 F.3d 211, 217 (2d Cir.2012).

A government employee may have a cause of action for violation of his right to substantive due process where a government defamation occurs in the course of dismissal from employment resulting in a deprivation of a liberty interest, commonly referred to as a stigma plus claim. *See Lawson v. Rochester City Sch. Dist.,* 446 F. App'x. 327, 329 (2d Cir.2011) (citing *Patterson,* 370 F.3d at 330). In order to prevail on such a claim, a plaintiff must prove (1) the utterance of a statement injurious to his reputation that is capable of being proved false and that plaintiff claims is false; and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement. *See Monserrate v. N.Y. State Senate,* 599 F.3d 148, 158 (2d Cir.2010). "An employee's liberty interest is not ordinarily implicated by statements in connection with his termination of employment if there has been no public disclosure of the reasons for the discharge." *Walsh v. Suffolk Cnty. Police Dep't,* 341 F. App'x 674, 675 (2d Cir.2009) (citing *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 (1976) ("Since the ... communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired."). Moreover, a plaintiff cannot prevail on a substantive due process claim unless he shows that the defendants infringed a liberty interest in an arbitrary or irrational manner and in such a way as to "shock the conscience." *Smith v. Half Hollow Hills Cent. School Dist.,* 298 F.3d 168, 173 (2d Cir.2002). *See also Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir.2001).

#### 4. 42 U.S.C. § 1981

***18** Employment discrimination claims brought under Section 1981, like those brought under Section 1983, are subject to the same substantive standards as claims brought pursuant to Title VII and NYHRL. *See Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4 (E.D.N.Y. Mar. 17, 2014). Procedurally, employment discrimination claims brought pursuant to Sections 1981 and 1983 are also analyzed under the *McDonnell Douglas* framework. *See id.* [8] Finally, Section 1981 claims against a municipality, like Section 1983 claims, are subject to analysis under *Monell. See Lang. v. New York City Health & Hosps. Corp.,* No. 12–CV–5523, 2013 WL 4774751, at * 5 (S.D.N.Y. Sept. 5, 2013).

#### 5. New York State Constitution

Where claims are brought pursuant to the New York State Constitution that mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. *See Canzoneri v. Incorporated Vill. of Rockville Ctr.,* 2013 WL 6330671, at *11 (E.D.N.Y. Dec. 5, 2013) (citing *Krug v. Cnty. of Rennselaer,* 559 F.Supp.2d 223, 247–48 (N.D.N.Y.2008)). *See also Clayton v. City of Poughkeepsie,* 2007 WL 2154196, at *7 (S.D.N.Y. June 21, 2007) (quoting *De Vito v. Barrant,* No. 03–CV–1927, 2005 WL 2033722, at *6–7 (E.D.N.Y. Aug. 23, 2005)); *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439, 446–47 (S.D.N.Y.1999).

## II. ANALYSIS

### A. Whether A Discriminatory Overtime Claim Exists in This Action

After carefully considering the matter, the Court answers this question in the negative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 36–43 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

Plaintiff fails to plead a claim for discriminatory overtime in his Third Amended Complaint. Moreover, Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The only evidence of Plaintiff being denied overtime occurred in January 2006, before the period that is relevant to the claims in this action. Moreover, the evidence reflects that Plaintiff grieved the issue, which was resolved in his favor. Accordingly, there is no evidence that Plaintiff endured a materially adverse change in the terms and conditions of his employment as it relates to overtime. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory denial of overtime is granted.

**B. Whether Plaintiff's Claims Under Article I of the New York State Constitution Must Be Dismissed**

***19** After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 70–71 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

First, Plaintiff's purported claim under the New York State Constitution is that Defendants deprived him of his rights under Article I, essentially claiming a violation of the entire Bill of Rights. Accordingly, Plaintiffs' New York Constitutional claim is overly broad and therefore, should be dismissed for failure to state a claim. In an abundance of caution, the Court interprets Plaintiff's Third Amended Complaint to allege claims under Article I, Sections 6 (due process), 8 (freedom of speech), and 11 (equal protection).

Second, and in any event, as indicated above in Point II.C.5. of this Decision and Order, where Plaintiff's state constitutional claims mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. Accordingly, for this reason alone, Defendants' motion for summary judgment on Plaintiff's 17th cause of action under the New York State Constitution is granted.

**C. Whether Plaintiff's Claims Against John Doe(s) and Jane Doe(s) Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 71 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' legally supported motion for summary judgment seeking dismissal of the John and Jane Doe defendants Plaintiff makes the bald and completely unsupported assertion that Defendants "have no standing" in that regard. (Dkt. No. 104 at 22 [Pl.'s Mem. of Law].) Plaintiff does not dispute that discovery in this action, which lasted in excess of two years, is complete, nor does he argue that further discovery would reveal the identity of these unnamed defendants. Accordingly, the completion of discovery and Plaintiff's failure to identify the John and Jane Doe defendants mandates their dismissal. *See Epps v. City of Schenectady,* No. 10–CV–1101, 2013 WL 717915, at *5 (N.D.N.Y. Feb. 27, 2013). Therefore, Defendants' motion for summary judgment is granted in this regard.

**D. Whether Plaintiff's Breach of Contract Claim Against Defendants Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 67–68 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' motion in this regard, Plaintiff cites inapposite caselaw and fails to address the point made by Defendants, which is that in order to pursue a breach of contract claim against the City under the undisputed facts of this case, Plaintiff must have also pursued a claim against Local 400 for breach of the duty of fair representation. *See Lore v. City of Syracuse,* 670 F.3d 127, 151 (2d Cir.2012). Plaintiff fails to identify any such claim against Local 400, nor has he alleged such a claim against Local 400 in this action. Accordingly, the caselaw Plaintiff cites, for the proposition that whether a union has breached its duty of fair representation is a fact question for a jury to decide, is irrelevant to the pending issue before the Court. (*See* Dkt. No. 104 at 20 [Pl.'s Mem. of Law citing *Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1244–45 (8th Cir.1980) ].) Finally, it is worth noting that Plaintiff's misunderstanding of the law in this regard is dubious considering the supporting legal authority cited by Defendants, *Lore v. City of Syracuse,* is a case out of the Second Circuit Court of Appeals, a party to which was represented by Plaintiff's counsel in this action.

***20** Therefore, Defendants' motion for summary judgment regarding Plaintiff's breach of contract claim is granted.

**E. Whether Plaintiff's Claims Alleging Discrimination and Retaliation Due to the City's Contestation of His Application for Unemployment Benefits Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 26–27 [Defs.' Mem. of Law]; Dkt. No. 124 at 14–15 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff opposes Defendants' motion in this regard, arguing that the City's contestation of his application for unemployment benefits was an adverse action. However, Plaintiff concedes that his retaliation claims in this regard are asserted solely against the City, despite the allegations in the Third Amended Complaint.

Plaintiff acknowledges that courts disagree whether an employer's decision to contest unemployment benefits constitutes an adverse action, but cites only one case in support of his argument that opposing unemployment benefits is adverse action, ostensibly suggesting that this Court should decide the issue here accordingly. *See Brown v. JP Morgan Chase Bank,* No. 12–CV–544, 2013 U.S. Dist. LEXIS 95946, at *21–22 (E.D.N.Y. Apr. 10, 2013). [9]

Nonetheless, this Court finds instructive and persuasive the caselaw holding that an employer's opposition of a terminated employee's application for unemployment benefits is not adverse action for purposes of a retaliation claim. *See Burnett v. Trinity Inst. Homer Perkins Ctr., Inc.,* No. 10–CV–681, 2011 WL 281023, at *3 (N.D.N.Y. Jan. 25, 2011) (citing *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997); *U.S. v. N.Y. City Transit Auth.,* 97 F.3d 672, 677 (2d Cir.1996)). *See also Belardo v. Con–Way Transp. Servs., Inc.,* No. 02–CV5406, 2005 WL 885016, at *8 (E.D.N.Y. Mar. 28, 2005) ("[A]n employer's actions in objecting to the provision of unemployment benefits to a former employee is not an adverse employment action cognizable under the employment discrimination laws."); *Jenkins v. St. Luke's–Roosevelt Hosp. Ctr.,* No. 09–CV–12, 2009 WL 3682458, at *9 (S.D.N.Y. Oct. 29, 2009) (granting motion to dismiss retaliation claim regarding employer's cessation of unemployment benefits); *Barriera v. Bankers Trust,* No. 98–CV–3641, 2003 WL 22387099, at *7 (S.D.N.Y. Oct. 20, 2003) (finding no adverse employment action where employer opposed plaintiff's unemployment benefits claim, failed to award severance pay, and informed the EEOC that the plaintiff resigned); *Roman v. Cornell Univ.,* 53 F.Supp.2d 223, 245 (N.D.N.Y.1999) (holding that employer's opposition to plaintiff's unemployment benefits application does not constitute an adverse employment action).

Therefore, Defendants' motion for summary judgment regarding Plaintiff's retaliation claims as it relates to the City's contestation of his unemployment benefits is granted.

**F. Whether Plaintiff's Hostile Work Environment Claims Must Be Dismissed**

***21** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 31–34 [Defs.' Mem. of Law]; Dkt. No. 124 at 12–14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Defendants point to Plaintiff's deposition testimony to demonstrate the lack of evidence supporting Plaintiff's hostile work environment claim. Specifically, Plaintiff testified that he felt his employment environment was hostile because nobody on his crew liked him nor would they communicate with him, despite the fact that they never made any racial comments to him. (*See* Dkt. No. 108 at 264–264 [Dep. of Guynell Wright, Jan. 18, 2013].) Plaintiff further testified that he felt like he was walking on egg shells at work because he feared being disciplined for things that other people were not disciplined for, and that despite being a victim when a white employee lifted his leg up behind Plaintiff's head and when another employee patted his butt, Plaintiff was still disciplined. [10] (*Id.,* at 267–268.) Defendants argue that these instances do not rise to the level of severity or pervasiveness to establish hostile work environment and that Plaintiff has not established that the alleged hostile or abusive treatment was because of his race.

Plaintiff, in opposition, fails to identify any evidence in the record to create a question of fact on the issues of severity or pervasiveness or the issue of whether the alleged hostile treatment was because of his race. Instead, Plaintiff argues, in conclusory fashion, that "there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation,

ridicule and insult that the terms and conditions of his employment were altered for the worse." (Dkt. No. 104 at 12 [Pl.'s Mem. of Law].) Accordingly, Plaintiff has not met his burden to identify any fact question for a jury to decide regarding his hostile work environment claim and summary judgment may be granted on this basis alone. However, in an abundance of caution, the Court has reviewed the record to identify any other evidence that could possibly support Plaintiff's hostile work environment claim.

In his affirmation, Plaintiff states that when Nolan was crew leader an employee called Plaintiff the N word in Nolan's presence, but Nolan asked Plaintiff to shake the other employee's hand to resolve the conflict, without disciplining the other employee. (*See* Dkt. No. 106 at 10, ¶ 56 [Pl.'s Aff.].) Plaintiff further asserts that, "[u]pon information and belief, Department of Personnel employee Terri Macri has made statements to other DPW employees that she does not approve of mixed race babies." (*Id.,* ¶ 60.) Other evidence includes Plaintiff's assertion that Nolan said that "no black man was ever going to make anything on my watch" in 2007. (*Id.,* at 8, ¶ 46.)

***22** To be sure, even assuming the admissibility of Plaintiff's double hearsay statements attributable to Terri Macri, their relevance is dubious considering they were made outside the presence of Plaintiff. *See, e.g., Greaves v. St. Luke's–Roosevelt Hosp. Ctr.,* 03–CV–7424, 2005 U.S. Dist. LEXIS 4082, at *33 (S.D.N.Y. March 17, 2005) (rejecting plaintiff's claim of hostile work environment because, "[w]ith the exception of a single hearsay remark, made outside his presence, Greaves fails to point to any discriminatory insult or abuse"); *cf. Benjamin v. Metro. Transp. Auth.,* 07–CV–3561, 2012 WL 3188764, at *12 (S.D.N.Y. Aug. 2, 2012) ("While some of Benjamin's fellow Plaintiffs also make allegations about a hostile work environment, the record does not indicate that Benjamin was aware of any comments made to other Plaintiffs, let alone was present to hear them and have them impact his own work environment."). Moreover, Plaintiff's assertion regarding another employee calling him the N-word in Nolan's presence is also of questionable relevance because, while Plaintiff fails to state with specificity when the statement was made, he asserts that it was made when Nolan was a crew leader, which would have been prior to the relevant time period at issue in this action. (*See* Dkt. No. 117, at 6 [Dep. of Andrew Nolan, Jan. 8, 2013].)

Nonetheless, even assuming the truth, relevance and admissibility of all of the aforementioned evidence, Plaintiff still cannot identify a question of fact regarding his hostile work environment claims. As indicated in Point II.C. 1.a. of this Decision and Order, occasional offensive racial comments are not sufficiently severe or pervasive in order to establish a hostile work environment claim. Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims is granted.

### G. Whether Plaintiff's Due Process Claims Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 68–70 [Defs.' Mem. of Law]; Dkt. No. 124 at 15–16 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

First, the Court notes that the Third Amended Complaint contains an allegation that "Plaintiff maintained a property and liberty interest in his good name and reputation" which was deprived by Defendants. (Dkt. No. 45 ¶¶ 103–104 [Pl.'s Third Am. Compl.].) In his papers in opposition to Defendants' motion for summary judgment on his due process claim, Plaintiff makes no mention of a liberty interest in his reputation, nor does the record contain any evidence of an offensive statement that was made public. Accordingly, to the extent any substantive due process claim was intended by Plaintiff, it is dismissed from this action.

Second, to the extent Plaintiff alleges a procedural due process claim based on any employment action other than termination, those claims are dismissed. Courts in this Circuit hold that an employee does not have a constitutionally protected interest to be free from employment actions other than termination. *See Barnes v, Pilgrim Psychiatric Ctr.,* 860 F.Supp.2d 194, 204 (E.D.N.Y.2012) (citing cases).

***23** Finally, regarding Plaintiff's termination, it is clear that the grievance procedure set forth in the CBA provided Plaintiff the appropriate pre-deprivation hearing as required by the Due Process Clause. *See Adams,* 517 F.3d at 128. Regarding post-deprivation procedures, Plaintiff argues that the CBA "replaces N.Y. Civil Service Law § 75 and any other procedures to challenge the termination of employment." (Dkt. No. 104 at 17 [Pl.'s Mem. of Law].) To be sure, the CBA provides, in relevant part, that the grievance procedure outlined therein "shall apply in lieu of Section 75 and 76 of the Civil Service Law for any employee who

would be covered by those sections." (Dkt. No. 96–2 at 52 [Ex. B to Thompson Decl.].) However, there is nothing in the CBA or otherwise that prevents Plaintiff from seeking a post-deprivation hearing. "[T]he availability of an Article 78 proceeding after the fact provides all the process that is due." *Kruggel v. Town of Arietta,* No. 11–CV–1250, 2013 WL 5304184, at *4 (N.D.N.Y. Sept. 19, 2013) (quoting *Sebast v. Mahan,* 754 F.Supp.2d 423, 431–32 (N.D.N.Y.2010)).

For these reasons, Defendants' motion for summary judgment regarding Plaintiff's due process claims is granted.

**H. Whether Plaintiff's Claims Based on Discriminatory Assignments Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 43–45 [Defs.' Mem. of Law]; Dkt. No. 124 at 14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The receipt of undesirable work assignments must be accompanied by a materially adverse change in employment, such as demotion or loss of wages, in order to be actionable. *See Henry v. NYC Health & Hosp. Corp.,* No. 13–CV–6909, 2014 WL 957074, at *5 (S.D.N.Y. Mar. 10, 2014). Here, Plaintiff complains that "he and other Black employees have been given less desirable assignments" such as those requiring work outdoors in the hazardous weather. (*See* Dkt. No. 42 at ¶ 28 [Pl.'s Third Am. Compl.].) At his deposition, however, Plaintiff conceded that it was part of his job to go out in the cold and shovel snow. (*See* Dkt. No. 108 at 116 [Pl.'s Dep.].) There is no evidence that such job assignments were accompanied by a loss in job title or pay. Accordingly, the alleged discriminatory job assignments cannot form the basis of a discrimination or retaliation claim since they were not materially adverse. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory reassignment of job duties is granted.

**I. Whether Plaintiff's Claims Based on Discriminatory Denial of Promotion Must Be Dismissed**

***24** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 57–67 [Defs.' Mem. of Law]; Dkt. No. 124 at 6–9 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

In support of his discriminatory failure to promote claim, Plaintiff alleges that he asked Defendants Nolan and Wright for promotions and that, when asked why he did not promote black employees, Nolan responded, "A black man will never make anything on my watch." (*See* Dkt. No. 42 at ¶¶ 26–27 [Pl.'s Third Am. Compl.].)

The following facts are undisputed. The opportunities for a pay grade promotion just above Plaintiff's job title, Laborer I, include Laborer II, Motor Equipment Operator ("MEO") I and MEO II, all of which are within Plaintiff's bargaining unit. Each of these positions require a Commercial Driver's License ("CDL"), which Plaintiff never sought. Plaintiff also never applied for any of these pay grade promotions. The title of "Crew Leader" is a position within the Street Cleaning Bureau, which falls under a separate CBA between the AFSCME 1773 and the City. (*See* Dkt. No. 96–7 [Ex. G to Thompson Decl.].) Under that CBA, all Crew Leader vacancies must be advertised and filled by qualified Local 1773 members before being offered to members of other bargaining units, such as Local 400.

Although the City has no record of Plaintiff ever having applied for a Crew Leader position, Plaintiff asserts that between 2006 and 2010, whenever a bid was posted for a Crew Leader position, he submitted an application, but was never promoted to Crew Leader. However, at his deposition, when asked what positions he put in a bid for between 2006 and 2010, Plaintiff replied that he "put in a bid for a crew leader" and later that he bid for "a couple of" and "more than one bid" for Crew Leader. (Dkt. No. 108 at 96, 99.) [11]

Plaintiff went on to explain that there was one Crew Leader position in Sanitation, and another in Street Cleaning. Plaintiff said that Sanitation position went to Efren Maldonado, who had previously worked in Street Cleaning and Sanitation, and the other position went to Thomas Rubado, who came from the Aviation Department. Finally, when asked what reason he has to believe he did not get those jobs because of his race, Plaintiff testified that he believes he didn't get those positions because "they didn't like me." (*Id.* at 105.)

According to Jeffrey Wright, who was Commissioner through the end of 2009, the only Crew Leader positions that he appointed in the Street Cleaning Bureau during his tenure were filled by existing Local 1773 members, Thomas Rubado and Richard Shepherd. Since both were qualified, the position would not have been opened to other bargaining units. The only non Local 1773 member who filled a Crew Leader position during Wright's tenure was Efran Maldonado, a minority who was an MEO at the time of his promotion. Also, that position opened in the Department of Sanitation in 2006 and had entirely different job responsibilities than that of the Street Cleaning Bureau. (*See* Dkt. No. 97 at ¶¶ 48–49 [Decl. of Jeffrey Wright, June 13, 2013].)

***25** Nolan, Superintendent, asserts that he was not involved in formal hiring decisions, which are made by the Commissioner. (*See* Dkt. No. 98 at ¶ 13 [Decl. of Andrew Nolan, June 13, 2013].) Plaintiff disputes this, citing Nolan's promotion of Ray Garcia to the vacant position of "acting crew leader" in 2007. It was at that time that, Plaintiff asserts, Nolan made the comment that "no black man was ever going to make anything on my watch." (Dkt. No. 106 at ¶¶ 44–46 [Pl.'s Aff.].)

Jeffrey Wright, who was Commissioner through 2009, affirms that, in the day-to-day operation of the Street Cleaning Bureau, it becomes necessary to name an acting Crew Leader if the actual Crew Leader is out sick or on vacation. These positions are temporary and are made by the Superintendent, not the Commissioner. (*See* Dkt. No. 97 at ¶ 51 [Jeffrey Wright Decl.].) Wright further affirmed that "at some point in 2007," Plaintiff came to Wright and told him that he should be considered for promotion to Crew Leader; not for a specific opening, but more generally in the future. Then Commissioner Wright explained to Plaintiff that he needed to make himself more competitive, "including obtaining his CDL and applying for some of the intermediate positions such as Laborer II and MEO." (*Id.,* at ¶ 50.) Wright explained that, "[i]n other words, since a Crew Leader must supervise laborers and heavy equipment and motor vehicle operators and be familiar with the operation of all of the equipment in the Bureau, it helps to have experience actually performing those jobs and operating that equipment." (*Id.*)

At his deposition, Plaintiff explains that he was told by Bobby Reed, a supervisor, that "next week you are going to be the acting crew leader" but then when that week arrived, Ray Garcia was the acting crew leader. (Dkt. No. 108 at 106–107 [Pl.s' Dep.].) Plaintiff agreed "that an acting crew leader is someone who is working out of title for a short period of time while somebody is either on medical leave or vacation." (*Id.* at 107:9–14.) Plaintiff also explained that during this short period of time, the acting crew leader is paid at the Crew Leader rate. Plaintiff testified that he felt that Nolan gave Ray Garcia the acting crew leader position because of racial animosity toward Plaintiff due to Nolan's comment that a black man wasn't going to make anything on his watch. (*Id.* at 108.) Plaintiff clarified that Nolan made this comment after he made Ray Garcia acting crew leader. (*Id.*)

In his opposition to Defendants' motion, Plaintiff cites one factual question that he argues warrants a denial of summary judgment. Specifically, Plaintiff argues that there is a question of fact regarding whether Nolan made the statement that no black man will ever make anything on his watch. Moreover, Plaintiff contends that even where Nolan was not the decision maker, under a Cat's Paw theory of liability, his racial animus may be imputed to the decision maker.

***26** As indicated in Point II.C. 1.b. of this Decision and Order, Plaintiff bears the burden at trial to show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See* *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013). In order to establish a prima facie case of discrimination based on failure to promote, Plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."

Plaintiff cannot establish a prima facie case of discriminatory failure to promote for several reasons. First, there is evidence that Plaintiff was not qualified to be a Crew Leader, given

his lack of experience and failure to obtain a CDL, which Plaintiff does not dispute. Next, as it relates to Plaintiff's claim that Defendants failed to promote him, instead promoting Mr. Rubado and Mr. Maldonado, to vacant Crew Leader positions, there is absolutely no evidence of racial animus underlying the decision to promote Mr. Rubado and Mr. Maldonado. In fact, Plaintiff testified that he was not promoted to either of these positions because "they didn't like me" but then later also testified that Mr. Rubado and Mr. Maldonado were in a position to get those jobs. (Dkt. No. 108 at 105, 106.) Moreover, even if Plaintiff could establish a prima facie case of discrimination on this basis, Defendants have identified legitimate, non-discriminatory reasons, which Plaintiff does not dispute, for promoting Mr. Rubado and Mr. Maldonado rather than Plaintiff: those gentlemen were qualified for the position and were members of Local 1773, which, pursuant to the CBA, required that the City promote them before opening the position up to members of other bargaining units, such as Local 400. Given the lack of evidence regarding racial animus attached to those promotions, Defendants are entitled to summary judgment in that regard.

Regarding Nolan's assignment of Ray Garcia to a temporary, acting crew leader position instead of Plaintiff, the Court notes that it is questionable whether such an assignment may be considered a promotion. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 229 (2d Cir.2004) (concluding that an assignment to substitute for an absent supervisor generally cannot fairly be labeled a promotion). Nonetheless, Plaintiff does not identify any evidence suggesting that he was qualified for the acting crew leader position, while Mr. Garcia, who was an MEO II, three positions ahead of Plaintiff, was clearly qualified. Because Plaintiff cannot show that the acting crew leader position was given to someone less qualified than him, he cannot establish a prima facie case of discrimination based on failure to promote.

***27** For these reasons, Defendants' motion for summary judgment on Plaintiff's claims based on failure to promote is granted.

### J. Whether Plaintiff's Claims Based on Discriminatory Discipline Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 48–577 [Defs.' Mem. of Law]; Dkt. No. 124 at 9–12 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to discipline. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to the disciplinary actions taken against Plaintiff. It is undisputed that the only Defendant who was the decision maker regarding the disciplinary actions against Plaintiff was Commissioner Wright.[12] Moreover, other than a bald and unsupported assertion by Plaintiff in his response to Defendants' Local Rule 7.1 statement, there is no evidence that Nolan had anything to do with the Commissioner's decision to discipline Plaintiff. Finally, there is absolutely no evidence of racial animus or bias on behalf of Commissioner Wright against Plaintiff.

Moreover, for the reasons stated in Defendants' memoranda, Plaintiff has failed to adduce any evidence that similarly situated white employees were treated more favorably than Plaintiff in terms of discipline. (*See* Dkt. No. 100–8 at 51–55 [Defs.' Mem. of Law].)

For these reasons, Defendants' motion for summary judgment on Plaintiff's claims regarding discriminatory and/ or retaliatory discipline is granted.

### K. Whether Plaintiff's Claims Based on Discriminatory Termination Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 14–25 [Defs.' Mem. of Law]; Dkt. No. 124 at 2–6 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to his termination. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to Plaintiff's termination. The evidence reflects that Defendant O'Connor, who was Commissioner at the time, made the decision to terminate Plaintiff. Even assuming that Defendants Thompson and Simone advised or encouraged O'Connor to terminate Plaintiff, there is no evidence of racial animus or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

bias on behalf of O'Connor, Thompson [13] or Simone against Plaintiff.

The only person that Plaintiff has identified as having racial animus is Nolan. Nolan affirms that he did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. Nolan further affirms that O'Connor did not ask for his input regarding the termination. (*See* Dkt. No. 98 at ¶ 49 [Nolan Decl.].) O'Connor affirms that he was the sole decision maker in the determination to terminate Plaintiff. (*See* Dkt. No. 99 at ¶ 36 [Decl. of John M. O'Connor, III, June 13, 2013].). In making the decision to terminate Plaintiff, O'Connor states that he relied upon

> ***28** (a) the Police Report and the statements Guynell Wright made to the police that he knew he was violating DPW policy; (b) the fact that Guynell Wright was in the last stage of disciplinary progression; (c) the fact that Guynell Wright had been previously received significant discipline in 2007 for near identical conduct; and (d) a review of Guynell Wright's prior “thick” disciplinary file which reflected numerous prior major and minor violations and demonstrated a pattern of misconduct over time.

(*Id.* at ¶ 37.) In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies the assertion that Nolan did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. (*See* Dkt. No. 105 at ¶ 47 [Pl.'s Rule 7.1 Response Statement].) In support of his purported denial, Plaintiff cites his affirmation that he personally observed O'Connor go to Nolan and Culkin for advice on how to perform his duties as Commissioner. (*See* Dkt. No. 106 at ¶ 42 [Pl.'s Aff.].) Plaintiff has failed to identify any evidence of Nolan's participation in his termination, either directly or by communication or encouragement of a decision maker.

For these reasons, Defendants' motion for summary judgment as it relates to Plaintiff's claims for discriminatory and/or retaliatory termination is granted.

Finally, the Court notes that Plaintiff has identified no evidence of a causal connection between his DHR complaints and the alleged adverse actions. There is no direct evidence of retaliatory motive on behalf of any decision maker. Moreover, there is no temporal proximity between Plaintiff's complaints and the adverse actions. For example, Plaintiff complained to DHR in March 2008, but the next adverse action did not occur until January 2009. Also, Plaintiff was terminated an entire year after his February 2009 DHR complaint. For these reasons, in addition to those asserted by Defendants in their memoranda of law, Plaintiffs' retaliation claims are dismissed.

Because the Court dismisses Plaintiff's claims for the absence of a question of material fact as to the substantive elements of those claims, the Court need not address the remainder of Defendants' arguments for dismissal, such as failure to exhaust and failure to file a notice of claim.

**ACCORDINGLY,** it is

**ORDERED** that the Defendants' motion for summary judgment (Dkt. No. 95) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's claims are dismissed with prejudice. The clerk is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1293527

## Footnotes

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

1 Conclusions of law in a Local Rule 7.1 Statement, even where unopposed, are not deemed admitted. *See Johnson v. Enu,* No. 08–CV–158, 2011 WL 3439179, at *1 (N.D.N.Y. July 13, 2011) (Homer, M .J.), *adopted in its entirety by,* 2011 WL 3439524 (N.D.N.Y. Aug. 5, 2011) (Scullin, J.).

2 Plaintiff asserts that he began working for the City on October 3, 1988 as a “Laborer I” for the Department's Sanitation Bureau. (*See* Dkt. No. 108, at 44–45 [Dep. of Guynell Wright, Jan. 18, 2013].) However, events which occurred prior to June of 2006 are irrelevant to the resolution of the pending motion since the longest statute of limitations applicable to any of the claims in this action is four years. *See James v. Countrywide Fin. Corp.,* 849 F.Supp.2d 296, 317–318 (E.D.N.Y.2012) (finding that four-year statute of limitations set forth in 28 U.S.C. § 1658(a) applies to employment discrimination and retaliation claims brought pursuant to 42 U.S.C. § 1981); *Asanjarani v. City of New York,* No. 09–CV–7493, 2011 WL 4343687, at * 10 (Aug. 18, 2011) (statute of limitations for employment discrimination claims brought pursuant to Section 1983 is three years); *Ruggerio v. Dynamic Elec. Sys. Inc.,* No. 12–CV–100, 2012 WL 3043102, at *6 (E.D.N.Y. Jul. 25, 2012) (citing 42 U.S.C. § 2000e–5(e)(f)) (claims are timely under Title VII if an administrative complaint is filed within 300 days of the alleged discriminatory act, and a judicial action is filed within 90 days of receipt of a rightto-sue letter by the administrative body); *Sloth v. Constellation Brands, Inc.,* 883 F.Supp.2d 359, 373 (W.D.N.Y.2012) (citing N.Y.C.P.L.R. § 214(2) (McKinneys 2008)) (under Section 296, the limitations period runs for three years from the date on which an action asserting NYHRL violations is filed, but this limitations period is tolled for the period between the filing of an administrative charge and the issuance of a right-to-sue letter).

3 Plaintiff filed a complaint with the New York State Division of Human Rights (“DHR”) on March 3, 2008, in which he argued that his 20–day suspension by the City for fighting was disparate treatment based on race. On August 18, 2008, DHR dismissed the complaint based on a lack of probable cause. (*See* Dkt. Nos. 96–29 and 96–30 [Exs. CC and DD to Thompson Decl.].)

4 Plaintiff ostensibly filed a complaint with DHR on February 18, 2009, charging the City with race discrimination due to his termination. The DHR later dismissed the complaint citing a lack of evidence of unlawful discrimination. (*See* Dkt. No. 96–31 [Ex. EE to Thompson Decl.].)

5 Plaintiff's complaints were cross-filed with the United States Equal Employment Opportunity Commission (“EEOC”).

6 As the Supreme Court has famously explained, “[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts.” *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348 (1986) (citations omitted).

7 Plaintiff's counsel argues that here, this Court must apply the “universal” rule in the courts of the State of New York that allows a non-moving party to successfully oppose summary judgment with evidence that would be inadmissable at trial because some of Plaintiff's claims arise under New York law. (*See* Dkt. No. 104 at 1–2 [Pl.'s Mem. of Law].) Without commenting on the veracity of Plaintiff's counsel's interpretation of New York law in this regard, the Court notes that it is by now very well-settled law that “[t]he issue of what burden a movant for summary judgment bears when the ultimate burden of proof lies with the non-movant is procedural rather than substantive, under the distinction created by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817 (1938) and its progeny, and accordingly is subject to federal rather than state law .” *Tingling v. Great Atl. & Pac. Tea Co.,* 02–CV–4196, 2003 WL 22973452, *2 (S.D.N.Y. Dec. 17, 2003), citing *Erie R. Co. v. Tompkins.* 304 U.S. 64, 58 S.Ct. 817 (1938) and *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986) (applying federal law on defendant's burden at summary judgment stage to diversity action).

8 “The primary doctrinal differences between Title VII claims and employment discrimination claims pursuant to Sections 1981 and 1983 regard (1) the statute of limitations, (2) the requirement that Section 1981 or 1983

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) that individuals may be held liable under Sections 1981 and 1983, but not under Title VII, and (4) a Title VII claim may be established through proof of negligence, whereas Section 1981 and 1983 claims must be supported by evidence of intentional discrimination." *Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4, n. 10 (E.D.N.Y. Mar. 17, 2014) (citing *Patterson,* 375 F.3d at 225–227).

9 Although, as Defendants point out, this decision is a Report and Recommendation that was later vacated, the case was thereafter reassigned to another District Judge who adopted the Report and recommendation in full. See *See Brown v. JP Morgan Chase Bank,* No. 12–CV544, 2013 U.S. Dist. LEXIS 109700 (E.D.N.Y. Aug. 5, 2013).

10 Regarding these incidents of discipline, the Court notes Plaintiff's affirmation that in 1997, another black employee slapped his bottom in the restroom, which resulted in two separate physical altercations between Plaintiff and this other employee: one in the restroom and another later in the day when Plaintiff was on his way home from work. Plaintiff asserts that both he and the other employee were disciplined as a result. (*See* Dkt. No. 106 at 2, ¶ 8 [Pl.'s Aff.].) Plaintiff further asserts that in February 2007, Stanley Gardynski, a white employee, made humping motions with his groin at Plaintiff's head. Plaintiff admits that afterward, when Gardynski was provoking him again, Plaintiff hit him. Both Plaintiff and Gardynski were disciplined as a result. (*Id.* at 3, ¶ 13.)

11 Plaintiff also put in a bid for a gardener position in the Parks and Recreation Department.

12 In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies that Nolan was not the decision maker regarding the discipline he received between 2006 and 2009. (*See* Dkt. No. 105 at ¶ 68 [Pl.'s Rule 7.1 Response Statement] .) In support of this purported denial, Plaintiff asserts that Commissioner Wright relied on Defendants Nolan and Culkin to make the final determination regarding discipline. However, Plaintiff cites a portion of his deposition testimony that does not support this assertion. Accordingly, this fact is deemed admitted.

13 At his deposition, Plaintiff testified that he did not believe that O'Connor or Thompson decided to terminate him because he is black. (*See* Dkt. No. 108 at 222 [Pl.'s Dep.].) Plaintiff testified that he thought Thompson retaliated against him for making complaints of discrimination because Thompson "never helped me out" when Plaintiff would go to him with problems. (*Id.* at 222–223.) Finally, at his deposition, Plaintiff testified that the only involvement Simone had was being present at meetings and that "[h]e didn't do anything, really." (*Id.* at 247.)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4297662
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.), Plaintiff,
v.
Ann ANISA Ali, Hallima Ali, Robert Ramcharitar, and Stephen Ali, Defendants.

22-CV-1001 (SIL)
|
Signed September 26, 2024

**Attorneys and Law Firms**

Owen Andrew Kloter, Sichenzia Ross Ference Carmel LLP, New York, NY, for Plaintiff.

Robert Ramcharitar, Wellington, FL, Pro Se.

Stephen Ali, Port Saint Lucie, FL, Pro Se.

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

STEVEN I. LOCKE, United States Magistrate Judge:

***1** The following constitutes the Court's Fed. R. Civ. P. 52 findings of fact and conclusions of law in this life insurance proceeds-interpleader action, following a bench trial held on January 30, 2024. *See* DE [53] (citations to the trial transcript are to "Tr."). At its core, this case is about two brothers' competing claims to the proceeds of their deceased mother's life insurance policies.

Decedent Zaimoon Ali ("Zaimoon") held two life insurance policies with Plaintiff John Hancock Life Insurance Company (U.S.A.) ("John Hancock"), the proceeds of which total $89,052.07. *See* Complaint ("Compl."), DE [1]; Amended Receipt, DE [31]. On February 24, 2022, John Hancock commenced this interpleader action requesting that the Court resolve the conflicting claims of the defendants: (i) Stephen Ali ("Stephen"), Zaimoon's son; (ii) Robert Ramcharitar ("Ramcharitar"), also Zaimoon's son; (iii) Ann Anisa Ali ("Anisa"), Zaimoon's niece; and (iv) Hallima Ali ("Hallima"), Stephen's ex-wife and Zaimoon's former daughter-in-law. *See* Compl., DE [1]. Only Ramcharitar and Stephen answered the Complaint, *see* DEs [12], [40], and the Clerk of Court issued certificates of default against Anisa and Hallima. *See* DE [16]. On March 28, 2023, the parties stipulated to John Hancock depositing $93,459.90 plus interest, minus $5,000 in attorneys' fees and costs, with the registry of the Court. *See* Minute Order, DE [30]. On April 3, 2023, John Hancock deposited $89,052.07 with the Court, representing the proceeds of the relevant policies, plus interest, less attorneys' fees and costs. *See* Amended Receipt, DE [31]; Declaration of Owen Andrew Kloter, DE [33]; Minute Order dated May 2, 2023, DE [35]. John Hancock was dismissed from the case on August 30, 2023. *See* Elec. Order dated Aug. 30, 2023.

## I. FINDINGS OF FACT [1]

On October 7, 1991, while living in New York and holding a New York bank account, Zaimoon applied to John Hancock Mutual Life Insurance Company [2] for a life insurance policy, which bore the number XXXXXX230 ("Policy 230"). Exhibit ("Ex.") 20; Tr. 82:10-15, 113:19-20, 136:13-14, 159:20-161:3. Zaimoon held a second life insurance policy with John Hancock bearing the number XXXXXX688 ("Policy 688"), although the application for Policy 688 is not in the trial record. In her application for Policy 230, she elected as beneficiaries her "husband if living, otherwise, Stephen S. Ali, son[;] Teddy I. Ali, son[; and] Robert R. Ramcharitar" in "equal shares or [to] the survivor[.]" Ex. 20 at 3. Zaimoon's husband predeceased her. Tr. 10:9-18.

On May 9, 2000, Zaimoon executed a change of beneficiary form with respect to Policy 230, naming as beneficiaries her sons Stephen, Teddy I. Ali ("Teddy"), and Ramcharitar, equally or to the survivor, if any. Ex. 1 at 2. Then, seventeen years later, on December 5, 2017, Zaimoon executed another change of beneficiary form applicable to both Policy 230 and Policy 688 (collectively, "the Policies"), identifying Stephen, Teddy, and Ramcharitar as primary beneficiaries, each entitled to "33 1/3 %" of the proceeds of those policies (the "December 5, 2017 Change of Beneficiary Form"). *See* Exs. 2, 21. At some time prior to December 13, 2017, Zaimoon moved from New York to live with Teddy in Port St. Lucie, Florida. Tr. 136:5-14; *see* Ex. 2. In 2020, Teddy passed away. Tr. 109:24-110. On May 8, 2020, Zaimoon changed the beneficiary distribution of the Policies, so that Stephen and Ramcharitar would each receive approximately one-third of the proceeds, and Anisa would receive a portion of the remaining balance. Tr. 11:4-13, 110:9-14, 136:22-137:3.

***2** On September 13, 2021, Zaimoon executed a notarized quitclaim deed (the "Deed") granting Stephen title to a house at 1038 SW Whittier Terrace, Port St. Lucie, Florida, 34953. Ex. 4; Tr. 6:18-20, 184-24, 136:5-11. Around the same time, she was diagnosed with breast cancer and admitted into a hospital, identified in the record only as "Tradition." Tr. 19:25-20:14, 23:8-18, 140:15-23. On or around October 9, 2021, she was admitted to a hospice called Trustbridge in Palm Beach County, Florida. Tr. 25:14-26:11; Ex. 10 at 1. Ramcharitar offered testimony that Zaimoon was not administered morphine at Trustbridge. *See* Tr. 29:3-7, 30:7-12, 67:3-7. The Court nevertheless rejects this testimony in light of medical records to the contrary demonstrating that Zaimoon received subcutaneous morphine intermittently at Trustbridge, including on October 9, 2021. Ex. 10 at 1, 2, 4. Nevertheless, Zaimoon was described as "alert" and "oriented" by Trustbridge medical personnel on October 9, 10 and 20, 2021. Ex. 10 at 2, 3, 7. Further, Zaimoon was visited by hospital volunteers on October 14, October 15, October 18, and October 21, 2021. Ex. 9. These volunteers described her as "alert and responsive" on October 14 and October 21, 2021; and "awake and alert" on October 18, 2021. *Id.* at 1, 3-4. The volunteer who visited her on October 15, 2021, Joseph Zarcone, stated that "Zaimoon and [he] spoke, and she offered [him] her life advice," as well as her "experiences of living in New York City." *Id.* at 2. Moreover, Sheryl Ali ("Sheryl"), Zaimoon's niece, testified that she spoke to Zaimoon on the phone "every day" between September and November 2021, with their final communication occurring two days before Zaimoon's death. Tr. 123:8-17. During these conversations, Sheryl testified, Zaimoon was "mentally ... competent" and "talk[ed] ... normal[ly]." Tr. 123:25-124:8. Sheryl further emphasized that there was "no" difference in her cognitive ability, and that Zaimoon's illness was not apparent during their communications. Tr. 124:3-12. Anisa and Zaimoon also spoke on the phone and via Facetime frequently, often multiple times a day. Tr. 97:25-98:2, 101:6-20. During these calls, Zaimoon communicated clearly and did not "appear confused at any time." Tr. 98:3-10.

Shortly before October 15, 2021, Ramcharitar and Zaimoon called John Hancock and requested to change the beneficiaries on the Policies. Ex. 6, Recording of Undated Phone Call; Tr. 36:22-37:3.[3] During that phone call, Zaimoon stated that Ramcharitar was authorized to speak on her behalf and explained that he was helping her because she was in a hospital bed, but that she wanted to complete the policy changes herself. Ex. 6. She also carefully spelled her name at the operator's request, articulated her date of birth, and stated the last four digits of her Social Security Number. *Id.* Ramcharitar explained to the operator that he needed to hold the phone for Zaimoon. *Id.*

The operator informed Zaimoon and Ramcharitar that beneficiary designation changes could not be completed over the phone, and Ramcharitar and the operator discussed the form required to change a beneficiary designation. *Id.* On October 15, 2021, while Zaimoon was in hospice, Ramcharitar filled out and Zaimoon signed a change of beneficiary form on Policy 688 and Policy 230 ("October 15, 2021 Change of Beneficiary Form"), so that Ramcharitar would receive 90% of the proceeds, and Anisa and Hallima Ali ("Hallima"), Stephen's ex-wife, would receive five percent each, but Stephen would receive no proceeds. Ex. 3 at 5-6; Ex. 11; Tr. 27:17-20, 39:22-40:4. Zaimoon's signature was witnessed by an unidentified individual. *See* Ex. 3 at 8; Tr. 40:5-9. The next day, on October 16, 2021, Zaimoon executed a power of attorney (the "Power of Attorney") in favor of Ramcharitar. Ex. 5, Tr. 26:23-27:20. On October 20, 2021, John Hancock mailed Zaimoon a letter confirming that the changes requested in the October 15, 2021 Change of Beneficiary Form were in effect. Ex. 11.

In late October 2021, Zaimoon left a series of voicemails on Stephen's telephone. *See* Exs. 15-19. Initially, on October 22, 2021, Zaimoon left a largely inaudible voicemail in which she sounds distressed, asking Stephen to come see her at Trustbridge. Ex. 19. In a voicemail dated October 24, 2021, Zaimoon asked Stephen to return her call and stating "something going on there. I need you to know what is going on," but not explaining what was "going on." Ex. 15. On October 25, 2021, Zaimoon left a voicemail to Stephen asking him to explain what a power of attorney is, stating that she "[did not] know what [Ramcharitar] want[ed] to do with" the Power of Attorney, and asking if a power of attorney is "a good paper." Ex. 16. On October 28, 2021, Zaimoon left another voicemail, which is difficult to understand, during which she became increasingly upset. Ex. 17. In this voicemail, Zaimoon stated that she had "no more money to give to Robert" and explained that Ramcharitar frequently asked for her "ATM card" to withdraw money from an ATM machine. *Id.* Further, Zaimoon stated that "everything [was] money, money, money" with respect to Ramcharitar, and that he had offered to order her checks, which she declined. *Id.* Zaimoon explained that she had "no wallet" with her and repeatedly asked Stephen to come visit her. Finally, Zaimoon stated that "Robert ... [took] advantage of [her]." *Id.* On October 29, 2021, Zaimoon left Stephen the


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

final voicemail in evidence, which is largely inaudible, asking him to "bring some stuff to wash [her] hair" because her "head [was] stinking." Ex. 18.

***3** Approximately two weeks after Zaimoon executed the Power of Attorney, on or around November 1, 2021, she was moved to a second hospice facility (the "Second Hospice Facility"), the name of which is not in the trial record. Tr. 68:6-17. Ramcharitar did not alert Stephen to Zaimoon's relocation. Tr. 63:17-64:7. She was administered morphine at the Second Hospice Facility. Tr. 67:8-18, 68:11-12. In an undated video taken there, Zaimoon spoke to Ramcharitar and identified him, by name, as her "last son." Ex. 13. In that video, Zaimoon confirmed that she "g[a]ve that power [of attorney] to ... Robert," and that she gave Ramcharitar her debit card to purchase and bring her supplies. *Id.* She was being treated with morphine at the time of that video. Tr. 67:8-17. Sheryl and Anisa, Zaimoon's nieces, testified that Ramcharitar used Zaimoon's debit card to purchase items that Zaimoon needed. Tr. 102:11-16, 127:10-17. On November 6, 2021, Zaimoon executed a Designation of Health Care Surrogate, authorizing Ramcharitar to "make health care decisions and to provide, withhold, or withdraw consent on [her] behalf," among other powers, and designating Anisa as her alternate surrogate. Ex. 12 at 1; Tr. 48:11-16. Anisa visited Zaimoon in person in mid- to late November 2021, for approximately four days, during which time Zaimoon was "very" lucid. Tr. 96:18-22. Zaimoon passed away on December 2, 2021. Tr. 82:15.

At present, Stephen and Ramcharitar live in Florida, while Anisa and Hallima live in New York. *See* Tr. 1, Appearances, 100:8-9; Ex. 3 at 5.

## II. CONCLUSIONS OF LAW

Having found the facts above based on the credible evidence, the Court now evaluates Defendants Ramcharitar's, Stephen's, Anisa's and Hallima's entitlement to the proceeds of the Policies. "[I]nterpleader is designed to protect stakeholders from undue harassment in the face of multiple claims against the same fund, and to relieve the stakeholder from assessing which claim among many has merit." *JP Morgan Chase Bank, NA v. Meged Funding Grp. Corp.*, No. 23-CV-2605, 2024 WL 3995052, at *3 (E.D.N.Y. Aug. 29, 2024) (citation omitted). An interpleader complaint "generally involves a two-stage inquiry": at the first stage, the stakeholder must "demonstrate that the requirements for interpleader have been met and that it is entitled to a discharge." *Id.* (citation omitted). Next, the Court "determines the adverse claims between the claimants." *Id.* Because John Hancock has already been discharged from the case, *see* Elec. Order dated Aug. 30, 2023, the Court turns to each relevant individual's entitlement to the proceeds of the Policies.

Ramcharitar claims entitlement to 90% of the life insurance proceeds, with the remaining ten percent divided evenly between Anisa and Hallima, based on the October 15, 2021 Change of Beneficiary Form. *See* Tr. 164:6-13; Ex. 3 at 5. Stephen, on the other hand, asserts a number of affirmative defenses, seeking to invalidate the October 15, 2021 Change of Beneficiary Form, and asks the Court to distribute the proceeds of the Policies according to the December 5, 2017 Change of Beneficiary Form instead. *See* Answer of Stephen Ali, DE [40], at 2.

### A. Anisa's and Hallima's Default

Initially, Hallima and Anisa failed to answer the Complaint or otherwise defend the action, and so on April 22, 2022, the Clerk of Court issued certificates of default against them. *See* DE [16]. In an interpleader action, a defaulting claimant is not entitled to proceeds. *See Great Am. Ins. Co. v. Gold Coast Exp. Inc.*, No. 12-CV-4847, 2015 WL 1039770, at *3 (E.D.N.Y. Mar. 10, 2015) (" 'The failure of a named interpleader defendant to answer the interpleader complaint and assert a claim to the res can be viewed as forfeiting any claim of entitlement that might have been asserted.' ") (citing *Metro. Life Ins. Co. v. Little*, No. 13-CV-1059, 2013 WL 4495684, at *2 (E.D.N.Y. Aug. 17, 2013)); *JP Morgan Chase Bank, NA v. Meged Funding Grp. Corp.*, No. 23-CV-2605, 2024 WL 3995052, at *3 (E.D.N.Y. Aug. 29, 2024); *Chicago Title Ins. Co. v. Lumbermens Mut. Cas. Co.*, No. 22-CV-00768, 2022 WL 19520885, at *3 (E.D.N.Y. Dec. 23, 2022); *Wells Fargo Bank, N.A. v. Krenzen Auto Inc.*, No. 19-CV-5329, 2021 WL 695122, at *3 (E.D.N.Y. Feb. 23, 2021). Accordingly, neither Anisa nor Hallima are entitled to any portion of the proceeds of the Policies, and the Court must determine the proper beneficiary between Stephen and Ramcharitar.

### B. Stephen's Affirmative Defenses

***4** Turning to Stephen's affirmative defenses, because he proceeds *pro se*, the Court liberally construes these affirmative defenses and interprets them to raise the strongest arguments they suggest. *See Courchevel 1850 LLC v.*

*Rodriguez*, No. 17-CV-6311, 2019 WL 2233828, at *5 (E.D.N.Y. May 22, 2019).

New York law applies here. A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012). Accordingly, the Court applies New York choice-of-law rules here. "New York looks to the 'center of gravity' of a contract," including an insurance policy, to determine choice of law. *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018) (citation omitted). "The two most important factors under New York law are the place of contracting," that is, "the state in which the policy was negotiated, contracted, and signed," and "the place of performance," that is, "the location where the premiums are billed and a claim on the policy is made." *Id.* (citations omitted). Under New York law, "where the insured risk is scattered throughout multiple states, New York courts deem the risk to be located principally in one state, namely, in the state of the insured's domicile at the time the policy was issued." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 642 (2d Cir. 2016) (citation omitted).

Here, Zaimoon lived in New York when she applied for Policy 230. Ex. 20. As explained above, the application for Policy 688 is not in the record. Prior to her move from New York to Florida on a date uncertain, Zaimoon held a New York bank account, from which she presumably paid premiums. Tr. 113:19-20, 136:13-14. Two possible beneficiaries to the Policies, Stephen and Ramcharitar, live in Florida, while the other two, Anisa and Hallima, live in New York. *See* Tr. 1, Appearances, 100:8-9; Ex. 3 at 5. While Florida and New York both have an interest in the litigation, the Court applies New York law in analyzing Stephen's affirmative defenses of duress, undue influence, lack of capacity, and fraud in the inducement, principally because Zaimoon was domiciled in New York when she applied for Policy 230. *See Fireman's Fund Ins. Co.*, 822 F.3d at 642 (2d Cir. 2016).

### *1. Duress and Undue Influence*

Initially, Stephen asserts duress and undue influence as separate affirmative defenses, and seeks to invalidate the October 15, 2021 Change of Beneficiary Form under these theories. *See* Answer, DE [40], at 2. For the reasons set forth below, Stephen has failed to meet his burden.

Under New York state law, a party alleging duress may "void a contract ... when it establishes that it was compelled to agree to the contract terms because of a wrongful threat by the other party which precluded the exercise of its free will." *805 Third Avenue Co. v. M.W. Realty Assoc.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 780 (1983) (internal citations omitted). New York courts recognize duress by "physical compulsion, by threat, or by the exercise of undue influence." *Silver v. Starrett*, 176 Misc. 2d 511, 516, 674 N.Y.S.2d 915, 919 (Sup. Ct. N.Y. Cty. 1998) (citing *Evans v. Waldorf-Astoria Corp.*, 827 F. Supp. 911, 913 (E.D.N.Y. 1993), *aff'd*, 33 F.3d 49 (2d Cir. 1994)). Because Stephen offers no testimony or evidence that Ramcharitar physically compelled or threatened Zaimoon, the Court construes Stephen's duress defense as an affirmative defense based on duress *via* undue influence and considers the two theories together.

***5** A party contesting a change of beneficiary designation in an insurance policy on grounds of undue influence must show "(1) the existence and exertion of an influence; (2) the effective operation of such influence as to subvert the mind at the time the transaction occurred; and (3) the execution of the transaction that, but for undue influence, would not have happened." *New York Life Ins. Co. v. Brown*, 19-CV-09437, 2021 WL 325857, at *6 (S.D.N.Y. Feb. 1, 2021) (citation omitted). To prove that a policyholder was unduly influenced, the party asserting the theory must show that another party "restrained [the policyholder's] independent action and destroyed free agency." *In re Zirinsky*, 43 A.D.3d 946, 947-48, 841 N.Y.S.2d 637, 639 (2d Dep't 2007) (citing *In re Walther's Will*, 6 N.Y.2d 49, 53, 188 N.Y.S.2d 168, 172 (1959)). Further, the party challenging the change of beneficiary designation must show more than opportunity and motive to exercise undue influence: he must prove "that such influence was actually utilized." *Brown*, 2021 WL 325857, at *6. "While undue influence may be proved by circumstantial evidence, the circumstances must lead to it not only by fair inference but as a necessary conclusion." *Id.* (citation omitted).

Stephen has not met his burden to prove that Ramcharitar "restrained" Zaimoon's "independent action" or "destroyed [her] free agency" with respect to the relevant beneficiary change. *See In re Zirinsky*, 43 A.D.3d at 947-48, 841 N.Y.S.2d at 639. Zaimoon called John Hancock, requesting to change the beneficiaries of the Policies, and authorized Ramcharitar to speak on her behalf. Ex. 6. The is no evidence in the trial record that Ramcharitar even asked Zaimoon to make that phone call, let alone influenced her to do so. Moreover,

while Ramcharitar filled out the October 15, 2021 Change of Beneficiary Form, *see* Tr. 39:22-40:4, Zaimoon signed it, which signature was witnessed by an unidentified individual. Ex. 3 at 8.

In his attempt to prove that Ramcharitar unduly influenced their mother, Stephen points to the voicemails she left Stephen in late October 2021. *See* Stephen Ali Closing Statement, DE [56]. While Zaimoon did leave Stephen a voicemail on October 28, 2021 complaining that Ramcharitar was focused on "money, money, money" and asked for her debit card, *see* Ex. 17, this topic of this voicemail was Ramcharitar's purchases with that card and his offer to order her more checks, not on the October 15, 2021 Change of Beneficiary Form. Moreover, both Sheryl and Anisa testified that Ramcharitar purchased necessities for his mother, Tr. 102:11-16, 127:10-17, and Zaimoon explained in a video recording that she gave him her card to buy her items she requested. *See* Ex. 13. Accordingly, the October 28, 2021 voicemail, Ex. 17, does not establish undue influence.

The other three voicemails, Exs. 15, 16, and 18, are even less probative. In a voicemail dated October 24, 2021, Zaimoon asked Stephen to return her call and stating "something going on there. I need you to know what is going on," without any context. Ex. 15. Her October 25, 2021 voicemail explicitly concerned the Power of Attorney and did not reference the Policies. Ex. 16. Finally, on October 29, 2021, Zaimoon asked Stephen "bring some stuff to wash [her] hair" because her "head [was] stinking." Ex. 18. The rest of that voicemail is inaudible. None of the voicemails, either separately or together, establish undue influence as an affirmative defense invalidating the October 15, 2021 Change of Beneficiary Form, or that Zaimoon was influenced in any way on the date she executed that form.

### *2. Lack of Capacity*

Next, Stephen asserts lack of capacity as an affirmative defense. *See* Answer, DE [40], at 2. For the reasons set forth below, the Court finds that Stephen has not carried his burden here either.

"In evaluating mental capacity, New York courts apply two different standards: one for contracts and one for testamentary instruments." *Brown*, 2021 WL 325857, at *6 (citation omitted). "The law is unclear with respect to which standard applies to beneficiary changes under a life insurance policy." *Id.*; *see Metro. Life Ins. Co. v. Giscombe*, No. 19CV4463, 2022 WL 2467066, at *10 (E.D.N.Y. Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 2704572 (E.D.N.Y. July 12, 2022). Because "[t]he contract standard is more exacting than the testamentary standard," a policyholder who is capable of making beneficiary changes to her life insurance policy under the contract standard is capable under both. *Brown*, 2021 WL 325857, at *6; *see Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 326 (S.D.N.Y. 2014) ("The capacity standard for making a will is less rigorous than the competence standard for making a contract, as a will is sometimes made by a person who is ill and facing death.") (citation omitted); *Sun Life Assur. Co. of Canada (U.S.) v. Gruber*, No. 05-CV-10194, 2007 WL 4457771, at *14 (S.D.N.Y. Dec. 14, 2007), *aff'd sub nom. Sun Life Assur. Co. of Canada v. Gruber*, 334 F. App'x 355 (2d Cir. 2009) ("In this case, we consider only the contractual standard, since if [the policyholder] would be deemed capable of designating a beneficiary under the contractual standard, he would necessarily meet the less demanding testamentary standard.").

***6** "In contract disputes, the test for a person's mental capacity is whether the person's mind was 'so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction.' " *Quinio v. Aala*, 344 F. Supp. 3d 464, 478-79 (E.D.N.Y. 2018) (citing *Rudolf Nureyev Dance Foundation v. Noureeva-Francois*, 7 F.Supp.2d 402, 416 (S.D.N.Y. 1998)). " 'People who observe the [person] daily—family members, teachers, employers—are often most familiar with his or her capacity to cope with challenge and can illuminate for the jury' that person's ability (or inability) to enter into a contract." *Id.* (citing *People v. Cratsley*, 86 N.Y.2d 81, 87-88, 629 N.Y.S.2d 992, 996 (1995)). "Under the contract standard[,] a person is presumed competent at the time of the performance of the challenged action and the burden of proving incompetence rests with the party asserting incapacity." *Brown*, 2021 WL 325857, at *7. Incapacity must be demonstrated at the time of the challenged transaction. *Feiden v. Feiden*, 151 A.D.2d 889, 890, 542 N.Y.S.2d 860, 862 (3rd Dep't 1989).

Here, the overwhelming weight of evidence points to Zaimoon's capacity to enter into a contract on October 15, 2021. Initially, Zaimoon is presumed to have had the mental capacity to make the relevant beneficiary changes. *Brown*, 2021 WL 325857, at *7. Trustbridge medical personnel described her as "alert" and "oriented" on October 9, 10 and 20, 2021. Ex. 10 at 2, 3, 7. Notably, Dr. Antonio Mendez

described her as "alert" and "oriented" on October 9, the same day that she was administered morphine, and so the record does not reflect that her capacity was impacted at that time. *See id.* at 1-2. Further, Zaimoon was visited by volunteers on October 14, 15, 18, and 21, 2021, who described her as "alert and responsive" on October 14 and 21, 2021; and "awake and alert" on October 18, 2021. Ex. 9 at 1, 3-4. The volunteer who visited her on October 15, the day she executed the relevant change of beneficiary designation, stated that "Zaimoon and [he] spoke, and she offered [him] her life advice," as well as her "experiences of living in New York City." *Id.* at 2.

Moreover, both Sheryl and Anisa, who spoke with Zaimoon daily, insisted that she was lucid during the relevant period. *See* Tr. 106:3-4, 123:12-14. Sheryl testified that Zaimoon was "mentally ... competent" and "talk[ed] ... normal[ly]." Tr. 123:25-124:8. Sheryl further emphasized that there was "no" difference in her cognitive ability, and that Zaimoon's illness was not apparent during their communications. Tr. 124:3-12. As for Anisa, she testified that Zaimoon communicated clearly with her and did not "appear confused at any time." Tr. 98:3-10. Further, on the phone call that Ramcharitar and Zaimoon placed to John Hancock requesting to change her beneficiary designations, Zaimoon articulated her date of birth, spelled her full name and stated the last four digits of her Social Security Number without confusion or hesitation. Ex. 6. This clarity of speech leads the Court to conclude that Zaimoon had mental capacity to change the beneficiary designations of the Policies on October 15, 2021.

While Zaimoon did sound distressed and confused on later voicemails she left Stephen, *see* Exs. 15-19, these voicemails were left one to two weeks after October 15, 2021, and are therefore insufficient to establish lack of capacity. *See Feiden*, 151 A.D.2d at 890, 542 N.Y.S.2d at 862 (under New York law, incapacity must be demonstrated at the time the challenged contract was formed). Moreover, these voicemails, as explained above, do not address the changes to the Policies' beneficiary designations at all. Therefore, they do not demonstrate her inability to "understand the nature of the transaction" at issue. *Quinio v. Aala*, 344 F. Supp. 3d 464, 478-79 (E.D.N.Y. 2018). Accordingly, the Court concludes that Stephen has failed to meet his burden as to this affirmative defense.

### *3. Fraud in the Inducement*

***7** Finally, Stephen asserts an affirmative defense of fraud in the inducement for the first time in his closing statement. *See* Stephen Ali Closing Statement, DE [56]. Generally, courts do not consider new theories of liability or recovery raised for the first time at trial. *See Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 285 (E.D.N.Y. 2012), *aff'd*, 519 F. App'x 724 (2d Cir. 2013); *Andrus v. Juniper Grp., Inc.*, No. 08-CV-1900, 2011 WL 4532694, at *4 (E.D.N.Y. Sept. 26, 2011). Courts considering whether to amend pleadings post-trial to include a new cause of action primarily consider whether the opposing party would be prejudiced by such an amendment. *See Monz*, 853 F. Supp. 2d at 285 ("[T]o allow Plaintiff to raise and argue a new theory of recovery at trial would seriously prejudice Defendants who had no opportunity to conduct discovery with respect to this issue or develop a defensive strategy."); *Andrus*, 2011 WL 4532694, at *4 (concluding that Defendant would be prejudiced by Plaintiff's introduction of alter-ego liability on the morning of trial); *Alberts v. City of New York*, 549 F. Supp. 227, 229 (S.D.N.Y. 1982).

"To maintain a cause of action for fraudulent inducement of contract, a plaintiff must show a material representation, known to be false, made with the intention of inducing reliance, upon which it actually relied, consequentially sustaining a detriment." *Frank Crystal & Co. v. Dillmann*, 84 A.D.3d 704, 704, 925 N.Y.S.2d 430, 431 (1st Dep't 2011). The essence of Stephen's fraudulent inducement defense is that Ramcharitar filled out the October 15, 2021 Change of Beneficiary Form without following Zaimoon's wishes, "ma[d]e the beneficiary changes without [his] mother's knowledge," "gave himself ... 90%" of the proceeds of the Policies, and then deceived Zaimoon into signing it. *See* Stephen Ali Closing Statement, DE [56], at 2-3. Stephen's answer contains no indication that he intended to raise this defense. *See* Answer, DE [40]. Moreover, at trial, Stephen only briefly reached the issue of why Ramcharitar, and not Zaimoon, filled out the October 15, 2021 Change of Beneficiary Form. *See* Tr. 72:14-73:20. This short line of cross-examination did not put Ramcharitar on notice that Stephen intended to prove that Ramcharitar had made a "material representation, known to be false" to Zaimoon about what the form she was signing actually said. *See Frank Crystal & Co.*, 84 A.D.3d at 704, 925 N.Y.S.2d at 431. Accordingly, the Court concludes that Ramcharitar would be prejudiced if Stephen were permitted to raise this affirmative defense post-trial, and declines to consider it. Moreover, even if the affirmative defense was properly pled, there was no evidence of a material misrepresentation or reliance at trial, and so the claim fails on the merits in any event.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that Robert Ramcharitar is entitled to the proceeds of the Policies, totaling $89,052.07. Further, the Court rejects Stephen Ali's affirmative defenses in their entirety for failure to carry their burden of proof, and, in the case of the defense of fraudulent inducement, for failure to introduce that defense prior to trial.

### All Citations

Not Reported in Fed. Supp., 2024 WL 4297662

## Footnotes

1 In order to save costs, this trial was conducted entirely by video conference, with the consent of the parties.

2 John Hancock later did business as, *inter alia*, John Hancock Life Insurance Company (U.S.A.). *See* Ex. 2.

3 Both Ramcharitar and Stephen offer recordings of Zaimoon prior to her death as evidence. *See* Exs. 6, 13, 15-19. Although these recordings implicate hearsay rules, neither party objected to their admission, and so any such objection is waived. *See* *Atl. Specialty Ins. Co. v. Coastal Env't Grp.*, 368 F. Supp. 3d 429, 452 (E.D.N.Y. 2018), *aff'd*, 945 F.3d 53 (2d Cir. 2019).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,
v.
Jose D. ORTIZ, Executive Officer Chase JP Morgan Chase & Co., and James Simon, Manager Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase & Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co., New York, NY.

## MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTING, District Judge.

## I. INTRODUCTION

***1** Plaintiff *pro se* Alexander McFadden ("McFadden"), an inmate at the Southport Correctional Facility ("SCF"), filed this action pursuant to 42 U.S.C. § 1983. In his complaint, Plaintiff appears to allege that Defendants, two executives of Chase JP Morgan Chase & Co. ("Chase"), violated his constitutional rights through conduct that, in some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter issued an Order and ReportRecommendation, recommending that the Court dismiss Plaintiff's complaint in its entirety with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5. Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's August 7, 2012 Order and ReportRecommendation.

## II. BACKGROUND

In his Order and Report–Recommendation dated August 7, 2012, Magistrate Judge Baxter recommended that Plaintiff's motion to proceed *in forma pauperis* ("IFP") should be denied by the Court and, upon review of the complaint, that this action be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9. Further, Magistrate Judge Baxter recommended that if the Court approves his report, the Court should certify that any appeal from this matter will not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's Order and ReportRecommendation recommends that because there is no indication that either Defendant acted under "color of state law," and because there are no allegations that either or both Defendants "conspired" with any state actors to bring this action under section 1983, Plaintiff's complaint should be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New York Penal Law by offering false documents for filing, tampering with public records, and falsifying business records, Magistrate Judge Baxter recommended that because there is no private right of action to enforce either state or federal criminal statutes, Plaintiff is barred from bringing a claim to enforce these provisions of the New York State Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this Court hold that, due to Plaintiff's failure to state a claim under 42 U.S.C. § 1983 upon which relief can be granted, combined with the courts inability to determine what venue might be appropriate, Plaintiff's motion for IFP should be denied, and Plaintiff's complaint should be dismissed in its entirety with prejudice pursuant 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and Report–Recommendation, Plaintiff simply provides the Court with language from various cases discussing various types of objections and the Court's authority to review unpreserved errors. *See* Dkt. Nos. 14, 15.

## III. DISCUSSION

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**A. Review of a magistrate judge's decision**

***2** If a party files specific objections to a magistrate judge's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. *In Forma Pauperis* application**

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information. However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

**C. Sufficiency of the complaint**

***1. Legal Standard***

***3** In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

***2. Application***

***a. Color of state law***

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals,* Inc., No. 08–CV–0430, 2009 WL 3068217, *1 (2d Cir. Sept. 28, 2009); *see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish

their personal involvement in any alleged constitutional deprivation. *See* *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

***b. Criminal statutes***

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See* *Abrahams v. Incorporated Village of Hempstead,* No. 08–CV–2584, 2009 WL 1560164, *8 (E.D.N.Y. June 2, 2009) (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo,* that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

***4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

***c. Venue***

Venue in federal-question cases is generally determined by 28 U.S .C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

***d. Leave to amend***

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also* *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

***5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

## IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1789593

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.